## COMPOSITE EXHIBIT B  TO
## MOTION FOR RELIEF FROM STAY

## CREDIT AND SECURITY AGREEMENT DATED APRIL 26, 2019

**CREDIT AND SECURITY AGREEMENT**

**dated as of April 26, 2019**

**by and among**

**EXAMINATION MANAGEMENT SERVICES, INC.**

**EMSI HOLDING COMPANY,**

**EMSI ACQUISITION, INC.**

**each as Borrower, and collectively as Borrowers,**

**and**

**MIDCAP FINANCIAL TRUST,**

**as Administrative Agent and as a Lender,**

**and**

**THE ADDITIONAL LENDERS**

**FROM TIME TO TIME PARTY HERETO**



## CREDIT AND SECURITY AGREEMENT

**THIS CREDIT AND SECURITY AGREEMENT** (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "**Agreement**") is dated as of April 26, 2019 by and among **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation, **EMSI HOLDING COMPANY,** a Delaware corporation, **EMSI ACQUISITION, INC.**, a Delaware corporation and any additional borrower that may hereafter be added to this Agreement (each individually as a "**Borrower**", and collectively as "**Borrowers**"), **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, individually as a Lender, and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender.

## RECITALS

Borrowers have requested that Lenders make available to Borrowers the financing facilities as described herein. Lenders are willing to extend such credit to Borrowers under the terms and conditions herein set forth.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, Lenders and Agent agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1**    Certain Defined Terms.  The following terms have the following meanings:

"**Acceleration Event**" means the occurrence of an Event of Default (a) in respect of which Agent has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 10.2, (b) pursuant to Section 10.1(a), and in respect of which Agent has suspended or terminated the Revolving Loan Commitment pursuant to Section 10.2, and/or (c) pursuant to either Section 10.1(e) and/or Section 10.1(f).

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**Accounts**" means, collectively, (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as defined in the UCC), any "payment intangibles" (as defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as defined in the UCC), Intellectual Property, rights, remedies, Guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing and (d) all proceeds of any of the foregoing.

"**Acquisition**" has the meaning set forth in the definition of "Permitted Acquisition".

"**Acquisition Consideration**" has the meaning set forth in the definition of "Permitted Acquisition".

"**Agent**" means MCF, in its capacity as administrative agent for itself and for Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors and assigns of MCF in such capacity.

"**Affiliate**" means, with respect to any Person, (a) any Person that directly or indirectly controls such Person, (b) any Person which is controlled by or is under common control with such controlling Person, and (c) each of such Person's (other than, with respect to any Lender, any Lender's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons.  As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Applicable Margin**" means (a) with respect to Revolving Loans and all other Obligations (other than Term Loans) three and three quarters of one percent (3.75%) and (b) with respect to any Term Loan, six and ninety-five-one hundredths of one percent (6.95%).

"**Asset Disposition**" means any sale, lease, license, transfer, assignment or other consensual disposition by any Credit Party of any asset.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"**Base LIBOR Rate**" means, for each Interest Period, the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar deposits (for delivery on the first day of such Interest Period or, if such day is not a Business Day on the preceding Business Day) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (Eastern time) two (2) Business Days prior to the commencement of such Interest Period, for a term comparable to such Interest Period, which determination shall be conclusive in the absence of manifest error.

"**Base Rate**" means the per annum rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; *provided, however,* that Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"**Blocked Person**" means any Person:  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on

2

the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

"**BOD Fees**" has the meaning set forth in the Compliance Certificate.

"**Borrower**" and "**Borrowers**" mean the entity(ies) described in the first paragraph of this Agreement and each of their successors and permitted assigns.

"**Borrower Representative**" means EMSI, in its capacity as Borrower Representative pursuant to the provisions of Section 2.9, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"**Borrowing Base**" means:

(a) the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *minus*

(b) the amount of any reserves and/or adjustments provided for in this Agreement.

"**Borrowing Base Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit C hereto.

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Washington, DC and New York City are authorized by law to close.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq*., as the same may be amended from time to time.

"**Change in Control**" means any of the following: (a) any change in the legal or beneficial ownership of the capital stock, partnership interests or membership interests, or in the capital structure, organizational documents or governing documents, of the applicable Person; (b) any pledge, assignment or hypothecation of or Lien or encumbrance on any of the legal or beneficial equity interests in the applicable Person; (c) any change in the legal or beneficial ownership or control of the outstanding voting equity interests of the applicable Person necessary at all times to elect a majority of the board of directors (or similar governing body) of each such Person and to direct the management policies and decisions of such Person; (d) the applicable Person shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of each Subsidiary of such Person; and (e) the occurrence of any "Change of Control", "Change in Control" or terms of similar import under any document or instrument governing or relating to Debt of or equity in such Person.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to this Agreement and the Security Documents, including, without limitation, all of the property described in Schedule 9.1 hereto.

"**Commitment Annex**" means Annex A to this Agreement.

3

"**Commitment Expiry Date**" means the date that is three (3) years following the Closing Date.

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit B hereto.

"**Consolidated Subsidiary**" means, at any date, any Subsidiary the accounts of which would be consolidated with those of Parent (or any other Person, as the context may require hereunder) in its consolidated financial statements if such statements were prepared as of such date.

"**Contingent Obligation**" means, with respect to any Person, any direct or indirect liability of such Person: (a) with respect to any Debt of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; (c) reserved; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for any obligations of another Person pursuant to any Guarantee or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so Guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so Guaranteed or otherwise supported.

"**Controlled Group**" means all members of any group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414(b), or (c) of the Code, or solely for purposes of Section 412 of the Code, Section 414 (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Credit Exposure**" means, at any time, any portion of the Revolving Loan Commitment, the Term Loan Commitment and of any other Obligations that remains outstanding, or any Reimbursement Obligation that remains unpaid or any Letter of Credit or Support Agreement not supported with cash collateral required by this Agreement that remains outstanding; *provided, however,* that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim, or the known existence of a claim reasonably likely to be asserted, with respect thereto.

"**Credit Party**" means any Guarantor under a Guarantee of the Obligations or any part thereof, any Borrower and any other Person (other than Agent, a Lender or a participant of a Lender), whether now existing or hereafter acquired or formed, that becomes obligated as a borrower, guarantor, surety, indemnitor, pledgor, assignor or other obligor under any Financing Document; and "**Credit Parties**" means all such Persons, collectively.

"**Debt**" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business, (d) all capital leases of such Person, (e) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such

4

obligation is otherwise an obligation of such Person, (h) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (i) all Debt of others Guaranteed by such Person, (j) off-balance sheet liabilities and/or Pension Plan or Multiemployer Plan liabilities of such Person, (k) obligations arising under non-compete agreements, and (l) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business. Without duplication of any of the foregoing, Debt of Borrowers shall include any and all Loans and Letter of Credit Liabilities.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC), an investment account, or other account in which funds are held or invested for credit to or for the benefit of any Borrower.

"**Deposit Account Control Agreement**" means an agreement, in form and substance satisfactory to Agent, among Agent, any Borrower and each financial institution in which such Borrower maintains a Deposit Account, which agreement provides that (a) such financial institution shall comply with instructions originated by Agent directing disposition of the funds in such Deposit Account without further consent by the applicable Borrower, and (b) such financial institution shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each such case expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including as to any such agreement pertaining to any Lockbox Account, providing that such financial institution shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited into such Lockbox or Lockbox Account.

"**Disqualified Equity Interests**" shall mean any equity interest that by its terms (or by the terms of any security or other equity interests into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other equity interests that would constitute Disqualified Equity Interests in each case prior to the date that is 180 days after the Termination Date.

"**Distribution**" means as to any Person (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person (except those payable solely in its equity interests of the same class), (b) any payment by such Person on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person, (c) any management fees, salaries or other fees or compensation to any Person holding an equity interest in a Borrower or a Subsidiary of a Borrower (other than reasonable and customary (i) payments of salaries and bonuses to individuals, (ii) directors fees, and (iii) advances and reimbursements to employees or directors, all in the Ordinary Course of Business), an Affiliate of a Borrower or an Affiliate of any Subsidiary of a Borrower, (d) any lease or rental payments to an Affiliate or Subsidiary of a Borrower, or (e) repayments of or debt service on loans or other indebtedness held by any Person holding an equity interest in a Borrower or a Subsidiary

5

of a Borrower, an Affiliate of a Borrower or an Affiliate of any Subsidiary of a Borrower unless permitted under and made pursuant to a Subordination Agreement applicable to such loans or other indebtedness.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**Eligible Account**" means, subject to the criteria below, an account receivable of a Borrower, which was generated in the Ordinary Course of Business, which was generated originally in the name of a Borrower and not acquired via assignment or otherwise, and which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Account.  The net amount of an Eligible Account at any time shall be (a) the face amount of such Eligible Account as originally billed *minus* all cash collections and other proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise Taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time, and (b) adjusted by applying percentages (known as "**liquidity factors**") by payor and/or payor class based upon the applicable Borrower's actual recent collection history for each such payor and/or payor class in a manner consistent with Agent's underwriting practices and procedures.  Such liquidity factors may be adjusted by Agent from time to time as warranted by Agent's underwriting practices and procedures and using Agent's good faith credit judgment.  Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(a)     the Account remains unpaid more than one hundred and twenty-five (125) days past the claim or invoice date (but in no event more than one hundred fifty-five (155) days after the applicable goods or services have been rendered or delivered);

(b)     the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     if the Account arises from the sale of goods, any part of any goods the sale of which has given rise to the Account has been returned, rejected, lost, or damaged (but only to the extent that such goods have been so returned, rejected, lost or damaged);

(d)     if the Account arises from the sale of goods, the sale was not an absolute, bona fide sale, or the sale was made on consignment or on approval or on a sale-or-return or bill-and-hold or progress billing basis, or the sale was made subject to any other repurchase or return agreement, or the goods have not been shipped to the Account Debtor or its designee or the sale was not made in compliance with applicable Laws;

(e)     if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any Law or the Account represents a progress billing for which services have not been fully and completely rendered;

(f)     the Account is subject to a Lien other than liens in favor of Agent (provided that, (i) in the event the Account is subject to a judgment Lien, so long as Agent has received satisfactory evidence that enforcement of the judgment Lien has been effectively stayed, with respect to such Account and all other Accounts proposed to be included in the Borrowing Base, collectively, only the aggregate amount of Accounts equal to the Dollar amount of the judgment Lien shall be ineligible and (ii) in the event the Account is subject to a tax Lien (other than Liens for Taxes not yet due and payable), with respect to

6

such Account and all other Accounts proposed to be included in the Borrowing Base, collectively, only the aggregate amount of Accounts equal to the Dollar amount of the tax Lien shall be ineligible), or Agent does not have a first priority, perfected Lien on such Account;

(g)     the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment, unless such Chattel Paper or Instrument has been delivered to Agent;

(h)     the Account Debtor is an Affiliate or Subsidiary of a Credit Party, or if the Account Debtor holds any Debt of a Credit Party;

(i)     more than fifty percent (50%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under subclause (a) above (in which case all Accounts from such Account Debtor shall be ineligible);

(j)     reserved;

(k)     the total unpaid Accounts of the Account Debtor obligated on the Account exceed twenty percent (20%) (other than with respect to Accounts owing from Genzyme Corporation, which shall be thirty-five percent (35%)) of the net amount of all Eligible Accounts owing from all Account Debtors (but only the amount of the Accounts of such Account Debtor exceeding such twenty percent (20%) (or, solely in the case of Accounts owing from Genzyme Corporation, thirty-five percent (35%)) limitation shall be considered ineligible);

(l)     any covenant, representation or warranty contained in the Financing Documents with respect to such Account has been breached in any respect;

(m)     the Account is unbilled for more than forty (40) days after the applicable goods or services have been rendered or delivered or has not been invoiced to the Account Debtor within such time period in accordance with the procedures and requirements of the applicable Account Debtor; provided, however, that Accounts that are unbilled or not invoiced shall be properly recorded on Borrowers' accounting systems at all times; and provided, further, for the avoidance of doubt, that Accounts that are unbilled for forty (40) or fewer days from the date the applicable goods or services have been rendered or delivered shall not be ineligible pursuant to this clause (m);

(n)     the Account is an obligation of a Governmental Account Debtor, unless Agent has agreed to the contrary in writing and Agent has received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement;

(o)     the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder;

(p)     the Account Debtor has its principal place of business or executive office outside the United States;

(q)     the Account is payable in a currency other than United States dollars;

(r)     the Account Debtor is an individual;

CHICAGO/#3272775.8

(s)     the Borrower owning such Account has not signed and delivered to Agent notices, in the form requested by Agent, directing the Account Debtors to make payment to the applicable Lockbox Account;

(t)     the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible);

(u)     the Account arises out of the sale of any Inventory upon which any other Person holds, claims or asserts a Lien;

(v)     the Account is owed to a Target or arises from the operations of a business acquired in a Permitted Acquisition, if Agent has not completed an initial field examination with respect thereto; or

(w)     the Account or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith credit judgment and discretion.

"**EMSI**" means Examination Management Services, Inc.

"**EMSI Acquisition**" means EMSI Acquisition, Inc.

"**EMSI Equity**" means EMSI Equity, LLC.

"**EMSI Holding**" means EMSI Holding Company.

"**Environmental Laws**" means any applicable Laws pertaining to the protection of the environment and natural resources, pollution, and protection of human health and safety from exposure to Hazardous Materials (including any environmental clean-up statutes and all implementing regulations adopted by any Governmental Authority related thereto) and any Law concerning the storage or disposal of medical waste) that apply to any Borrower and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*) (as it relates to exposure to Hazardous Materials), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*) and any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and governing judicial interpretations thereof.

"**Environmental Liens**" means all Liens imposed pursuant to any Environmental Law, whether due to any act or omission of any Borrower or any other Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA,

to which any Borrower or any member of the Controlled Group has any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Event of Default**" has the meaning set forth in Section 10.1.

"**Excluded Account**" has the meaning set forth in Section 5.14.

"**Excluded Collateral**" has the meaning set forth on Schedule 9.1.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Agent, any Lender or any other recipient of any payment to be made by or on behalf of any obligation of Credit Parties hereunder or the Obligations or required to be withheld or deducted from a payment to Agent, such Lender or such recipient (including any interest and penalties thereon): (a) Taxes to the extent imposed on or measured by Agent's, any Lender's or such recipient's net income (however denominated), branch profits Taxes, and franchise Taxes and similar Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under which Agent, such Lender or such recipient is organized, has its principal office or conducts business with respect to entering into any of the Financing Documents or taking any action thereunder or (ii) that are Other Connection Taxes; (b) in the case of a Lender, United States withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loans pursuant to a Law in effect on the date on which (i) such Lender becomes a party to this Agreement other than as a result of an assignment requested by a Credit Party under the terms hereof or (ii) such Lender changes its lending office for funding its Loan, except in each case to the extent that, pursuant to Section 2.8, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan, Letter of Credit, Revolving Loan Commitment or Term Loan Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 2.8(c); and (d) any U.S. federal withholding taxes imposed in respect of a Lender under FATCA.

"**Extraordinary Receipts**" means any cash or Cash Equivalents received by or paid to or for the account of any Credit Party or any Subsidiary not in the Ordinary Course of Business (and not consisting of proceeds described in any of clauses (i), (iii) and/or (iv) of Section 2.1(a)(ii)(B)), in respect of (a) pension plan reversions, (b) reserved, (c) litigation proceeds, (d) purchase price and other monetary adjustments made pursuant to any acquisition documents (including, without limitation, any Transaction Document) and/or indemnification payments made pursuant to any acquisition document (including, without limitation, any Transaction Document), excluding any payments received by any Credit Party or any Subsidiary on account of any post-closing working capital adjustment made pursuant to a related purchase agreement, and (e) other indemnification payments; *provided, however*, that an Extraordinary Receipt shall not include cash proceeds from proceeds of indemnity payments to the extent that such proceeds, awards or payments are received by any Credit Party or any Subsidiary in respect of any third party claim against such Person and applied to pay (or to reimburse such Credit Party or Subsidiary for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"**FATCA**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof and any agreement entered into pursuant to the implementation of Section 1471(b)(1) of the Code, and any intergovernmental agreement or treaty between the United States Internal Revenue Service, the U.S. Government and any governmental or taxation authority under any other jurisdiction which agreement's principal purposes deals with the implement such sections of the Code.

"**Fee Letter**" means that certain letter agreement between Agent and Borrower relating to fees payable to Agent, for its own account, in connection with the execution of this Agreement.

"**Financing Documents**" means this Agreement, any Notes, the Security Documents, the Fee Letter, any subordination or intercreditor agreement pursuant to which any Debt and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations and all other documents, instruments and agreements related to the Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangible**" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"**Governmental Account Debtor**" means any Account Debtor that is a Governmental Authority.

"**Governmental Authority**" means any nation or government, any state, local or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), *provided*, *however*, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guarantor**" means any Credit Party that has executed or delivered, or shall in the future execute or deliver, any Guarantee of any portion of the Obligations.

"**Hazardous Materials**" means material or substance defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import under any Environmental Law due to its dangerous or deleterious properties or characteristics, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including any governing judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products,

including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority due to its dangerous or deleterious properties or characteristics.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other environmental media on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person is in material compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and, as of the date of this Agreement, has no reason to believe that it will become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to have a Material Adverse Effect on such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual violation by such Person of the provisions of HIPAA.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrowers or any other Credit Party under any Financing Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"**Instrument**" means "instrument", as defined in Article 9 of the UCC.

"**Intellectual Property**" means, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable Laws, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Interest Period**" means a 3-month period commencing on the first day of each calendar month. For purposes of clarity, an Interest Period may commence prior to the Closing Date.

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

11

"**Investment**" means any investment in any Person, whether by means of acquiring (whether for cash, property, services, securities or otherwise), making or holding Debt, securities, capital contributions, loans, time deposits, advances, Guarantees or otherwise. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto.

"**Laws**" means any and all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, and legally binding governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to any Credit Party in any particular circumstance.

"**LC Issuer**" means one or more banks, trust companies or other Persons in each case expressly identified by Agent from time to time, in its sole discretion, as an LC Issuer for purposes of issuing one or more Letters of Credit hereunder. Without limitation of Agent's discretion to identify any Person as an LC Issuer, no Person shall be designated as an LC Issuer unless such Person maintains reporting systems acceptable to Agent with respect to letter of credit exposure and agrees to provide regular reporting to Agent satisfactory to it with respect to such exposure.

"**Lender**" means each of (a) MCF, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as Lender pursuant to Section 11.17, and (d) the respective successors of all of the foregoing, and "**Lenders**" means all of the foregoing.

"**Lender Letter of Credit**" means a Letter of Credit issued by an LC Issuer that is also, at the time of issuance of such Letter of Credit, a Lender.

"**Letter of Credit**" means a standby letter of credit issued for the account of any Borrower by an LC Issuer which expires by its terms within one year after the date of issuance and in any event at least thirty (30) days prior to the Commitment Expiry Date. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiry date for one or more successive one (1) year periods, *provided, however,* that the LC Issuer that issued such Letter of Credit has the right to terminate such Letter of Credit on each such annual expiration date and no renewal term may extend the term of the Letter of Credit to a date that is later than the thirtieth (30th) day prior to the Commitment Expiry Date. Each Letter of Credit shall be either a Lender Letter of Credit or a Supported Letter of Credit.

"**Letter of Credit Liabilities**" means, at any time of calculation, the sum of (a) without duplication, the amount then available for drawing under all outstanding Lender Letters of Credit and all Supported Letters of Credit, in each case without regard to whether any conditions to drawing thereunder can then be met, *plus* (b) without duplication, the aggregate unpaid amount of all reimbursement obligations in respect of previous drawings made under all such Lender Letters of Credit and Supported Letters of Credit.

"**LIBOR Rate**" means, for each Loan, a per annum rate of interest equal to the greater of (a) one-half of one percent (0.50%) and (b) the rate determined by Agent (rounded upwards, if necessary, to the next 1/100th%) by *dividing* (i) the Base LIBOR Rate for the Interest Period, *by* (ii) the sum of one *minus* the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, in respect of such asset. For the purposes of this Agreement and the other Financing Documents, any Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset

which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"**Liquidity**" means, on any date of determination, the sum of (x) the aggregate Qualified Cash and (y) the Revolving Loan Availability, in each case as of the date of determination.

"**Litigation**" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Loan(s)**" means the Term Loan, the Revolving Loans and each and every advance under the Term Loan, or any combination of the foregoing, as the context may require. All references herein to the "making" of a Loan or words of similar import shall mean, with respect to the Term Loan, the making of any advance in respect of a Term Loan.

"**Lockbox**" has the meaning set forth in Section 2.11.

"**Lockbox Account**" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid, which account or accounts shall be, if requested by Agent, opened in the name of Agent (or a nominee of Agent).

"**Lockbox Bank**" has the meaning set forth in Section 2.11.

"**Material Adverse Effect**" means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business, or properties of the Credit Parties, (ii) the rights and remedies of Agent or Lenders under the Financing Documents, or the ability of the Credit Parties to perform their obligations under the Financing Documents, (iii) the legality, validity or enforceability of the Financing Documents, (iv) the existence, perfection or priority of the security interests granted in the Financing Documents, and (v) the value of any material Collateral.

"**Material Contracts**" has the meaning set forth in Section 3.17.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7.

"**MCF**" means MidCap Financial Trust, a Delaware statutory trust, and its successors and assigns.

"**Minimum Balance**" shall mean $5,000,000.

"**Minimum Balance Fee**" shall mean a fee equal to (a) the positive difference, if any, remaining after subtracting (i) the average end-of-day principal balance of Revolving Loans outstanding during the immediately preceding month (without giving effect to the clearance day calculations referenced in Section 2.2(a)) from (ii) the Minimum Balance *multiplied by* (b) the highest interest rate applicable to the Revolving Loans during such month (or, during the existence of an Event of Default, the default rate of interest set forth in Section 10.5(a).

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any Borrower or any other member of the Controlled Group is making or accruing an obligation to make contributions or has within the preceding five plan years (as determined on the applicable

date of determination) made contributions if liability to a Borrower remains (including on account of any Person who in the last five years was a member of the Controlled Group).

"**Non-U.S. Lender Party**" has the meaning set forth in Section 2.8(c).

"**Notes**" has the meaning set forth in Section 2.3.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit D hereto.

"**Notice of LC Credit Event**" means a notice from a Responsible Officer of Borrower Representative to Agent with respect to any issuance, increase or extension of a Letter of Credit specifying: (a) the date of issuance or increase of a Letter of Credit; (b) the identity of the LC Issuer with respect to such Letter of Credit, (c) the expiry date of such Letter of Credit; (d) the proposed terms of such Letter of Credit, including the face amount; and (e) the transactions that are to be supported or financed with such Letter of Credit or increase thereof.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including, without limitation, the payment of interest and other amounts arising after the commencement of any case with respect to any Credit Party under the Bankruptcy Code or any similar statute which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. In addition to, but without duplication of, the foregoing, the Obligations shall include, without limitation, all obligations, liabilities and indebtedness arising from or in connection with (a) all Support Agreements, and (b) all Lender Letters of Credit.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Operative Documents**" means the Financing Documents, the Sponsor Management Agreement, Subordinated Debt Documents, the Settlement Agreement and any documents effecting any purchase or sale or other transaction that is closing contemporaneously with the closing of the financing under this Agreement.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Credit Party, the ordinary course of business of such Credit Party, as conducted by such Credit Party in accordance with past practices.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

"**Other Connection Taxes**" means Taxes imposed as a result of a present or former connection between Agent or any Lender and the jurisdiction imposing such tax (other than connections arising from Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loans or any Financing Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.8(i)).

"**Parent**" means EMSI Holdco, Inc.

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of each Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by notice to Borrower Representative.

"**Payment Notification**" means a written notification substantially in the form of Exhibit E hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals of a Credit Party required under all applicable Laws and required for such Credit Party in order to carry on its business as now conducted.

"**Permitted Acquisition**" means the acquisition by a Borrower of all or substantially all of the assets, or all (but not less than all) of the Equity Interests, of any Person (the "**Target**") with the prior written approval of Required Lenders or subject to the satisfaction of each of the following conditions:

(a) unless Agent consents otherwise, Agent shall have received (and shall promptly distribute to Lenders) not less than twenty (20) days' prior notice of such proposed Permitted Acquisition, which notice shall include a due diligence package including the following materials, each in form reasonably satisfactory to Agent:

(i) if available copies of the Target's two most recent annual income statements and balance sheets, together with the audit opinions thereon, if any, of the Target's independent accountants, together with available interim financial statements,

(ii) if available, any asset or business appraisals,

(iii) a general description of the business to be acquired,

(iv) summary of pending and known threatened litigation materially adversely affecting the business or assets to be acquired,

15

(v) a description of the method of financing such acquisition, including sources and uses,

(vii) a listing of locations of all personal and real property to be acquired,

(viii) copies of all material agreements, instruments and documents to be assumed or acquired,

(ix) if the Target owns, or if the assets to be acquired includes, any real property, if requested by Agent, available environmental reports and related information regarding any such owned property,

(x) draft copies of all proposed acquisition agreements and all related transaction documents for such acquisition, together with all schedules thereto (followed by updated drafts as the same are generated and fully-executed copies thereof within five (5) Business Days after the closing of such acquisition), and

(xii) any other material or reports reasonably requested by Agent;

(b) unless Agent agrees otherwise or as otherwise provided below, concurrently with delivery of the notice and due diligence materials referred to in clause (i) above, Borrower Representative shall have delivered to Agent (and shall promptly distribute to Lenders), in form reasonably satisfactory to Agent:

(i) a pro forma consolidated balance sheet of Borrowers and their Consolidated Subsidiaries (the "**Transaction Pro Forma**"), based on most recently available financial statements, which shall be complete and shall fairly present in all material respects the assets, liabilities, financial condition and results of operations of Borrowers and their Consolidated Subsidiaries in accordance with GAAP consistently applied and in form substantially similar to the balance sheet provided to Agent pursuant to Section 4.1 but taking into account such Permitted Acquisition, the funding of all Loans and the incurrence or assumption of all other Debt and repayment of Debt in connection therewith (it being understood and agreed that the amount of any pro forma adjustments to EBITDA resulting from such Permitted Acquisition shall be consistent with the Quality of Earnings Report, if required by clause (viii) below and if no such Quality of Earnings Report is required, consistent with the definition of EBITDA set forth herein, with other adjustments inconsistent with the foregoing requirements as consented to in writing by Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed)); and such Transaction Pro Forma shall reflect that (1) on a pro forma basis, Borrowers and their Consolidated Subsidiaries would have had the lower of (x) a Senior Net Leverage Ratio not in excess of 0.50 lower than the then applicable covenant level in Section 6.3 for the Defined Period ending as of the most recently ended calendar month for which internal financial statements are available or (y) the Senior Net Leverage Ratio on the Closing Date, in each case, prior to the consummation of such Permitted Acquisition (after giving effect to such Permitted Acquisition and all Loans funded in connection therewith as if made on the first day of such period), (2) on a pro forma basis, no Event of Default has occurred and is continuing or would result after giving effect to such Permitted Acquisition, the funding of all Loans and the incurrence or assumption of all other Debt and repayment of Debt in connection therewith, and (3) on a pro forma basis,

16

Borrowers will have at least $1,000,000 in Liquidity after giving effect to the Permitted Acquisition;

(ii) at least fifteen (15) days prior to each Permitted Acquisition (or such shorter period as agreed to by Agent), operating plans, budgets and forecasts covering a one (1) year period commencing on the date of such Permitted Acquisition (the "**Transaction Projections**") and based upon historical financial data of a recent date reasonably satisfactory to Agent, taking into account such Permitted Acquisition, the funding of all Loans and the incurrence or assumption of all other Debt and repayment of Debt in connection therewith; and

(iii) at least five (5) days prior to each Permitted Acquisition (or such shorter period as agreed to by Agent), a certificate of a Responsible Officer of Borrower Representative to the effect that (w) the Credit Parties and their Consolidated Subsidiaries will be Solvent on a consolidated basis upon the consummation of the Permitted Acquisition, (x) the Transaction Pro Forma fairly presents in all material respects the financial condition of the Borrowers and their Consolidated Subsidiaries as of the date thereof and the periods covered thereby, in each case after giving effect to the Permitted Acquisition and related transactions, (y) the Transaction Projections represent Borrowers' best estimate of their consolidated future financial performance as of the date thereof and after giving effect to the Permitted Acquisition, the assumptions contained therein are believed by Borrowers to be fair and reasonable in light of current business conditions and the Transaction Projections demonstrate Borrowers' projected compliance with the covenants set forth in Article 6 for the one-year period immediately following the consummation of such Permitted Acquisition; *provided*, *that* Borrowers can give no assurance that the results reflected in the Transaction Projections will be attained; and (z) Borrowers and their Consolidated Subsidiaries have completed their due diligence investigation with respect to the Target and such Permitted Acquisition, which investigation was conducted in a manner similar to that which would have been conducted by a prudent purchaser of a comparable business and the results of which investigation, to the extent requested, were delivered to Administrative Agent;

(c) such Permitted Acquisition shall only involve assets located in the United States (and, in connection with the acquisition of the Equity Interests of a Target, such Target shall be formed, incorporated or otherwise organized under the Laws of a state within the United States) and comprising a business, or those assets of a business, of the type engaged in by a Credit Party as of the Closing Date and businesses reasonably related or incidental thereto, and which business would not subject Agent or any Lender to regulatory or third party approvals in connection with the exercise of its rights and remedies under this Agreement or any other Financing Documents other than approvals applicable to the exercise of such rights and remedies with respect to a Credit Party prior to such Permitted Acquisition;

(d) such Permitted Acquisition shall be consensual, shall have been approved by the Target's board of directors (or comparable governing board or if applicable, a bankruptcy court) and shall be consummated in accordance with the terms of the agreements and documents related thereto, and in compliance with all applicable Laws;

(e) no assets or liabilities (including, without limitation, Investments, Debt and Contingent Obligations) shall be acquired, incurred, assumed or otherwise be reflected on a consolidated balance sheet of Borrowers and their Consolidated Subsidiaries after giving effect to such

17

Permitted Acquisition, except (A) Loans made hereunder and (B) those assets and liabilities which may be acquired, incurred or assumed in accordance with the provisions of this Agreement;

(f)     the business and assets acquired in such Permitted Acquisition shall be free and clear of all Liens (other than Permitted Liens);

(g)     at or prior to the closing of any Permitted Acquisition, Agent will be granted a first priority perfected Lien (subject to the limitations set forth in the Financing Documents and subject to Permitted Liens and the filing of short-form security agreements for Intellectual Property with any applicable United States Governmental Authority) in all assets acquired pursuant thereto or, as contemplated by Section 4.11, in the assets and Equity Interests of the Target, and Borrowers and the Target shall have executed such documents and taken such actions as may be required by Agent in connection therewith including the delivery of (A) certified copies of the resolutions of the board of directors (or comparable governing board) of Borrowers and the Target authorizing such Permitted Acquisition and the granting of Liens described herein, (B) legal opinions, in form and substance reasonably acceptable to Agent, with respect to the transactions described herein and (C) evidence of insurance of the business to be acquired consistent with the requirements of Section 4.4;

(h)     with respect to Permitted Acquisitions wherein the Target's business comprises more than ten percent (10%) of the pro forma EBITDA, or is in excess of $5,000,000, Borrowers shall deliver to Agent a Quality of Earnings Report prepared by a firm reasonably acceptable to Agent and the analysis and results of which are reasonably satisfactory to Agent;

(i)     the Target shall have a positive pro forma EBITDA in each case as determined based upon the Target's financial statements for its most recently completed fiscal year and its most recent interim financial period completed within sixty (60) days prior to the date of consummation of such Permitted Acquisition;

(j)     on or prior to the date of such Permitted Acquisition, Agent shall have received, in form and substance reasonably satisfactory to Agent, (A) executed (if applicable) copies of the acquisition agreement, related agreements and instruments, opinions, certificates, lien search results and other documents reasonably requested by Agent and (B) amendments to the Schedules, to the extent necessary to make the representations and warranties in this Agreement true and correct in all material respects after giving effect to the consummation of such Permitted Acquisition;

(k)     at the time of such Permitted Acquisition and after giving effect thereto, no Event of Default has occurred and is continuing; and

(l)     the sum of all cash consideration payable in connection with all Permitted Acquisitions consummated during the term hereof (including all Debt, liabilities and Contingent Obligations incurred or assumed and the maximum amount of any earnout or comparable payment obligation in connection therewith, whether or not reflected on a consolidated balance sheet of Borrowers and Target) shall not exceed $5,000,000 in the aggregate during the term of the Facility (excluding transaction costs and amounts funded with equity contributions).

"**Permitted Affiliate**" means with respect to any Person (a) any Person that directly or indirectly controls such Person, and (b) any Person which is controlled by or is under common control with such controlling Person. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote eighty percent (80%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Permitted Asset Dispositions**" means the following Asset Dispositions, *provided, however,* that at the time of such Asset Disposition, no Default or Event of Default exists or would result from such Asset Disposition:

(a)     dispositions of Inventory in the Ordinary Course of Business and not pursuant to any bulk sale;

(b)     dispositions of furniture, fixtures and equipment in the Ordinary Course of Business that the applicable Borrower or Subsidiary determines in good faith is no longer used or useful in the business of such Borrower and its Subsidiaries,

(c)     sales or dispositions not otherwise permitted so long as made at fair market value and the aggregate fair market value of all assets disposed of in any fiscal year would not exceed $250,000;

(d)     the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Financing Documents;

(e)     the (i) licensing or sublicensing on a non-exclusive basis, of patents, trademarks, copyrights and other Intellectual Property rights in the Ordinary Course of Business, (ii) assignment of Intellectual Property from any Borrower or any Subsidiary of a Borrower to any Borrower, or (iii) sale, assignment or transfer for value of any Intellectual Property that is not in the applicable Borrower's reasonable business judgment, necessary in the conduct of its business and where any such sale assignment or transfer is not materially adverse to the interests of the Lenders;

(f)     the granting of Permitted Liens;

(g)     any involuntary loss, damage or destruction of property;

(h)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(i)     the leasing or subleasing of assets of any Borrower or its Subsidiaries in the Ordinary Course of Business, and any extension, modification or termination of any existing leases pursuant to the terms of such leases;

(j)     (i) the lapse of registered patents, trademarks, copyrights and other Intellectual Property of any Borrower or any of its Subsidiaries to the extent not economically desirable in the conduct of its business or in accordance with the applicable statutory term or (ii) the abandonment of parents, trademarks, copyrights or other Intellectual Property rights in the Ordinary Course of Business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights such copyrights are not material revenue generating copyrights, (B) the Intellectual Property that is the subject of such lapse or abandonment is not, in the applicable Credit Party's reasonable business judgment, necessary in the conduct of its business; and (C) such lapse is not materially adverse to the interests of the Lenders;

(k)     the making of Permitted Distributions expressly in accordance with this Agreement;

(l)     the making of Permitted Investments expressly in accordance with this Agreement;

(m)     transfers, sales or other dispositions of assets (i) from any Borrower or any of its Subsidiaries to any Borrower and (ii) so long as no Event of Default has occurred and is continuing or

would immediately result therefrom from, transfer of assets any Subsidiary of any Borrower that is not a Credit Party to any other Subsidiary of any Borrower;

(n)     so long as no Event of Default has occurred and is continuing or would immediately result therefrom, dispositions of assets acquired by Borrower and its Subsidiaries pursuant to a Permitted Acquisition or other Permitted Investment permitted under clause (p) of the definition thereof consummated within six (6) months of the date of such acquisition so long as (i) the consideration received for the assets to be so disposed is at least equal to the fair market value of such assets, (ii) the assets to be so disposed are not necessary or economically desirable in connection with the business of Borrower and its Subsidiaries and (iii) the assets to be so disposed are readily identifiable as assets acquired pursuant to the subject Permitted Acquisition or Permitted Investment; and

(o)     the sale or issuance of equity interests (other than Disqualified Equity Interests) of a Borrower to Parent or any other Borrower if and to the extent the acquisition of such equity interests would constitute a Permitted Investment and Agent maintains a first-priority Lien on such equity interests; *provided that* no such issuance shall cause a Subsidiary that is (A) a wholly-owned Subsidiary of a Credit Party to cease to be wholly-owned by a Credit Party, or (B) majority-owned by a Credit Party to cease to be majority-owned by a Credit Party;

(p)     other dispositions approved by Agent.

"**Permitted Contest**" means, with respect to any Tax obligation or other obligation allegedly or potentially owing from any Borrower or its Subsidiary to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the applicable Credit Party(ies); *provided, however*, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrowers have given Agent reasonably prompt notice of the commencement of such contest and upon request by Agent, from time to time, Borrowers shall give notice of the status of such contest by Borrowers and/or confirmation of the continuing satisfaction of this definition; and (c) upon a final determination of such contest, Borrowers and its Subsidiaries shall promptly comply with the requirements thereof.

"**Permitted Contingent Obligations**" means:

(a)     Contingent Obligations arising in respect of the Debt under the Financing Documents;

(b)     Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business;

(c)     Contingent Obligations outstanding on the date of this Agreement and set forth on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to the indebtedness underlying such Contingent Obligations other than extensions of the maturity thereof without any other change in terms);

(d)     Contingent Obligations incurred in the Ordinary Course of Business with respect to appeal bonds;

(e)     Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and performance bonds and other similar obligations not to exceed $500,000 in the aggregate at any time outstanding;

(f)     Contingent Obligations arising under indemnity agreements with title insurers to cause such title insurers to issue to Agent mortgagee title insurance policies;

(g)     Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions of personal property assets permitted under Section 5.6;

(h)     Contingent Obligations in respect of any customary indemnification obligations, purchase price adjustments, non-compete obligations (other than contingent earnout obligations) of any Credit Party incurred in connection with the consummation of any Permitted Acquisition;

(i)     Contingent Obligations arising with respect to the guaranty of Permitted Debt incurred by any Borrower,

(j)     Contingent Obligations arising with respect to the guaranty of other obligations of any Borrower expressly permitted hereunder; and

(k)     other Contingent Obligations not permitted by clauses (a) through (i) above, not to exceed $250,000 in the aggregate at any time outstanding.

"**Permitted Debt**" means:

(a)     Borrowers' and its Subsidiaries' Debt to Agent and each Lender under this Agreement and the other Financing Documents;

(b)     Debt incurred as a result of endorsing negotiable instruments received in the Ordinary Course of Business;

(c)     purchase money Debt not to exceed $1,000,000 at any time (whether in the form of a loan or a lease) used solely to acquire equipment used in the Ordinary Course of Business and secured only by such equipment;

(d)     Debt existing on the date of this Agreement and described on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to such Debt other than extensions of the maturity thereof without any other change in terms);

(e)     so long as there exists no Event of Default both immediately before and immediately after giving to any such transaction, Debt existing or arising under any Swap Contract, provided however that such obligations are (or were) entered into by a Borrower or its Subsidiary in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets or property held or reasonably anticipated by such Person and not for purposes of speculation,

(f)     Debt in the form of insurance premiums financed through the applicable insurance company;

(g)      trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business;

(h)      Subordinated Debt;

(i)      Debt of any Person that becomes a Borrower after the date hereof in connection with a Permitted Acquisition, provided that (i) such Debt exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary and (ii) the aggregate principal amount of Debt permitted by this clause (i), shall not exceed $500,000 at any time outstanding;

(j)      Debt owing from one Borrower to another Borrower;

(k)      Permitted Contingent Obligations;

(l)      Debt incurred in the Ordinary Course of Business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), so long as the aggregate outstanding principal amount of such Debt does not exceed $750,000 at any time outstanding;

(m)      unsecured Debt owing to former employees, officers, or directors (or any spouses, ex-spouses, or estates of any of the foregoing) incurred in connection with the repurchase of equity interests of EMSI that has been issued to such Persons, so long as (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence of such Debt, (ii) such Debt is subordinated to the Obligations on terms and conditions reasonably acceptable to Agent and (iii) the aggregate outstanding principal amount of such Debt does not exceed $500,000 at any time outstanding;

(n)      Debt incurred in respect of netting services, overdraft protection and other like services, in each case, incurred in the Ordinary Course of Business and only so long as such Debt is extinguished within five (5) Business Days after such Debt is first incurred;

(o)      unsecured Debt of any Borrower or its Subsidiaries in respect of earnouts owing to sellers of assets or equity interests to such Borrower or its Subsidiaries that is incurred in connection with the consummation of one or more Permitted Acquisitions permitted hereunder and subject to the limits set forth in the definition of Permitted Acquisition;

(p)      Debt composing Permitted Investments;

(q)      accrual of interest, accretion or amortization of original issue discount or the payment of interest in kind, in each case, on Debt that otherwise constitutes Permitted Debt;

(r)      Debt evidenced by the Settlement Agreement; and

(s)      other Debt incurred by any Borrower or Subsidiary of a Borrower in an aggregate outstanding amount not to exceed $500,000 at any one time.

"**Permitted Distributions**" means the following Distributions:

(a)      dividends by any Subsidiary of any Borrower to such parent Borrower;

(b)      dividends payable solely in common stock;

(c)　　repurchases by any Borrower of stock of former employees, directors or consultants pursuant to stock purchase agreements (or forgiveness of Debt owed by such persons to such Borrower) so long as an Event of Default does not exist at the time of such repurchase and would not exist after giving effect to such repurchase, *provided, however,* that such repurchase or forgiveness does not exceed $250,000 in the aggregate per fiscal year (with any unused amounts to be carried forward to the next succeeding fiscal year and applied last);

(d)　　management fees paid to the Sponsor on or after March 31, 2022 and in accordance with the terms of the Sponsor Management Agreement, if, and only to the extent that at the time of such payment: (i) the Sponsor has entered into an agreement whereby it subordinates its right to payment of management fees to Agent's right to payments hereunder, in an agreement acceptable to Agent, (ii) no Default or Event of Default has occurred and is continuing and no Default or Event of Default would result from the making of such payment, and (iii) the outstanding principal balance of the Term Loan is $0;

(e)　　reasonable and documented expenses reimbursed to Sponsor and indemnity payments paid to the Sponsor, in each case in accordance with the terms of the Sponsor Management Agreement;

(f)　　transaction fees paid to Sponsor and in accordance with the terms of the Sponsor Management Agreement for providing services to the Borrowers and their Subsidiaries in connection with a Permitted Acquisition if, and only to the extent that (i) such transaction fees are paid at or substantially concurrent with the closing of such Permitted Acquisition, (ii) such transaction fees do not exceed an amount equal to 1% of the "Acquisition Price" (as defined in the Sponsor Management Agreement in effect on the date hereof) of such Permitted Acquisition, (iii) no Default or Event of Default has occurred and is continuing and no Default or Event of Default would result from the making of such payment, and (iv) the outstanding principal balance of the Term Loan is $0;

(g)　　for so long as (x) no Event of Default exists and no act, event or condition shall have occurred or exists that (in each case) could result in an Event of Default and (y) a Borrower is a member of an "affiliated group" (within the meaning of Code section 1504 and any similar group under state or local U.S. tax laws) of corporations (or a disregarded entity whose regarded member is a member of such group) filing a consolidated income tax return with Parent (or any direct or indirect parent of Parent) as the "common parent" of such group ("**Common Parent**"), in respect of each taxable year during which such Borrower was such a member of such a group, such Borrower may make (i) distributions to Parent to be used by Parent (or Common Parent) for the sole purpose to pay to a taxing authority Taxes measured by net income solely attributed to such Borrower (and its Subsidiaries) for which Common Parent is liable for such taxable year as a result of such tax return filing, up to an amount not to exceed the amount of any such income taxes that would have been due and payable by the relevant Borrower and its relevant Subsidiaries had the Borrowers not filed such consolidated, combined, unitary or similar type return with Parent and Common Parent and (ii) distributions not to exceed in the aggregate $50,000 in any Fiscal Year to Parent the proceeds of which shall be used by Parent (or Common Parent) to pay franchise and excise Taxes and other fees, Taxes and expenses required to maintain its (or any of Common Parent's) corporate existence; and

(h)　　dividends or distributions from one Borrower to another Borrower.

"**Permitted Investments**" means:

(a)　　Investments shown on Schedule 5.7 and existing on the Closing Date;

(b)　　cash and cash equivalents;

(c)      Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the Ordinary Course of Business;

(d)      Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the Ordinary Course of Business, and (ii) loans to employees, officers or directors of Borrower Representative relating to the purchase of equity securities of EMSI Equity pursuant to employee stock purchase plans or agreements approved by Borrowers' Board of Directors (or other governing body) in a cashless transaction (or series of related cashless transactions);

(e)      Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the Ordinary Course of Business;

(f)      Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the Ordinary Course of Business, *provided, however*, that this subpart (f) shall not apply to Investments of Borrowers in any Subsidiary;

(g)      Investments consisting of Deposit Accounts in which Agent has received a Deposit Account Control Agreement or Deposit Accounts in which a Deposit Account Control Agreement is not required by Section 5.14;

(h)      Investments by any Borrower in any other Borrower made in compliance with Section 4.11(c);

(i)      Permitted Acquisitions;

(j)      Investments of any Person that becomes a Borrower after the date hereof in connection with a Permitted Acquisition provided that such Investments exist at the time such Person becomes a Subsidiary and so long as such Investments were not made in contemplation of such Person becoming a Subsidiary;

(k)      advances made in the connection with the purchase of goods and services in the Ordinary Course of Business;

(l)      loans, capital contributions or other advances made by a Borrower or its Subsidiary to another Borrower;

(m)      guarantees permitted under the definition of Permitted Contingent Obligations;

(n)      deposits of cash made in the Ordinary Course of Business to secure performance of operating leases; and

(o)      other Investments in an amount not exceeding $500,000 in the aggregate.

"**Permitted Liens**" means:

(a)      deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to a Borrower's or its Subsidiary's employees, if any;

(b)     deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety bonds and other obligations of like nature arising in the Ordinary Course of Business and to secure appeal bonds;

(c)     carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than any Collateral which is part of the Borrowing Base, arising in the Ordinary Course of Business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest;

(d)     Liens on Collateral for Taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest;

(e)     judgment Liens on Collateral, to the extent such judgments do not constitute an Event of Default; *provided*, *however*, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest;

(f)     with respect to real estate, easements, rights of way, encroachments, restrictions, minor defects or irregularities of title, none of which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Documents, materially affect the value or marketability of the Collateral, impair the use or operation of the Collateral for the use currently being made thereof or impair Borrowers' ability to pay the Obligations in a timely manner or impair the use of the Collateral or the ordinary conduct of the business of any Borrower or any Subsidiary;

(g)     Liens and encumbrances in favor of Agent under the Financing Documents;

(h)     Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on <u>Schedule 5.2</u>;

(i)     any Lien on any equipment securing Debt permitted under subpart (c) of the definition of Permitted Debt, *provided*, *however*, that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof;

(j)     Liens solely on any cash earnest money deposits made by any Borrower in connection with any letter of intent or purchase agreement with respect to a Permitted Acquisition or other Permitted Investment;

(k)     Liens of a landlord or sublandlord arising under Law with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest

(l)     the interest of non-exclusive licensors and sublicensors under license agreements;

(m)     non-exclusive licenses or sublicenses of patents, trademarks, copyrights and other Intellectual Property rights in the Ordinary Course of Business;

(n)     rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the Ordinary Course of Business and solely to the extent such rights of setoff or bankers' liens are subordinated to the reasonably satisfaction of Agent pursuant to a Deposit Account Control Agreement unless the Deposit Account encumbered by such Liens or setoff rights is not required to be subject to a Deposit Account Control Agreement pursuant to Section 5.14;

(o)     Liens granted in the Ordinary Course of Business on the unearned portion of insurance premiums securing Debt described in clause (f) of the definition of Permitted Debt;

(p)     Liens solely on any cash earnest money deposits made by a Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement with respect to a Permitted Acquisition;

(q)     Liens assumed by any Borrower or its Subsidiaries in connection with a Permitted Acquisition and securing Debt described in clause (i) of the definition of Permitted Debt; and

(r)     other Liens in an amount not exceeding $50,000 in the aggregate.

"**Permitted Modifications**" means (a) such amendments or other modifications to a Borrower's or Subsidiary's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Agent within thirty (30) days after such amendments or modifications have become effective, and (b) such amendments or modifications to a Borrower's or Subsidiary's Organizational Documents (other than those involving a change in the name of a Borrower or Subsidiary or involving a reorganization of a Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of the Agent or Lenders in any material respect and fully disclosed to Agent within thirty (30) days after such amendments or modifications have become effective.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Pro Rata Share**" means (a) with respect to a Lender's obligation to make advances in respect of a Term Loan and such Lender's right to receive payments of principal and interest with respect to the Term Loans, the Term Loan Commitment Percentage of such Lender, (b) with respect to a Lender's obligation to make Revolving Loans, such Lender's right to receive the unused line fee described in Section 2.2(b), such Lender's obligation to purchase interests and participations in Letters of Credit and related Support Agreement liabilities and obligations, and such Lender's obligation to share in Letter of Credit Liabilities and to receive the related Letter of Credit fee described in Section 2.5(b), the Revolving Loan Commitment Percentage of such Lender, (c) with respect to a Lender's right to receive payments of principal and interest with respect to Revolving Loans, such Lender's Revolving Loan Exposure with respect thereto; and (d) for all other purposes (including, without limitation, the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by *dividing* (i) the sum of the Revolving Loan Commitment Amount and Term Loan Commitment Amount of such Lender (or, in the event the Revolving Loan Commitment and Term Loan Commitment shall have been terminated, such Lender's then existing Revolving Loan Outstandings or then outstanding principal advances of such Lender under the Term Loan, as applicable), *by* (ii) the sum of the Revolving Loan Commitment and Term Loan Commitment Amount (or, in the event the Revolving Loan Commitment or Term Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings or then outstanding principal advances of such Lenders under the Term Loan, as applicable) of all Lenders.

"**Qualified Cash**" means, as of any date of determination, the aggregate amount of unrestricted cash and cash equivalents on-hand of the Credit Parties subject to no Lien other than the Lien of Agent, and other non-consensual Permitted Liens, and maintained in Deposit Accounts or Securities Accounts in the name of a Credit Party in the United States as of such date, which, in each case, are not Lockbox Accounts and are subject to Deposit Account Control Agreements or a Securities Account Control Agreement.

"**Reimbursement Obligations**" means, at any date, the obligations of each Borrower then outstanding to reimburse (a) Agent for payments made by Agent under a Support Agreement, and/or (b) any LC Issuer, for payments made by such LC Issuer under a Lender Letter of Credit.

"**Required Lenders**" means at any time Lenders holding (a) sixty-six and two thirds percent (66 2/3%) or more of the sum of the Revolving Loan Commitment and the Term Loan Commitment (taken as a whole), or (b) if the Revolving Loan Commitment or Term Loan Commitment has been terminated, sixty-six and two thirds percent (66 2/3%) or more of the sum of (x) the then aggregate outstanding principal balance of the Loans *plus* (y) the then aggregate amount of Letter of Credit Liabilities

"**Responsible Officer**" means any of the Chief Executive Officer, Chief Financial Officer or any other officer of the applicable Borrower acceptable to Agent.

"**Revolving Lender**" means each Lender having a Revolving Loan Commitment Amount in excess of $0 (or, in the event the Revolving Loan Commitment shall have been terminated at any time, each Lender at such time having Revolving Loan Outstandings in excess of $0).

"**Revolving Loan Availability**" means, at any time, the Revolving Loan Limit *minus* the Revolving Loan Outstandings.

"**Revolving Loan Commitment**" means, as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date.

"**Revolving Loan Commitment Amount**" means, as to any Lender, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Amount" (if such Lender's name is not so set forth thereon, then the dollar amount on the Commitment Annex for the Revolving Loan Commitment Amount for such Lender shall be deemed to be $0), as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Revolving Loans outstanding and its commitment to make Revolving Loans) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party.

"**Revolving Loan Commitment Percentage**" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the Revolving Loan Commitment Amount of such Lender on such date *divided by* the Revolving Loan Commitment on such date.

"**Revolving Loan Exposure**" means, with respect to any Lender on any date of determination, the percentage equal to the amount of such Lender's Revolving Loan Outstandings on such date *divided by* the aggregate Revolving Loan Outstandings of all Lenders on such date.

"**Revolving Loan Limit**" means, at any time, the lesser of (a) the Revolving Loan Commitment and (b) the Borrowing Base (as determined by the most recently delivered Borrowing Base Certificate).

"**Revolving Loan Outstandings**" means, at any time of calculation, (a) the sum of the then existing aggregate outstanding principal amount of Revolving Loans *plus* the then existing Letter of Credit Liabilities, and (b) when used with reference to any single Lender, the sum of the then existing outstanding principal amount of Revolving Loans advanced by such Lender *plus* the then existing Letter of Credit Liabilities for the account of such Lender.

27

"**Revolving Loans**" has the meaning set forth in Section 2.1(b).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Account**" means a "securities account" (as defined in Article 9 of the UCC), an investment account, or other account in which investment property or securities are held or invested for credit to or for the benefit of any Borrower.

"**Securities Account Control Agreement**" means an agreement, in form and substance satisfactory to Agent, among Agent, any applicable Borrower and each securities intermediary in which such Borrower maintains a Securities Account pursuant to which Agent shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"**Security Document**" means this Agreement and any other agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the Obligations, and/or (b) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of the Lenders, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Settlement Agreement**" means that certain Confidential Settlement Agreement, dated as of April 26, 2019 by and between EMSI and BMO Harris Bank, N.A.

"**Solvent**" means, with respect to any Person, that such Person (a) owns and will own assets the fair saleable value of which are (i) greater than the total amount of its liabilities (including Contingent Obligations), and (ii) greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it; (b) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction; and (c) does not intend to incur and does not believe that it will incur debts beyond its general ability to pay such debts as they become due.

"**Specified Equity Contribution**" has the meaning set forth in Section 6.5.

"**Sponsor Management Agreement**" means that certain Management Agreement dated as of November 3, 2015 between Sponsor and EMSI Holding, as in effect on the date hereof.

"**Sponsor**" means Beecken Petty O'Keefe & Company, LLC, a Delaware limited liability company.

"**Stock Purchase Litigation**" means the lawsuit captioned *EMSI Acquisition, Inc. v. RSUI Indemnity Company*, No. 1-16-cv-01046 (D. Del) that is currently pending in the United States Court of Appeals for the Third Circuit, No. 18-2712.

"**Subordinated Debt**" means any Debt of Borrowers incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Agent, all of which documents must be in form and substance acceptable to Agent in its sole discretion. As of the Closing Date, there is no Subordinated Debt.

"**Subordinated Debt Documents**" means any documents evidencing and/or securing Debt governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Agent in its sole discretion. As of the Closing Date, there are no Subordinated Debt Documents.

"**Subordination Agreement**" means any agreement between Agent and another creditor of Borrowers, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Debt owing from any Borrower(s) and/or the Liens securing such Debt granted by any Borrower(s) to such creditor are subordinated in any way to the Obligations and the Liens created under the Security Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Agent in the exercise of its sole discretion.

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which an aggregate of more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, capital stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such capital stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"**Support Agreement**" has the meaning set forth in Section 2.5(a).

"**Supported Letter of Credit**" means a Letter of Credit issued by an LC Issuer in reliance on one or more Support Agreements.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means the earlier to occur of (a) the Commitment Expiry Date, (b) any date on which Agent accelerates the maturity of the Loans pursuant to Section 10.2, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section 2.12.

"**Term Loan**" has the meaning set forth in Section 2.1(a).

"**Term Loan Commitment**" means, as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date.

"**Term Loan Commitment Amount**" means, (a) as to any Lender that is a Lender on the Closing Date, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Amount", as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Term Loans outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party, and (b) as to any Lender that becomes a Lender after the Closing Date, the amount of the "Term Loan Commitment Amount(s)" of other Lender(s) assigned to such new Lender

pursuant to the terms of the effective assignment agreement(s) pursuant to which such new Lender shall become a Lender, as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Term Loans outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party.

"**Term Loan Commitment Percentage**" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the Term Loan Commitment Amount of such Lender on such date *divided by* the Term Loan Commitment on such date.

"**UCC**" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

"**U.S. Lender Party**" has the meaning set forth in Section 2.8(c).

"**Waco Relocation Expenses**" means any costs and expenses related to the consolidation of two customer support centers in Waco, TX including, but not limited to, in connection with the relocation of personnel and equipment and upgrades to the backup and power supply systems to support the combined workforce.

"**Withholding Agent**" means any Borrower or Agent.

**Section 1.2**     Accounting Terms and Determinations.     Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including, without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of each Borrower and its Consolidated Subsidiaries delivered to Agent and each of the Lenders on or prior to the Closing Date. If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and either Borrowers or the Required Lenders shall so request, the Agent, the Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided*, *however*, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing, all leases of any Person that are or would be characterized as operating leases in accordance with GAAP as implemented immediately prior to the Closing Date (whether or not such operating leases were in effect on such date) shall continue to be accounted for as operating leases (and not capital lease obligations) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such leases to be re-characterized as capital lease obligations unless otherwise agreed to by Borrowers and Agent. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards

30

159 (or any other Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value", as defined therein.

**Section 1.3** <u>Other Definitional and Interpretive Provisions</u>. References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations. All amounts used for purposes of financial calculations required to be made herein shall be without duplication. References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States. References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto. As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC. All references herein to times of day shall be references to daylight or standard time, as applicable.

**Section 1.4** <u>Time is of the Essence</u>. Time is of the essence in Borrower's and each other Credit Party's performance under this Agreement and all other Financing Documents.

## ARTICLE 2 - LOANS AND LETTERS OF CREDIT

**Section 2.1** <u>Loans</u>.

(a) <u>Term Loans</u>.

(i) <u>Term Loan Amounts</u>. On the terms and subject to the conditions set forth herein, the Lenders severally hereby agree to make to Borrowers a term loan in an original principal amount equal to the Term Loan Commitment ("**Term Loan**"). Each Lender's obligation to fund the Term Loan shall be limited to such Lender's Term Loan Commitment Percentage, and no Lender shall have any obligation to fund any portion of any Term Loan required to be funded by any other Lender, but not so funded. No Borrower shall have any right to reborrow any portion of the Term Loan that is repaid or prepaid from time to time. The Term Loan shall be funded in one advance on the Closing Date. Borrowers shall deliver to Agent a Notice of Borrowing with respect to the proposed Term Loan advance, such Notice of Borrowing to be delivered no later than noon (Eastern time) on the Business Day prior to the Closing Date.

(ii) <u>Scheduled Repayments; Mandatory Prepayments; Optional Prepayments</u>.

(A) There shall become due and payable, and Borrowers shall repay the Term Loan through, scheduled payments as set forth on <u>Schedule 2.1</u> attached hereto. Notwithstanding the payment schedule set forth above, the outstanding principal amount of the Term Loan shall become immediately due and payable in full on the Termination Date.

31

(B)　　　There shall become due and payable and Borrowers shall prepay the Term Loan in the following amounts and at the following times:

(i)　　　unless Agent shall otherwise consent in writing, no later than two (2) Business Days after the date on which any Credit Party (or Agent as loss payee or assignee) receives any casualty proceeds in excess of $250,000 with respect to assets upon which Agent maintained a Lien, an amount equal to one hundred percent (100%) of such proceeds (net of out-of-pocket expenses and repayment of secured debt permitted under clause (c) of the definition of Permitted Debt and encumbering the property that suffered such casualty), or such lesser portion of such proceeds as Agent shall elect to apply to the Obligations;

(ii)　　　an amount equal to any interest that is deemed to be in excess of the Maximum Lawful Rate (as defined below) and is required to be applied to the reduction of the principal balance of the Loans by any Lender as provided for in Section 2.7;

(iii)　　　unless Agent shall otherwise consent in writing, no later than two (2) Business Days after the date on which any Credit Party receives the proceeds of any Asset Disposition in excess of $250,000 that is not made in the Ordinary Course of Business or that pertains to any Collateral upon which a Borrowing Base is calculated, an amount equal to one hundred percent (100%) of the net cash proceeds of such Asset Disposition (net of out-of-pocket expenses and repayment of secured debt permitted under clause (c) of the definition of Permitted Debt and encumbering such asset), or such lesser portion as Agent shall elect to apply to the Obligations;

(iv)　　　unless Agent shall otherwise consent in writing, no later than two (2) Business Days after the date on which any Credit Party receives the proceeds from the incurrence of Debt or issuance and sale of any Debt or equity securities, an amount equal to one hundred percent (100%) of such proceeds, or such lesser portion as Agent shall elect to apply to the Obligations;

(v)　　　unless Agent shall otherwise consent in writing, no later than two (2) Business Days after the date on which any Credit Party or any Subsidiary receives any Extraordinary Receipts (other than in connection with the Stock Purchase Litigation, which is addressed in clause (vi) below) in excess of $250,000, an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Extraordinary Receipts;

(vi)　　　no later than two (2) Business Days after the date on which any Credit Party or any Subsidiary receives any Extraordinary Receipts in connection with the Stock Purchase Litigation, an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Extraordinary Receipts; provided that, notwithstanding the foregoing, if proceeds of such Extraordinary Receipts remain after the outstanding principal balance of the Term Loan is paid down to $5,000,000 (or if the outstanding principal balance of the Term Loan is less than $5,000,000 prior to receipt of such proceeds), so long as no Event of Default or Default then exists and the Borrowers have delivered to Agent a duly completed Compliance Certificate signed by a Responsible Officer demonstrating pro forma compliance with the financial covenants set forth in Article 6 of this Agreement

both before and after receipt and application of such Extraordinary Receipts, the mandatory prepayment amount required with respect to such remaining Extraordinary Receipts received in connection with the Stock Purchase Litigation shall be fifty percent (50%); and

(vii)    within one (1) Business Day of the date of receipt by any Borrowers of the proceeds of any Specified Equity Contribution pursuant to Section 6.5, an amount equal to 100% of such proceeds.

Notwithstanding the foregoing and so long as no Event of Default or Default then exists: (1) any such casualty proceeds in excess of $250,000 may be used by Borrowers within one hundred eighty (180) days from the receipt of such proceeds to replace or repair any assets in respect of which such proceeds were paid so long as (x) prior to the receipt of such proceeds, Borrowers have delivered to Agent a reinvestment plan detailing such replacement or repair acceptable to Agent in its reasonable discretion, (y) the monies or proceeds received by Borrowers in connection with such casualty event shall be deposited in a Deposit Account subject to a Deposit Account Control Agreement and (z) Borrowers notify Agent in writing when such reinvestment occurs; and (2) proceeds of personal property Asset Dispositions in excess of $250,000 that are not made in the Ordinary Course of Business (other than Collateral upon which the Borrowing Base is calculated) may be used by Borrowers within one hundred eighty (180) days from the receipt of such proceeds to purchase new or replacement assets of comparable value, so long as (y) prior to the receipt of such proceeds, Borrowers have delivered to Agent a reinvestment plan detailing such replacement or repair acceptable to Agent in its reasonable discretion and (z) Borrowers notify Agent in writing when such reinvestment occurs.  If the applicable Borrower does not intend to fully reinvest the proceeds described in this paragraph, or if the applicable time period set forth in the immediately prior sentence expires without such Borrower having reinvested all of such proceeds, Borrowers shall within five (5) Business Day prepay the Loans in an amount equal to such proceeds (to the extent not reinvested or intended to be reinvested within such time period).

(C)    Borrowers may from time to time, with at least two (2) Business Days prior delivery to Agent of an appropriately completed Payment Notification, prepay the Term Loan in whole or in part; *provided, however*, that each such prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000 and shall be accompanied by any prepayment fees required hereunder.

(iii)    All Prepayments.  Except as this Agreement may specifically provide otherwise, (A) all prepayments made pursuant to Section 2.1(a)(ii)(B) shall be applied by Agent pro rata to the remaining installments of the Term Loan (excluding, solely in the case of the prepayment described in Section 2.1(a)(ii)(B)(vi), the last installment due on the Termination Date) and (B) optional prepayments pursuant to Section 2.1(a)(ii)(C) shall be applied as directed by the Borrower Representative (provided that, without the prior consent of Agent, the Borrower Representative may not direct the application of any optional prepayment of the Term Loan to more than three (3) installments in direct order of maturity).  For purpose of clarity, except with respect to the prepayment described in Section 2.1(a)(ii)(B)(vi), the payment due on the Termination Date shall be deemed an installment.

33

        (iv)     <u>LIBOR Rate</u>.

        (A)     Except as provided in subsection (C) below, the Term Loan shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

        (B)     The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; *provided, however,* that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

        (C)     In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to maintain Loans bearing interest based upon the LIBOR Rate or to continue such maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender, (I) in the case of the pro rata share of the Term Loan held by such Lender and then outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such portion of the Term Loan, and interest upon such portion thereafter shall accrue interest at the Base Rate *plus* the Applicable Margin, and (II) such portion of the Term Loan shall continue to accrue interest at the Base Rate *plus* the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Term Loan at the LIBOR Rate.

        (D)     Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

CHICAGO/#3272775.8

(b)    Revolving Loans.

(i)    Revolving Loans and Borrowings.    On the terms and subject to the conditions set forth herein, each Lender severally agrees to make loans to Borrowers from time to time as set forth herein (each a "**Revolving Loan**", and collectively, "**Revolving Loans**") equal to such Lender's Revolving Loan Commitment Percentage of Revolving Loans requested by Borrowers hereunder, *provided*, *however*, that after giving effect thereto, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit.  Borrowers shall deliver to Agent a Notice of Borrowing with respect to each proposed borrowing of a Revolving Loan, such Notice of Borrowing to be delivered before 1:00 p.m. (Eastern time) two (2) Business Days prior to the date of such proposed borrowing.  Each Borrower and each Revolving Lender hereby authorizes Agent to make Revolving Loans on behalf of Revolving Lenders, at any time in its sole discretion, (A) as provided in Section 2.5(c), with respect to obligations arising under Support Agreements and/or Lender Letters of Credit, and (B) to pay principal owing in respect of the Loans and interest, fees, expenses and other charges payable by any Credit Party from time to time arising under this Agreement or any other Financing Document.  The Borrowing Base shall be determined by Agent based on the most recent Borrowing Base Certificate delivered to Agent in accordance with this Agreement and such other information as may be available to Agent.  Without limiting any other rights and remedies of Agent hereunder or under the other Financing Documents, the Revolving Loans shall be subject to Agent's continuing right to withhold from the Borrowing Base reserves, and to increase and decrease such reserves from time to time, if and to the extent that in Agent's good faith credit judgment and discretion, such reserves are necessary.

(ii)    Mandatory Revolving Loan Repayments and Prepayments.

(A)    The Revolving Loan Commitment shall terminate on the Termination Date.  On such Termination Date, there shall become due, and Borrowers shall pay, the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid Obligations pertaining thereto incurred to, but excluding the Termination Date; *provided, however,* that such payment is made not later than 12:00 Noon (Eastern time) on the Termination Date.

(B)    If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrowers shall repay the Revolving Loans or cash collateralize Letter of Credit Liabilities in the manner specified in Section 2.5(e) or cause the cancellation of outstanding Letters of Credit, or any combination of the foregoing, in an aggregate amount equal to such excess.

(C)    Principal payable on account of Revolving Loans shall be payable by Borrowers to Agent (I) immediately upon the receipt by any Borrower or Agent of any payments on or proceeds from any of the Accounts, to the extent of such payments or proceeds, as further described in Section 2.11 below, and (II) in full on the Termination Date.

(iii)    Optional Prepayments.    Borrowers may from time to time prepay the Revolving Loans in whole or in part; *provided*, *however*, that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(iv)     LIBOR Rate.

(A)     Except as provided in subsection (C) below, Revolving Loans shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

(B)     The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; *provided, however,* that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

(C)     In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Loans bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (I) in the case of any outstanding Loans of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon such Lender's Loans thereafter shall accrue interest at Base Rate *plus* the Applicable Margin, and (II)  such Loans shall continue to accrue interest at Base Rate *plus* the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Loans at the LIBOR Rate.

(D)     Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

**Section 2.2**     Interest, Interest Calculations and Certain Fees.

(a)     Interest. From and following the Closing Date, except as expressly set forth in this Agreement, Loans and the other Obligations shall bear interest at the sum of the LIBOR Rate *plus* the Applicable Margin. Interest on the Loans shall be paid in arrears on the first (1st) day of each month and on the maturity of such Loans, whether by acceleration or otherwise. Interest on all other Obligations shall be payable upon demand. For purposes of calculating interest, all funds transferred to the Payment Account for application to any Revolving Loans or the Term Loan shall be subject to a five (5) Business Day clearance period (to be reduced to four (4) Business Days from and after the date that the outstanding principal balance of the Term Loan is less than $3,000,000.00), and all interest accruing on such funds during such clearance period shall accrue for the benefit of Agent, and not for the benefit of the Lenders.

(b)     Unused Line Fee. From and following the Closing Date, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans, in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) (A) the Revolving Loan Commitment *minus* (B) the average daily balance of the sum of the Revolving Loan Outstandings during the preceding month, *multiplied by* (ii) one half of one percent (0.50%) per annum. Such fee is to be paid monthly in arrears on the first day of each month.

(c)     Fee Letter. In addition to the other fees set forth herein, the Borrowers agree to pay Agent the fees set forth in the Fee Letter.

(d)     Minimum Balance Fee. On the first day of each month, commencing with the first full calendar month after the Closing Date, the Borrowers agree to pay to Agent, for the ratable benefit of all Lenders committed to make Revolving Loans, the sum of the Minimum Balance Fees due for the prior month. The Minimum Balance Fee shall be deemed fully earned when due and payable and, once paid, shall be non-refundable.

(e)     Deferred Revolving Loan Origination Fee. If Lenders' funding obligations in respect of the Revolving Loan Commitment under this Agreement terminate in full by voluntary termination by Borrowers prior to the Commitment Expiry Date, Borrowers shall pay to Agent, for the benefit of all Lenders committed to make Revolving Loans on the Closing Date, a fee as compensation for the costs of such Lenders being prepared to make funds available to Borrowers under this Agreement, equal to an amount determined by *multiplying* the highest Revolving Loan Commitment in effect from and after the Closing Date *by* the following applicable percentage amount: (i) two percent (2.00%) until and including April 25, 2020 (ii) one percent (1.00%) from April 26, 2020 until and including April 25, 2021, (iii) one-half of one percent (0.50%) from April 26, 2021 until and including October 25, 2021 and (iv) zero percent (0.00%) thereafter. Notwithstanding the foregoing, if the Revolving Loan Commitment is voluntarily terminated in full in connection with a Change of Control and/or in connection with an asset or stock sale involving aggregate consideration of $20,000,000 or more, the percentages referenced in the previous sentence shall be reduced as follows: (i) one percent (1.00%) until and including April 25, 2020, (ii) one-half of one percent (0.50%) from April 26, 2020 until and including April 25, 2021, (iii) one-quarter of one percent (0.25%) from April 26, 2021 until and including October 25, 2021 and (iv) zero percent (0.00%) thereafter. All fees payable pursuant to this paragraph shall be deemed fully earned and non-refundable as of the Closing Date.

(f)     Audit Fees. Borrowers shall pay to Agent, for its own account and not for the benefit of any other Lenders, all reasonable fees and expenses in connection with audits and inspections of Borrowers' books and records, audits, valuations or appraisals of the Collateral, audits of Borrowers' compliance with applicable Laws and such other matters as Agent shall deem appropriate, which shall be due and payable on the first Business Day of the month following the date of issuance by Agent of a written

37

request for payment thereof to Borrowers, provided that Borrowers shall not be obligated to reimburse Agent for the expenses associated with more than two (2) such audits, inspections, valuations or appraisals in any fiscal year except to the extent an audit is commenced at a time when an Event of Default exists (in which case Borrowers shall be obligated to reimburse Agent for its fees and expenses in accordance with this clause (e) without regard to the number of audits, inspections, valuations or appraisals conducted during such fiscal year).

(g)     Wire Fees.  Borrowers shall pay to Agent, for its own account and not for the account of any other Lenders, on written demand, fees for incoming and outgoing wires made for the account of Borrowers, such fees to be based on Agent's then current wire fee schedule (available upon written request of the Borrowers).

(h)     Late Charges.  If payments of principal (other than a final installment of principal upon the Termination Date), interest due on the Obligations, or any other amounts due hereunder or under the other Financing Documents are not timely made and remain overdue for a period of five (5) days, Borrowers, without notice or demand by Agent, promptly shall pay to Agent, for its own account and not for the benefit of any other Lenders, as additional compensation to Agent in administering the Obligations, an amount equal to five percent (5.0%) of each delinquent payment.

(i)     Computation of Interest and Related Fees.  All interest and fees under each Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  The date of funding of a Loan shall be included in the calculation of interest.  The date of payment of a Loan shall be excluded from the calculation of interest.  If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.

(j)     Automated Clearing House Payments.  If Agent so elects, monthly payments of principal, interest, fees, expenses or any other amounts due and owing from Borrower to Agent hereunder shall be paid to Agent by Automated Clearing House debit of immediately available funds from the financial institution account designated by Borrower Representative in the Automated Clearing House debit authorization executed by Borrowers or Borrower Representative in connection with this Agreement, and shall be effective upon receipt.  Borrowers shall execute any and all forms and documentation necessary from time to time to effectuate such automatic debiting.  In no event shall any such payments be refunded to Borrowers.

Section 2.3     Notes.  The portion of the Loans made by each Lender shall be evidenced, if so requested by such Lender, by one or more promissory notes executed by Borrowers on a joint and several basis (each, a "**Note**") payable to such Lender and its registered assignees in an original principal amount equal to such Lender's Revolving Loan Commitment Amount or Term Loan Commitment Amount.

Section 2.4     Reserved.

Section 2.5     Letters of Credit and Letter of Credit Fees.

(a)     Letter of Credit.  On the terms and subject to the conditions set forth herein, the Revolving Loan Commitment may be used by Borrowers, in addition to the making of Revolving Loans hereunder, for the issuance, prior to that date which is one year prior to the Termination Date, by (i) Agent, of letters of credit, Guarantees or other agreements or arrangements (each, a "**Support Agreement**") to induce an LC Issuer to issue or increase the amount of, or extend the expiry date of, one or more Letters of Credit and (ii) a Lender, identified by Agent, as an LC Issuer, of one or more Lender Letters of Credit, so long as, in each case:

38

(i)     Agent shall have received a Notice of LC Credit Event at least five (5) Business Days before the relevant date of issuance, increase or extension; and

(ii)     after giving effect to such issuance, increase or extension, (A) the aggregate Letter of Credit Liabilities do not exceed $1,000,000.00, and (B) the Revolving Loan Outstandings do not exceed the Revolving Loan Limit

Nothing in this Agreement shall be construed to obligate any Lender to issue, increase the amount of or extend the expiry date of any Letter of Credit, which act or acts, if any, shall be subject to agreements to be entered into from time to time between Borrowers and such Lender. Each Lender that is an LC Issuer hereby agrees to give Agent prompt written notice of each issuance of a Lender Letter of Credit by such Lender and each payment made by such Lender in respect of Lender Letters of Credit issued by such Lender.

(b)     Letter of Credit Fee. Borrowers shall pay to Agent, for the benefit of the Revolving Lenders in accordance with their respective Pro Rata Shares, a letter of credit fee with respect to the Letter of Credit Liabilities for each Letter of Credit, computed for each day from the date of issuance of such Letter of Credit to the date that is the last day a drawing is available under such Letter of Credit, at a rate per annum equal to the Applicable Margin then applicable to Loans bearing interest based upon the LIBOR Rate. Such fee shall be payable in arrears on the last day of each calendar month prior to the Termination Date and on such date. In addition, Borrowers agree to pay promptly to the LC Issuer any fronting or other fees that it may charge in connection with any Letter of Credit.

(c)     Reimbursement Obligations of Borrowers. If either (i) Agent shall make a payment to an LC Issuer pursuant to a Support Agreement, or (ii) any Lender shall notify Agent that it has made payment in respect of, a Lender Letter of Credit, (A) the applicable Borrower shall reimburse Agent or such Lender, as applicable, for the amount of such payment by the end of the day on which Agent or such Lender shall make such payment and (B) Borrowers shall be deemed to have immediately requested that Revolving Lenders make a Revolving Loan, in a principal amount equal to the amount of such payment (but solely to the extent such Borrower shall have failed to directly reimburse Agent or, with respect to Lender Letters of Credit, the applicable LC Issuer, for the amount of such payment). Agent shall promptly notify Revolving Lenders of any such deemed request and each Revolving Lender hereby agrees to make available to Agent not later than noon (Eastern time) on the Business Day following such notification from Agent such Revolving Lender's Pro Rata Share of such Revolving Loan. Each Revolving Lender hereby absolutely and unconditionally agrees to fund such Revolving Lender's Pro Rata Share of the Loan described in the immediately preceding sentence, unaffected by any circumstance whatsoever, including, without limitation, (x) the occurrence and continuance of a Default or Event of Default, (y) the fact that, whether before or after giving effect to the making of any such Revolving Loan, the Revolving Loan Outstandings exceed or will exceed the Revolving Loan Limit, and/or (z) the non-satisfaction of any conditions set forth in Section 7.2. Agent hereby agrees to apply the gross proceeds of each Revolving Loan deemed made pursuant to this Section 2.5(c) in satisfaction of Borrowers' reimbursement obligations arising pursuant to this Section 2.5(c). Borrowers shall pay interest, on demand, on all amounts so paid by Agent pursuant to any Support Agreement or to any applicable Lender in honoring a draw request under any Lender Letter of Credit for each day from the date of such payment until Borrowers reimburse Agent or the applicable Lender therefor (whether pursuant to clause (A) or (B) of the first sentence of this subsection (c)) at a rate per annum equal to the sum of two percent (2%) *plus* the interest rate applicable to Revolving Loans for such day.

(d)     Reimbursement and Other Payments by Borrowers. The obligations of each Borrower to reimburse Agent and/or the applicable LC Issuer pursuant to Section 2.5(c) shall be absolute,

unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including the following:

(i)     any lack of validity or enforceability of, or any amendment or waiver of or any consent to departure from, any Letter of Credit or any related document;

(ii)     the existence of any claim, set-off, defense or other right which any Borrower may have at any time against the beneficiary of any Letter of Credit, the LC Issuer (including any claim for improper payment), Agent, any Lender or any other Person, whether in connection with any Financing Document or any unrelated transaction, *provided*, *however*, that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(iii)     any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(iv)     any affiliation between the LC Issuer and Agent; or

(v)     to the extent permitted under applicable Law, any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

(e)     <u>Deposit Obligations of Borrowers</u>.  In the event any Letters of Credit are outstanding at the time that Borrowers prepay in full or are required to repay the Obligations or the Revolving Loan Commitment is terminated, Borrowers shall (i) deposit with Agent for the benefit of all Revolving Lenders cash in an amount equal to one hundred five percent (105%) of the aggregate outstanding Letter of Credit Liabilities to be available to Agent, for its benefit and the benefit of issuers of Letters of Credit, to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related thereto, and (ii) prepay the fee payable under Section 2.5(b) with respect to such Letters of Credit for the full remaining terms of such Letters of Credit assuming that the full amount of such Letters of Credit as of the date of such repayment or termination remain outstanding until the end of such remaining terms.  Upon termination of any such Letter of Credit and so long as no Event of Default has occurred and is continuing, the unearned portion of such prepaid fee attributable to such Letter of Credit shall be refunded to Borrowers, together with the deposit described in the preceding clause (i) attributable to such Letter of Credit, but only to the extent not previously applied by Agent in the manner described herein.

(f)     <u>Participations in Support Agreements and Lender Letters of Credit</u>.

(i)     Concurrently with the issuance of each Supported Letter of Credit, Agent shall be deemed to have sold and transferred to each Revolving Lender, and each such Revolving Lender shall be deemed irrevocably and immediately to have purchased and received from Agent, without recourse or warranty, an undivided interest and participation in, to the extent of such Lender's Pro Rata Share, Agent's Support Agreement liabilities and obligations in respect of such Supported Letter of Credit and Borrowers' Reimbursement Obligations with respect thereto. Concurrently with the issuance of each Lender Letter of Credit, the LC Issuer in respect thereof shall be deemed to have sold and transferred to each Revolving Lender, and each such Revolving Lender shall be deemed irrevocably and immediately to have purchased and received from such LC Issuer, without recourse or warranty, an undivided interest and participation in, to the extent of such Lender's Pro Rata Share, such Lender Letter of Credit and Borrowers' Reimbursement Obligations with respect thereto.  Any purchase obligation arising pursuant to the immediately two

preceding sentences shall be absolute and unconditional and shall not be affected by any circumstances whatsoever.

(ii) If either (A) Agent makes any payment or disbursement under any Support Agreement and/or (B) an LC Issuer makes any payment or disbursement under any Lender Letter of Credit, and (I) Borrowers have not reimbursed Agent or the applicable LC Issuer, as applicable, in full for such payment or disbursement in accordance with Section 2.5(c), or (II) any reimbursement under any Support Agreement or Lender Letter of Credit received by Agent or any LC Issuer, as applicable, from any Credit Party is or must be returned or rescinded upon or during any bankruptcy or reorganization of any Credit Party or otherwise, each Revolving Lender shall be irrevocably and unconditionally obligated to pay to Agent or the applicable LC Issuer, as applicable, its Pro Rata Share of such payment or disbursement (but no such payment shall diminish the Obligations of Borrowers under Section 2.5(c)). To the extent any such Revolving Lender shall not have made such amount available to Agent or the applicable LC Issuer, as applicable, before 12:00 Noon (Eastern time) on the Business Day on which such Lender receives notice from Agent or the applicable LC Issuer, as applicable, of such payment or disbursement, or return or rescission, as applicable, such Lender agrees to pay interest on such amount to Agent or the applicable LC Issuer, as applicable, forthwith on demand accruing daily at the Federal Funds Rate, for the first three (3) days following such Lender's receipt of such notice, and thereafter at the Base Rate *plus* the Applicable Margin in respect of Revolving Loans. Any such Revolving Lender's failure to make available to Agent or the applicable LC Issuer, as applicable, its Pro Rata Share of any such payment or disbursement, or return or rescission, as applicable, shall not relieve any other Lender of its obligation hereunder to make available such other Revolving Lender's Pro Rata Share of such payment, but no Revolving Lender shall be responsible for the failure of any other Lender to make available such other Lender's Pro Rata Share of any such payment or disbursement, or return or rescission.

**Section 2.6**     <u>General Provisions Regarding Payment; Loan Account</u>.

(a) All payments to be made by each Borrower under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto). Any payments received in the Payment Account before 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on such date, and any payments received in the Payment Account at or after 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on the next succeeding Business Day. In the absence of receipt by Agent of a written designation by Borrower Representative, at least two (2) Business Days prior to such prepayment, that such prepayment is to be applied to a Term Loan, Borrowers and each Lender hereby authorize and direct Agent, subject to the provisions of Section 10.7 hereof, to apply such prepayment against then outstanding Revolving Loans, and second, if no Revolving Loans are then outstanding, pro rata against all outstanding Term Loans in accordance with the provisions of Section 2.1(a)(iii); *provided, however,* that if Agent at any time determines that payments received by Agent were in respect of a mandatory prepayment event, Agent shall apply such payments in accordance with the provisions of Section 2.1(a)(ii) and shall be fully authorized by Borrowers and each Lender to make corresponding Loan Account reversals in respect thereof.

(b)     Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by the Lenders hereunder or under any other Financing Document, and all payments thereon made by each Borrower. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded in Agent's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to Agent by each Borrower absent manifest error; *provided*, *however*, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay all amounts owing hereunder or under any other Financing Document. Agent shall endeavor to provide Borrowers with a monthly statement regarding the Loan Account (but neither Agent nor any Lender shall have any liability if Agent shall fail to provide any such statement). Unless any Borrower notifies Agent of any objection to any such statement (specifically describing the basis for such objection) within ninety (90) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrowers in all respects as to all matters reflected therein.

**Section 2.7**     Maximum Interest. In no event shall the interest charged with respect to the Loans or any other Obligations of any Borrower under any Financing Document exceed the maximum amount permitted under the laws of the State of New York or of any other applicable jurisdiction. Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable Law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; *provided*, *however*, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, each Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable. Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply. In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrowers. In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate *divided by* the number of days in the year in which such calculation is made.

**Section 2.8**     Taxes; Capital Adequacy.

(a)     All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and if any such withholding or deduction is in respect of any Indemnified Taxes, then the Borrowers shall pay such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent and each Lender will equal the full amount Agent and such Lender would have received had no such withholding or deduction been required (including, without limitation, such withholdings and deductions applicable to additional sums payable under this Section 2.8). After payment of any Tax by a Borrower to a Governmental Authority pursuant to this Section 2.8, such Borrower shall promptly forward to Agent the original or a certified copy of an official receipt, a

42

copy of the return reporting such payment, or other documentation reasonably satisfactory to Agent evidencing such payment to such Governmental Authority. Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(b)     The Borrowers shall indemnify Agent and Lenders, within ten (10) days after receipt of written demand thereof, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) payable or paid by Agent or any Lender or required to be withheld or deducted from a payment to Agent or any Lender and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes and Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate in reasonable detail as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)     (i)     Each Lender that is not a U.S. person within the meaning of Section 7701(a)(30) of the Code (a "**Non-U.S. Lender Party**") shall, to the extent permitted by Law, on or prior to the date on which such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder provide Agent and the Borrower Representative with two completed copies of each of the following, as applicable: (A) IRS Forms W-8ECI (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN (or W-8BEN-E, as applicable) (claiming exemption from, or a reduction of, U.S. withholding Tax under an income Tax treaty) and/or -8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, IRS Form W-8BEN (or W-8BEN-E, as applicable) claiming exemption from U.S. withholding Tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) so long as in the Non-U.S. Lender Party's reasonable judgment the completion, execution or submission of such other documents would not subject such Non-U.S. Lender Party to any material unreimbursed cost or expense or materially prejudice the legal or commercial position of such Lender, any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents.

(ii)     Each Lender that is a U.S. person within the meaning of Section 7701(a)(30) of the Code (a "**U.S. Lender Party**") shall on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder provide Agent and the Borrower Representative (or in the case of a Participant or special purpose vehicle, the relevant Lender) with two completed copies of IRS Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding Tax) or any successor form.

(iii)     In addition, any Lender, if reasonably requested by the Borrower Representative or Agent, shall deliver such other documentation prescribed by applicable requirements of Law or reasonably requested by the Borrower Representative or Agent as will enable the Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(iv)     Each Lender agrees that if any documentation it previously delivered pursuant to this Section 2.8(c) expires or becomes obsolete or inaccurate in any respect, it shall

promptly update such documentation or promptly notify the Borrower Representative and Agent in writing of its legal ineligibility to do so. Each Lender hereby authorizes Agent to deliver to the Credit Parties and to any successor Agent any documentation provided by such Lender to Agent pursuant to this Section 2.8(c).

(d)      If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified by any Borrower pursuant to this Section 2.8 (including by the payment of additional amounts pursuant to this Section 2.8), then it shall promptly pay an amount equal to such refund to Borrowers, net of all reasonable out-of-pocket expenses of such Lender or of Agent with respect thereto, including any Taxes; provided, however, that Borrowers, upon the written request of such Lender or Agent, agree to repay any amount paid over to Borrowers to such Lender or to Agent (plus any related penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such Lender or Agent is required, for any reason, to disgorge or otherwise repay such refund. Notwithstanding anything to the contrary in this Section 2.8, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.8(d) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.8 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(e)      If a payment made to a Lender under any Financing Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower Representative and Agent at the time or times prescribed by Law and at such time or times reasonably requested by Borrower Representative or Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower Representative or Agent as may be necessary for Borrowers and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement and "Lender" shall include Agent to the extent Agent is subject to FATCA reporting obligations solely as a result of satisfying its obligations as Agent under this Agreement.

(f)      Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.17 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by Agent to such Lender from any other source against any amount due to Agent under this paragraph (f).

(g)      Each party's obligations under Section 2.8(a) through (f) shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all Obligations hereunder.

(h)      If any Lender shall determine in its commercially reasonable judgment that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy, in each instance, after the Closing Date, or any change after the Closing Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder or under any Support Agreement or Lender Letter of Credit to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon written demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrowers shall promptly pay to such Lender such additional amount (other than (A) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (B) Taxes that are Other Connection Taxes imposed on or measured by net income (however denominated)) as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor; provided, however, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.

(i)      If any Lender requires compensation under Section 2.8(h), or requires any Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to this Section 2.8, then, upon the written request of Borrower Representative, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the terms of this Agreement) to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to any such subsection, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (as determined in its sole discretion). Without limitation of the provisions of Section 12.14, each Borrower hereby agrees to pay all reasonable and documented, out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

**Section 2.9**      Appointment of Borrower Representative.  Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Notices of Borrowing, Notices of LC Credit Events and Borrowing Base Certificates, and giving instructions with respect to the disbursement of the proceeds of the Loans, requesting Letters of Credit, giving and receiving all other notices and consents hereunder or under any of the other Financing Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under

CHICAGO/#3272775.8

the Financing Documents. Borrower Representative hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions. The proceeds of each Loan made hereunder shall be advanced to or at the direction of Borrower Representative and if not used by Borrower Representative in its business (for the purposes provided in this Agreement) shall be deemed to be immediately advanced by Borrower Representative to the appropriate other Borrower hereunder as an intercompany loan (collectively, "**Intercompany Loans**"). All Letters of Credit and Support Agreements issued hereunder shall be issued at Borrower Representative's request therefor and shall be allocated to the appropriate Borrower's Intercompany Loan account by Borrower Representative. All collections of each Borrower in respect of Accounts and other proceeds of Collateral of such Borrower received by Agent and applied to the Obligations shall also be deemed to be repayments of the Intercompany Loans owing by such Borrower to Borrower Representative. Borrowers shall maintain accurate books and records with respect to all Intercompany Loans and all repayments thereof. Agent and each Lender may regard any notice or other communication pursuant to any Financing Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

Section 2.10    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation.

(a)    Borrowers are defined collectively to include all Persons named as one of the Borrowers herein; *provided*, *however*, that any references herein to "any Borrower", "each Borrower" or similar references, shall be construed as a reference to each individual Person named as one of the Borrowers herein. Each Person so named shall be jointly and severally liable for all of the obligations of Borrowers under this Agreement. Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Persons named as the Borrowers herein, the joint and several liability of all such Persons, and the cross-collateralization of the collateral of all such Persons. Accordingly, each Borrower individually acknowledges that the benefit to each of the Persons named as one of the Borrowers as a whole constitutes reasonably equivalent value, regardless of the amount of the credit facilities actually borrowed by, advanced to, or the amount of collateral provided by, any individual Borrower. In addition, each entity named as one of the Borrowers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Borrowers herein as well as all such Persons when taken together. By way of illustration, but without limiting the generality of the foregoing, the terms of Section 10.1 of this Agreement are to be applied to each individual Person named as one of the Borrowers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in Section 10.1 of this Agreement as to any Person named as one of the Borrowers herein shall constitute an Event of Default even if such event has not occurred as to any other Persons named as the Borrowers or as to all such Persons taken as a whole.

(b)    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the Obligations and the Liens granted by Borrowers to secure the Obligations, not constitute a Fraudulent Conveyance (as defined below). Consequently, Agent, Lenders and each Borrower agree that if the liability of a Borrower for the Obligations, or any Liens granted by such Borrower securing the Obligations would, but for the application

46

of this sentence, constitute a Fraudulent Conveyance, the liability of such Borrower and the Liens securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such Lien to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, the term "**Fraudulent Conveyance**" means a fraudulent conveyance under Section 548 of Chapter 11 of Title II of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)     Agent is hereby authorized, without notice or demand (except as otherwise specifically required under this Agreement) and without affecting the liability of any Borrower hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Borrower, change the terms relating to the Obligations or otherwise modify, amend or change the terms of any Note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to Agent for any Lender; (iii) accept partial payments of the Obligations; (iv) take and hold any Collateral for the payment of the Obligations or for the payment of any guaranties of the Obligations and exchange, enforce, waive and release any such Collateral; (v) apply any such Collateral and direct the order or manner of sale thereof as Agent, in its sole discretion, may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the Obligations and any Collateral therefor in any manner, all guarantor and surety defenses being hereby waived by each Borrower. Without limitations of the foregoing, with respect to the Obligations, each Borrower hereby makes and adopts each of the agreements and waivers set forth in each Guarantee, the same being incorporated hereby by reference. Except as specifically provided in this Agreement or any of the other Financing Documents, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations that Agent shall determine, in its sole discretion, without affecting the validity or enforceability of the Obligations of the other Borrower.

(d)     Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by Agent with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Agent; (iii) failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against a Borrower or Agent's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any borrowing or grant of a security interest by a Borrower as debtor-in-possession, under Section 364 of the Bankruptcy Code; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Agent's claim(s) for repayment of any of the Obligations; or (vii) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(e)     The Borrowers hereby agree, as between themselves, that to the extent that Agent, on behalf of Lenders, shall have received from any Borrower any Recovery Amount (as defined below), then the paying Borrower shall have a right of contribution against each other Borrower in an amount equal to such other Borrower's contributive share of such Recovery Amount; provided, however, that in the event any Borrower suffers a Deficiency Amount (as defined below), then the Borrower suffering the Deficiency Amount shall be entitled to seek and receive contribution from and against the other Borrowers in an amount equal to the Deficiency Amount; and provided, further, that in no event shall the aggregate amounts so reimbursed by reason of the contribution of any Borrower equal or exceed an amount that would, if paid,

47

constitute or result in Fraudulent Conveyance. Until all Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of any other Borrower, or (ii) a payment made by any other Guarantor under any Guarantee, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property. The right of each Borrower to receive any contribution under this Section 2.10(e) or by subrogation or otherwise from any other Borrower shall be subordinate in right of payment to the Obligations and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until the Obligations have been indefeasibly paid and satisfied in full, and no Borrower shall exercise any right or remedy with respect to this Section 2.10(e) until the Obligations have been indefeasibly paid and satisfied in full. As used in this Section 2.10(e), the term "**Recovery Amount**" means the amount of proceeds received by or credited to Agent from the exercise of any remedy of the Lenders under this Agreement or the other Financing Documents, including, without limitation, the sale of any Collateral. As used in this Section 2.10(e), the term "**Deficiency Amount**" means any amount that is less than the entire amount a Borrower is entitled to receive by way of contribution or subrogation from, but that has not been paid by, the other Borrowers in respect of any Recovery Amount attributable to the Borrower entitled to contribution, until the Deficiency Amount has been reduced to $0 through contributions and reimbursements made under the terms of this Section 2.10(e) or otherwise.

      **Section 2.11**    Collections and Lockbox Account.

      (a)    Borrowers shall maintain a lockbox (the "**Lockbox**") with a United States depository institution designated from time to time by Agent (the "**Lockbox Bank**"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as Agent may require. Borrowers shall ensure that all collections of Accounts (other than Accounts for which the Account Debtor is a Governmental Account Debtor) are paid directly from Account Debtors (i) into the Lockbox for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account; *provided, however*, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Borrowers, which Borrowers shall then administer and apply in the manner required below. All funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day.

      (b)    Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement to the contrary, Borrowers agree that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox, the Lockbox Account, and that Agent shall have no liability therefor. Borrowers hereby indemnify and agree to hold Agent harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses, arising from or relating to actions of Agent or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement or similar agreement, except to the extent of such losses arising solely from Agent's gross negligence or willful misconduct.

      (c)    Agent shall apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans in such order of application as Agent shall elect. Agent shall have no obligation to apply any funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Term Loan, but Agent shall have the option to apply such funds to any Term Loan to the extent of any payments (whether of principal, interest or otherwise) due and payable in respect thereof. If as the result of collections of Accounts pursuant to the terms and conditions of this Section, a credit balance exists with respect to the Loan Account, such credit balance shall not accrue

interest in favor of Borrowers, but Agent shall transfer such funds into an account designated by Borrower Representative for so long as no Event of Default exists.

(d)     To the extent that any collections of Accounts or proceeds of other Collateral are not sent directly to the Lockbox or Lockbox Account but are received by any Borrower, such collections shall be held in trust for the benefit of Agent pursuant to an express trust created hereby and immediately remitted, in the form received, to applicable Lockbox or Lockbox Account.  No such funds received by any Borrower shall be commingled with other funds of the Borrowers.

(e)     Borrowers acknowledge and agree that compliance with the terms of this Section is essential, and that Agent and Lenders will suffer immediate and irreparable injury and have no adequate remedy at law, if any Borrower, through acts or omissions, causes or permits Account Debtors to send payments other than to the Lockbox or Lockbox Accounts or if any Borrower fails to promptly deposit collections of Accounts or proceeds of other Collateral in the Lockbox Account as herein required. Accordingly, in addition to all other rights and remedies of Agent and Lenders hereunder, Agent shall have the right to seek specific performance of the Borrowers' obligations under this Section, and any other equitable relief as Agent may deem necessary or appropriate, and Borrowers waive any requirement for the posting of a bond in connection with such equitable relief.

(f)     Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral. Borrowers shall, and shall cause each Credit Party to, cooperate with Agent in the identification and reconciliation on a daily basis of all amounts received in or required to be deposited into the Lockbox Accounts.  In addition, if any such amount cannot be identified or reconciled to the reasonable satisfaction of Agent, Agent may utilize its own staff or, if it deems necessary, engage an outside auditor, in either case at Borrowers' expense (which in the case of Agent's own staff shall be in accordance with Agent's then prevailing customary charges (*plus* expenses)), to make such examination and report as may be necessary to identify and reconcile such amount.

(g)     If any Borrower breaches its obligation to direct payments of the proceeds of the Collateral to the Lockbox Account, Agent, as the irrevocably made, constituted and appointed true and lawful attorney for Borrowers, may, by the signature or other act of any of Agent's authorized representatives (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Collateral to Borrowers by directing payment to the Lockbox Account.

**Section 2.12**     Termination; Restriction on Termination.

(a)     Termination by Lenders.  In addition to the rights set forth in Section 10.2, Agent may, and at the direction of Required Lenders shall, terminate this Agreement without notice upon or after the occurrence and during the continuance of an Event of Default.

(b)     Termination by Borrowers.  Upon at least thirty (30) days' prior written notice to Agent and Lenders, Borrowers may, at its option, terminate this Agreement; *provided, however,* that no such termination shall be effective until Borrowers have (i) paid or collateralized to Agent's satisfaction all of the Obligations in immediately available funds, all Letters of Credit and Support Agreements have expired, terminated or have been cash collateralized to Agent's satisfaction, and (ii) complied with Section 2.2(e) and the terms of any Fee Letter.  Any notice of termination given by Borrowers shall be irrevocable unless all Lenders otherwise agree in writing and no Lender shall have any obligation to make any Loans or issue or procure any Letters of Credit or Support Agreements on or after the termination date

49

stated in such notice. Notwithstanding the foregoing, Borrowers may rescind any termination notice given in connection with a proposed termination in connection with a refinancing or sale if the closing of such refinancing or sale does not happen on or before the date set forth in the written notice. In the event of any such rescission, a new written notice of termination shall be delivered in accordance with this clause (b). Borrowers may elect to terminate this Agreement in its entirety only. No section of this Agreement or type of Loan available hereunder may be terminated singly. For the avoidance of doubt, at no time may the Revolving Loan Commitment be terminated when any amount remains outstanding under the Term Loan.

(c)       Effectiveness of Termination. All of the Obligations shall be immediately due and payable upon the Termination Date. All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Financing Documents shall survive any such termination and Agent shall retain its Liens in the Collateral and Agent and each Lender shall retain all of its rights and remedies under the Financing Documents notwithstanding such termination until all Obligations have been discharged or paid, in full, in immediately available funds, including, without limitation, all Obligations under Section 2.2(e) and the terms of any Fee Letter resulting from such termination. Notwithstanding the foregoing or the payment in full of the Obligations, Agent shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Agent may incur as a result of dishonored checks or other items of payment received by Agent from Borrower or any Account Debtor and applied to the Obligations, Agent shall, at its option, (i) have received a written agreement satisfactory to Agent, executed by Borrowers and by any Person whose loans or other advances to Borrowers are used in whole or in part to satisfy the Obligations, indemnifying Agent and each Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Agent, in its discretion, may deem necessary to protect Agent and each Lender from any such loss or damage.

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to Agent and each Lender that:

**Section 3.1**       Existence and Power. Each Credit Party is an entity as specified on Schedule 3.1, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 3.1 and no other jurisdiction, has the same legal name as it appears in such Credit Party's Organizational Documents and an organizational identification number (if any), in each case as specified on Schedule 3.1, and has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as proposed to be conducted, except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect. Each Credit Party is qualified to do business as a foreign entity in each jurisdiction in which it is required to be so qualified, which jurisdictions as of the Closing Date are specified on Schedule 3.1, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 3.1, no Credit Party (a) has had, over the five (5) year period preceding the Closing Date, any name other than its current name, or (b) was incorporated or organized under the laws of any jurisdiction other than its current jurisdiction of incorporation or organization.

**Section 3.2**       Organization and Governmental Authorization; No Contravention. The execution, delivery and performance by each Credit Party of the Operative Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, require no further action by or in respect of, or filing with, any Governmental Authority and do not violate, conflict with or cause a breach or a default under (a) any Law applicable to any Credit Party or any of the Organizational Documents of any Credit Party, or (b) any agreement or instrument binding upon it, except

for such violations, conflicts, breaches or defaults as could not, with respect to this clause (b), reasonably be expected to have a Material Adverse Effect.

Section 3.3    Binding Effect. Each of the Operative Documents to which any Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

Section 3.4    Capitalization. The authorized equity securities of each of the Credit Parties as of the Closing Date are as set forth on Schedule 3.4. All issued and outstanding equity securities of each of the Credit Parties are duly authorized and validly issued, fully paid, nonassessable, free and clear of all Liens other than those in favor of Agent for the benefit of Agent and Lenders and Permitted Liens, and such equity securities were issued in compliance with all applicable Laws. The identity of the holders of the equity securities of each of the Credit Parties and the percentage of their fully-diluted ownership of the equity securities of each of the Credit Parties as of the Closing Date is set forth on Schedule 3.4. No shares of the capital stock or other equity securities of any Credit Party, other than those described above, are issued and outstanding as of the Closing Date. Except as set forth on Schedule 3.4, as of the Closing Date there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Credit Party of any equity securities of any such entity.

Section 3.5    Financial Information. All information delivered to Agent and pertaining to the financial condition of any Credit Party fairly presents, in all material respects, the financial position of such Credit Party as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year-end adjustments and the absence of footnote disclosures) in all material respects. Since December 31, 2018, there has occurred no event that could reasonably be expected to have a Material Adverse Effect.

Section 3.6    Litigation. Except as set forth on Schedule 3.6 as of the Closing Date, and except as hereafter disclosed to Agent in writing, there is no material Litigation pending against, or to such Borrower's knowledge threatened against or affecting, any Credit Party or, to such Borrower's knowledge, any party to any Operative Document other than a Credit Party. There is no Litigation pending which could reasonably be expected to have a Material Adverse Effect or which in any manner draws into question the validity of any of the Operative Documents.

Section 3.7    Ownership of Property. Each Borrower and each of its Subsidiaries is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by such Person which is necessary for the conduct of its business (subject to ordinary wear and tear and casualty and condemnation).

Section 3.8    No Default. No Event of Default, or to such Borrower's knowledge, Default, has occurred and is continuing. No Credit Party is in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

Section 3.9    Labor Matters. As of the Closing Date, there are no strikes or other material labor disputes pending or, to any Borrower's knowledge, threatened against any Credit Party. Hours worked and payments made to the employees of the Credit Parties have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters. All payments due from the Credit Parties, or

51

for which any claim may be made against any of them, on account of wages have been paid or accrued as a liability on their books, as the case may be. The consummation of the transactions contemplated by the Financing Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

**Section 3.10**    Regulated Entities. No Credit Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

**Section 3.11**    Margin Regulations. None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Federal Reserve Board), for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any "margin stock" or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

**Section 3.12**    Compliance With Laws; Anti-Terrorism Laws.

(a)    Each Credit Party is in compliance with the requirements of all applicable Laws (including HIPAA), except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect.

(b)    None of the Credit Parties and, to the knowledge of the Credit Parties, none of their Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Blocked Person, or is controlled by a Blocked Person, (iv) is acting or will act for or on behalf of a Blocked Person, (v) is associated with, or will become associated with, a Blocked Person or (vi) is providing, or will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. No Credit Party nor, to the knowledge of any Credit Party, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

**Section 3.13**    Taxes. All Tax returns required to be filed by or on behalf of each Credit Party have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns, reports and statements are required to be filed, all such returns, reports and statements were correct in all material respects and prepared in material compliance with applicable Law, and, except to the extent subject to a Permitted Contest, all income and other material Taxes (including real and personal property Taxes) and other charges shown to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof. No Borrower is a party to any tax sharing, tax indemnification or similar agreement or arrangement with any Person other than another Borrower and/or any Subsidiary of a Borrower.

**Section 3.14**    Compliance with ERISA.

(a)    Except as would not result in a Material Adverse Effect, (i) each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code; (ii) each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so

qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently; and (iii) no Credit Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)     Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Borrower and each Subsidiary is in compliance with the applicable provisions of ERISA and the provision of the Code relating to ERISA Plans and the regulations and published interpretations therein; (ii) during the thirty-six (36) month period prior to the Closing Date or the making of any Loan or the issuance of any Letter of Credit, (i) no steps have been taken to terminate any Pension Plan; (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 303(k) of ERISA or Section 430(k) of the Code and no event has occurred that would give rise to a Lien under Section 4068 of ERISA; (iii) no condition exists or event or transaction has occurred with respect to any Pension Plan which could reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty; (iv) no Credit Party has incurred liability to the PBGC (other than for current premiums) with respect to any employee Pension Plan; (v) all contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by any Credit Party or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable Law; and (vi)  no Credit Party nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could reasonably be expected to result in a withdrawal or partial withdrawal from any such plan, and no Credit Party nor any member of the Controlled Group has received any notice with respect to a Multiemployer Plan that increased contributions may be required to avoid a reduction in plan benefits  or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

**Section 3.15**     Consummation of Operative Documents; Brokers.   Except for fees payable to Agent and/or Lenders, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and no Credit Party has or will have any obligation to any Person in respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith except as disclosed on Schedule 3.15.

**Section 3.16**     Related Transactions.   All transactions contemplated by the Operative Documents to be consummated on or prior to the date hereof have been so consummated (including, without limitation, the disbursement and transfer of all funds in connection therewith) in all material respects pursuant to the provisions of the applicable Operative Documents, true and complete copies of which have been delivered to Agent, and in compliance with all applicable Law, except for such Laws the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

**Section 3.17**     Material Contracts.   Except for the Operative Documents and the other agreements set forth on Schedule 3.17 (collectively with the Operative Documents, the "**Material Contracts**"), as of the Closing Date there are (i) no (a) employment agreements covering the management of any Credit Party, (b) collective bargaining agreements or other similar labor agreements covering any employees of any Credit Party, (c) agreements for managerial, consulting or similar services to which any Credit Party is a party or by which it is bound, (d) agreements regarding any Credit Party, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound, (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which any Credit Party is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products), (f) reserved, (g) partnership agreements to which any Credit Party is

a general partner or joint venture agreements to which any Credit Party is a party, (h) third party billing arrangements to which any Credit Party is a party, or (i) any other agreements or instruments to which any Credit Party is a party, in each case with respect to the preceding clauses (a) to (i), inclusive (but excluding (f)), the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect, and (ii) no customer, distribution, or marketing agreements to which any Credit Party is a party, requiring payment of more than $3,600,000 in any year. The consummation of the transactions contemplated by the Financing Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than any Credit Party), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

Section 3.18    Compliance with Environmental Requirements; No Hazardous Materials. Except in each case as set forth on Schedule 3.18 and except as could not reasonably be expected to have a Material Adverse Effect:

(a)    no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to such Borrower's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by any Credit Party of any Environmental Law, (ii) alleged failure by any Credit Party to have any Permits required under Environmental Laws in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials, or (iv) release of Hazardous Materials; and

(b)    no property now owned by any Credit Party and, to the knowledge of each Borrower, no property currently leased or previously owned or leased by any Credit Party, to which any Credit Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to such Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of such Borrower, other investigations which may lead to claims against any Credit Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA.

For purposes of this Section 3.18, each Credit Party shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Credit Party.

Section 3.19    Intellectual Property. Each Credit Party owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is necessary to the business of such Credit Party, except as would not reasonably be expected to have a Material Adverse Effect. All Intellectual Property existing as of the Closing Date which is issued, registered or pending with any United States Governmental Authority (including, without limitation, any and all applications for the registration of any Intellectual Property with any such United States Governmental Authority) and all licenses under which any Borrower is the licensee of any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person other than licenses arising from the purchase of "off the shelf" products) are set forth on Schedule 3.19. Except as indicated on Schedule 3.19, the applicable Credit Party is the sole and exclusive owner of the entire right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Credit Party, free and clear of any Liens except for Permitted Liens. All such registered Intellectual Property of each Credit Party is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. To such Borrower's knowledge, each Credit Party conducts its business without infringement or

54

claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of any Credit Party, in each case as would not reasonably be expected to have a Material Adverse Effect.

**Section 3.20**   <u>Solvency</u>.   After giving effect to the Loan advance and the liabilities and obligations of each Borrower under the Operative Documents, the Credit Parties (taken as a whole) are Solvent.

**Section 3.21**   <u>Full Disclosure</u>.   None of the written information (financial or otherwise) furnished by or on behalf of any Credit Party to Agent or any Lender in connection with the consummation of the transactions contemplated by the Operative Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements, when taken as a whole, contained herein or therein not materially misleading in light of the circumstances under which such statements were made. All financial projections delivered to Agent and the Lenders by Borrowers (or their agents) have been prepared on the basis of the assumptions stated therein.  Such projections represent each Borrower's good faith estimate of such Borrower's future financial performance and such assumptions were believed by such Borrower to be fair and reasonable in light of current business conditions at the time made; *provided*, *however*, that Borrowers can give no assurance that such projections will be attained, such projections shall not be considered a guarantee of performance, and actual results may be materially different.

**Section 3.22**   <u>Interest Rate</u>.   The rate of interest paid under the Notes and the method and manner of the calculation thereof do not violate any usury or other law or applicable Laws,  any of the Organizational Documents, or any of the Operative Documents.

**Section 3.23**   <u>Subsidiaries</u>.   Borrowers do not own any stock, partnership interests, limited liability company interests or other equity securities or Subsidiaries except for Permitted Investments.

## ARTICLE 4 - AFFIRMATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 4.1**   <u>Financial Statements and Other Reports</u>.   Each Borrower will deliver to Agent: (a) as soon as available, but no later than thirty (30) days after the last day of each month (or 45 days in the case of a month that is the end of one of Borrowers' fiscal quarters), a company prepared consolidated balance sheet, cash flow and income statement covering Parent's and its Consolidated Subsidiaries' consolidated operations during the period, prepared under GAAP, consistently applied, certified by a Responsible Officer and in a form acceptable to Agent; (b) together with the financial reporting package described in (a) above, evidence of payment and satisfaction of all payroll, withholding and similar taxes due and owing by all Borrowers with respect to the payroll period(s) occurring during such month; (c) as soon as available, but no later than one hundred twenty (120) days after the last day of Borrowers' fiscal year (or 150 days with respect to the fiscal year ended March 31, 2019), audited consolidated financial statements for  Parent and its Consolidated Subsidiaries prepared under GAAP, consistently applied, together with an opinion (which opinion shall not be qualified as to scope or contain any going concern qualification other than a qualification related to the pending maturity of the obligations under this Agreement) on the financial statements from an independent certified public accounting firm acceptable to Agent in its reasonable discretion; (d) within five (5) days of delivery or filing thereof, copies of all statements, reports and notices made available to Borrower's security holders or to any holders of Subordinated Debt and copies of all reports and other filings made by Borrower with any stock exchange on which any securities of any Borrower are traded and/or the SEC; (e) a prompt written report of any legal actions pending or threatened against any Borrower or any of its Subsidiaries that could reasonably be expected to result in damages or costs to any Borrower or any of its Subsidiaries of $250,000 or more;

(f) prompt written notice of any litigation or proceeding against any Borrower or its Subsidiaries that materially and adversely affects the value of any material Intellectual Property; (g) as soon as available, but no later than the fifth (5th) day of each month, evidence that all payments due under the Settlement Agreement as of the first day of such month have been paid (which evidence may be in the form of bank statement, bank debit screenshot or similar documentation) and (h) budgets, sales projections, operating plans and other financial information and information, reports or statements regarding the Borrowers, their business and the Collateral as Agent may from time to time reasonably request, but not to exceed two (2) such requests per fiscal year unless such request is made at a time when an Event of Default exists. Each Borrower will, within thirty (30) days after the last day of each month (or 45 days in the case of a month that is the end of one of Borrowers' fiscal quarters), deliver to Agent with the monthly financial statements described in clause (a) above, a duly completed Compliance Certificate signed by a Responsible Officer setting forth calculations showing compliance with the financial covenants set forth in this Agreement. Promptly upon their becoming available, Borrowers shall deliver to Agent copies of all Material Contracts not delivered on the Closing Date. Each Borrower will, within twenty (20) days after the last day of each month (or more frequently as the Borrower may elect in its sole discretion), deliver to Agent a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date). Borrowers shall, every ninety (90) days on a schedule to be designated by Agent, and at such other times as Agent shall request, deliver to Agent a schedule of Eligible Accounts denoting, for the thirty (30) largest Account Debtors during such quarter, such Account Debtor's credit rating(s), if any, as rated by A.M. Best Company, Standard & Poor's Corporation, Moody's Investors Service, Inc., FITCH, Inc. or other applicable rating agent.

**Section 4.2** <u>Payment and Performance of Obligations</u>. Each Borrower (a) will pay and discharge, and cause each Subsidiary to pay and discharge, on a timely basis as and when due, all of their respective obligations and liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) without limiting anything contained in the foregoing clause (a), pay all amounts due and owing in respect of material Taxes (including without limitation, payroll and material withholdings Tax liabilities) on a timely basis as and when due, and in any case prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof, (c) will maintain, and cause each Subsidiary to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (d) will not breach or permit any Subsidiary to breach, or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.

**Section 4.3** <u>Maintenance of Existence</u>. Each Borrower will preserve, renew and keep in full force and effect and in good standing, and will cause each Subsidiary to preserve, renew and keep in full force and effect and in good standing, their respective existence and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business, except, to the extent desirable but not necessary, as could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.4** <u>Maintenance of Tangible Property; Insurance</u>.

(a) Each Borrower will keep, and will cause each Subsidiary to keep, all tangible property necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b) Upon completion of any Permitted Contest, Borrowers shall, and will cause each Subsidiary to, promptly pay the amount due, if any, and deliver to Agent proof of the completion of the

contest and payment of the amount due, if any, following which Agent shall return the security, if any, deposited with Agent pursuant to the definition of Permitted Contest.

(c) Each Borrower will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood, windstorm and quake), covering the repair and replacement cost of all such property and coverage, business interruption and rent loss coverages with extended period of indemnity (for the period required by Agent from time to time) and indemnity for extra expense, in each case without application of coinsurance and with agreed amount endorsements, (ii) general and professional liability insurance (including products/completed operations liability coverage), and (iii) such other insurance coverage in such amounts and with respect to such risks as Agent may request from time to time, pursuant to the Insurance Requirements attached hereto as Schedule 4.4; *provided*, *however*, that, in no event shall such insurance be in amounts or with coverage less than, or with carriers with qualifications inferior to, any of the insurance or carriers in existence as of the Closing Date (or required to be in existence after the Closing Date under a Financing Document). All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent.

(d) On or prior to the Closing Date, and at all times thereafter, each Borrower will cause Agent to be named as an additional insured, assignee and lender loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained pursuant to this Section 4.4 pursuant to endorsements in form and substance acceptable to Agent. Borrowers shall deliver to Agent and the Lenders (i) on the Closing Date, a certificate from Borrowers' insurance broker dated such date showing the amount of coverage as of such date, and that such policies will include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days (or ten (10) days in the case of non-payment of premium) after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) on an annual basis, and upon the request of any Lender through Agent from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Borrower, and (v) at least 30 days prior to expiration of any policy of insurance, evidence of renewal of such insurance upon the terms and conditions herein required.

(e) In the event any Borrower fails to provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at Borrowers' expense to protect Agent's interests in the Collateral. This insurance may, but need not, protect such Borrower's interests. The coverage purchased by Agent may not pay any claim made by such Borrower or any claim that is made against such Borrower in connection with the Collateral. Such Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that such Borrower has obtained insurance as required by this Agreement. If Agent purchases insurance for the Collateral, Borrowers will be responsible for the costs of that insurance to the fullest extent provided by law, including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance such Borrower is able to obtain on its own.

**Section 4.5**    <u>Compliance with Laws and Material Contracts</u>. Each Borrower will comply, and cause each Subsidiary to comply, with the requirements of all applicable Laws (including HIPAA) and

Material Contracts, except to the extent that failure to so comply could not reasonably be expected to (a) have a Material Adverse Effect, or (b) result in any Lien upon either (i) a material portion of the assets of any such Person in favor of any Governmental Authority, or (ii) any Collateral that is part of the Borrowing Base (except, in each case, for Permitted Liens and, in the case of Liens on Collateral that is part of the Borrowing Base, only to the extent expressly permitted in the definition of "Eligible Accounts").

Section 4.6     Inspection of Property, Books and Records.  Each Borrower will keep, and will cause each Subsidiary to keep, proper books of record substantially in accordance with GAAP (except, with respect to interim financial information, for the absence of footnotes and normal year end adjustments) in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit, and will cause each Subsidiary to permit, at the sole cost of the applicable Borrower or any applicable Subsidiary (subject to the limitations on reimbursement set forth in Section 2.2(f)), representatives of Agent and of any Lender to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective operations and the Collateral, to verify the amount and age of the Accounts, the identity and credit of the respective Account Debtors, to review the billing practices of Borrowers and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired.  In the absence of an Event of Default, Agent or any Lender exercising any rights pursuant to this Section 4.6 shall give the applicable Borrower or any applicable Subsidiary commercially reasonable prior notice of such exercise.  No notice shall be required during the existence and continuance of any Default or any time during which Agent reasonably believes a Default exists.

Section 4.7     Use of Proceeds.  Borrowers shall use the proceeds of the Term Loan solely for payment of amounts due in respect of transaction fees incurred in connection with the Operative Documents and the refinancing on the Closing Date of Debt.  Borrowers shall use the proceeds of Revolving Loans solely for (a) transaction fees incurred in connection with the Financing Documents and the refinancing on the Closing Date of Debt, (b) for working capital needs, capital expenditures and other general corporate purposes of Borrowers and their Subsidiaries not in contravention of any Laws or of any Financing Document, and (c) payment of amounts due (including transaction fees incurred in connection with) in respect of Permitted Acquisitions.  No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use.

Section 4.8     Estoppel Certificates.  After written request by Agent, but not to exceed two (2) such requests per fiscal year, Borrowers, within fifteen (15) days and at their expense, will furnish Agent with a statement, duly acknowledged and certified by a Responsible Officer, setting forth (a) the amount of the original principal amount of the Notes, and the unpaid principal amount of the Notes, (b) the rate of interest of the Notes, and (c) that such Responsible Officer has no knowledge of the existence, as of the date thereof, of any condition or event that constitutes a Default or Event of Default or if such Default or Event of Default exists, the nature thereof, the period of time it has existed, and the action being taken to remedy such Default or Event of Default.  After written request by Agent, Borrowers, within fifteen (15) days and at their expense, will furnish Agent with a certificate, signed by a Responsible Officer of Borrowers, updating all of the representations and warranties contained in this Agreement and the other Financing Documents and certifying that all of the representations and warranties contained in this Agreement and the other Financing Documents, as updated pursuant to such certificate, are true, accurate and complete as of the date of such certificate.

Section 4.9     Notices of Litigation and Defaults.  Borrowers will give prompt written notice to Agent (a) of any litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party which would reasonably be expected to have a Material Adverse Effect with respect to Borrowers or any other Credit Party or which in any manner calls into question the validity

or enforceability of any Financing Document, (b) upon any Borrower becoming aware of the existence of any Default or Event of Default, (c) if any Credit Party is in breach or default under or with respect to any Material Contract, or if any Credit Party is in breach or default under or with respect to any contract agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (d) of any strikes or other labor disputes pending or, to any Borrower's knowledge, threatened against any Credit Party, except as would not reasonably be expected to result in a Material Adverse Effect, (e) if there is any infringement, litigation or governmental proceedings pending or threatened (in writing) by any other Person against Borrowers or other Credit Party with respect to any Intellectual Property rights of any Person or any Credit Party that could reasonably be expected to have a Material Adverse Effect, and (f) of all returns, recoveries, disputes and claims that involve more than $250,000.

**Section 4.10**    <u>Hazardous Materials; Remediation</u>.

(a)    If any release or disposal of Hazardous Materials shall occur or shall have occurred on any owned or leased real property or any other assets of any Borrower or any other Credit Party, such Borrower will cause, or direct the applicable Credit Party to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets, except to the extent such release or disposal could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, each Borrower shall, and shall cause each other Credit Party to, comply with each Environmental Law requiring the performance at any real property by any Borrower or any other Credit Party of activities in response to the release or threatened release of a Hazardous Material, except to the extent such release or disposal could not reasonably be expected to have a Material Adverse Effect.

(b)    Borrowers will provide Agent within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Agent that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Materials or Hazardous Materials Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Agent's reasonable business determination that the failure to remove, treat or dispose of any Hazardous Materials or Hazardous Materials Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**Section 4.11**    <u>Further Assurances</u>.

(a)    Each Borrower will, and will cause each Subsidiary to, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as Agent or the Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to (i) establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Agent for itself and for the benefit of the Lenders on the Collateral (including Collateral acquired after the date hereof), and (ii) unless Agent shall agree otherwise in writing, cause all Subsidiaries of Borrowers to be jointly and severally obligated with the other Borrowers under all covenants and obligations under this Agreement, including the obligation to repay the Obligations. Without limiting the generality of the foregoing, (x) Borrowers shall, at the time of the delivery of any Compliance Certificate disclosing the acquisition by any Credit Party of any registered Intellectual Property or application for the registration of Intellectual Property, deliver to Agent a duly completed and executed supplement to the applicable Credit Party's Patent Security Agreement or Trademark Security Agreement in the form of the respective Exhibit thereto, and (y) at the request of Agent,

following the disclosure by Borrowers on any Compliance Certificate of the acquisition by any Borrower of any rights under a license as a licensee with respect to any registered Intellectual Property or application for the registration of any Intellectual Property owned by another Person, Borrowers shall execute any documents reasonably requested by Agent to establish, create, preserve, protect and perfect a first priority lien in favor of Agent, to the extent legally possible, in such Borrower's rights under such license and shall use their commercially reasonable best efforts to obtain the written consent of the licensor which such license to the granting in favor of Agent of a Lien on such Borrower's rights as licensee under such license. Notwithstanding anything to the contrary in this Agreement or any other Financing Document, no Borrower, nor any Subsidiary, shall be required to take any action to perfect any Lien in any foreign Intellectual Property.

(b)    Upon receipt of an affidavit of an authorized representative of Agent or a Lender as to the loss, theft, destruction or mutilation of any Note or any other Financing Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other applicable Financing Document, Borrowers will issue, in lieu thereof, a replacement Note or other applicable Financing Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Financing Document in the same principal amount thereof and otherwise of like tenor.

(c)    Upon the formation or acquisition of a new Subsidiary, Borrowers shall (i) pledge, have pledged or cause or have caused to be pledged to the Agent pursuant to a pledge agreement in form and substance satisfactory to the Agent, all of the outstanding shares of equity interests or other equity interests of such new Subsidiary owned directly or indirectly by any Borrower, along with undated stock or equivalent powers for such certificates, executed in blank; (ii) unless Agent shall agree otherwise in writing, cause the new Subsidiary to take such other actions (including entering into or joining any Security Documents) as are necessary or advisable in the reasonable opinion of the Agent in order to grant the Agent, acting on behalf of the Lenders, a first priority Lien on all real and personal property of such Subsidiary in existence as of such date and in all after acquired property, which first priority Liens are required to be granted pursuant to this Agreement; (iii) unless Agent shall agree otherwise in writing, cause such new Subsidiary to either (at the election of Agent) become a Borrower hereunder with joint and several liability for all obligations of Borrowers hereunder and under the other Financing Documents pursuant to a joinder agreement or other similar agreement in form and substance satisfactory to Agent or to become a Guarantor of the obligations of Borrowers hereunder and under the other Financing Documents pursuant to a guaranty and suretyship agreement in form and substance satisfactory to Agent; and (iv) cause the new Subsidiary to deliver certified copies of such Subsidiary's certificate or articles of incorporation, together with good standing certificates, by-laws (or other operating agreement or governing documents), resolutions of the Board of Directors or other governing body, approving and authorize the execution and delivery of the Security Documents, incumbency certificates and to execute and/or deliver such other documents and legal opinions or to take such other actions as may be requested by the Agent, in each case, in form and substance reasonably satisfactory to the Agent.

(d)    Upon the request of Agent, Borrowers shall obtain a landlord's agreement or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of owned property with respect to the Borrower's headquarters location and the two (2) following other business locations: (i) 8300 Central Park Drive, Waco, TX and (ii) 9485 Regency Square Blvd., Suite 320 & 310, Jacksonville, FL 32225, which agreement or letter shall be reasonably satisfactory in form and substance to Agent; provided that, with respect to any location, if Agent determines, in its reasonable discretion, that notwithstanding commercially reasonable efforts on the part of Borrowers, a satisfactory agreement cannot be obtained, Agent may establish a reserve against the Borrowing Base in an amount equal to three (3) months rent, fees and other obligations arising under the lease or other applicable agreement relative to such location.  Borrowers shall timely and fully pay and perform its obligations in all material respects

under all leases and other agreements with respect to each leased location where any Collateral, or any records related thereto, is or may be located.

**Section 4.12**     Reserved.

**Section 4.13**     Power of Attorney.  Each of the authorized representatives of Agent is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrowers (without requiring any of them to act as such) with full power of substitution to do the following:  (a) endorse the name of Borrowers upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Borrowers and constitute collections on Borrowers' Accounts; (b) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action, execute in the name of Borrowers any schedules, assignments, instruments, documents, and statements that Borrowers are obligated to give Agent under this Agreement; (c) after the occurrence and during the continuance of an Event of Default, take any action Borrowers are required to take under this Agreement; (d) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce any Account or other Collateral or perfect Agent's security interest or Lien in any Collateral; and (e) after the occurrence and during the continuance of an Event of Default, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce its rights with regard to any Account or other Collateral.  This power of attorney shall be irrevocable and coupled with an interest.

**Section 4.14**     Borrowing Base Collateral Administration.

(a)     All data and other information relating to Accounts or other intangible Collateral shall at all times be kept by Borrowers, at their respective principal offices and shall not be moved from such locations without (i) providing prior written notice to Agent, and (ii) obtaining the prior written consent of Agent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)     Borrowers shall provide prompt written notice to each Person who becomes an Account Debtor at any time following the date of this Agreement that directs each Account Debtor to make payments into the Lockbox, and hereby authorizes Agent, upon Borrowers' failure to send such notices within ten (10) days after the Person becomes an Account Debtor, to send any and all similar notices to such Person.  Agent reserves the right to notify Account Debtors that Agent has been granted a Lien upon all Accounts.

**Section 4.15**     Maintenance of Permits.  Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would impair the operations of any Borrower, all Permits necessary under Laws to carry on the business of Borrowers as it is conducted on the Closing Date.

**Section 4.16**     HIPAA Compliance.  Each Borrower that is a "covered entity" (as such term is defined in HIPAA) shall be HIPAA Compliant.

**Section 4.17**     Minimum Balance.  Borrowers shall cause the Revolving Loan Outstandings (without giving effect to any Letter of Credit Liabilities) to be at least the Minimum Balance at all times.

**Section 4.18**     Accounts Receivable and Billing Systems.  Upon request from Agent, which request shall be made only after the occurrence and during the continuance of an Event of Default, Borrowers shall provide to Agent, a copy of the current password(s) to Borrowers' cloud-based accounts

receivable and billing systems. Once provided, Borrowers shall not change such password(s) without providing Agent with a copy of such new password(s) (which disclosure shall be made within two (2) Business Days after any such change).

## ARTICLE 5 - NEGATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 5.1**     Debt; Contingent Obligations. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Debt. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for Permitted Contingent Obligations.

**Section 5.2**     Liens. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for Permitted Liens.

**Section 5.3**     Distributions. No Borrower will, or will permit any Subsidiary to, directly or indirectly, declare, order, pay, make or set apart any sum for any Distribution, except for Permitted Distributions.

**Section 5.4**     Restrictive Agreements. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) enter into or assume any agreement prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or (b) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary to:  (i) pay or make Distributions to any Borrower or any Subsidiary; (ii) pay any Debt owed to any Borrower or any Subsidiary; (iii) make loans or advances to any Borrower or any Subsidiary; or (iv) transfer any of its property or assets to any Borrower or any Subsidiary. Notwithstanding the foregoing, the following shall be permitted without limitation:  (A) customary restrictions and conditions contained in agreements relating to a Permitted Asset Disposition pending such disposition provided that such restrictions and conditions apply only to the assets to be sold and such disposition is a Permitted Asset Disposition, (B) restrictions or conditions imposed by any agreement relating to any Debt described in clause (c) of the definition of Permitted Debt if such restrictions or conditions apply only to the property or assets securing such Debt, (C) customary provisions in leases and other contracts entered into in the Ordinary Course of Business which restrict the assignment thereto, but only so long as such prohibition (to the extent purporting to restrict the creation of a Lien upon such lease or contract) is ineffective pursuant to Sections 9-406, 9-407 and 9-408 of the UCC, (D) the Financing Documents, and (E) conditions or restrictions in any Intellectual Property license entered into in the Ordinary Course of Business, but only so long as such prohibition (to the extent purporting to restrict the creation of a Lien upon such lease or contract) is ineffective pursuant to Sections 9-406, 9-407 and 9-408 of the UCC.

**Section 5.5**     Payments and Modifications of Subordinated Debt. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, except for payments made in full compliance with and expressly permitted under the Subordination Agreement, (b) amend or otherwise modify the terms of any Subordinated Debt, except for amendments or modifications made in full compliance with the Subordination Agreement, (c) declare, pay, make or set aside any amount for payment in respect of any Debt hereinafter incurred that, by its terms, or by separate agreement, is subordinated to the Obligations, except for payments made in full compliance with and expressly permitted under the subordination provisions applicable thereto, or (d) amend or otherwise modify the terms of any such Debt if the effect of such amendment or modification

62

is to (i) increase the interest rate or fees on, or change the manner or timing of payment of, such Debt, (ii) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of, such Debt, (iii) change in a manner adverse to any Credit Party or Agent any event of default or add or make more restrictive any covenant with respect to such Debt, (iv) change the prepayment provisions of such Debt or any of the defined terms related thereto, (v) change the subordination provisions thereof (or the subordination terms of any guaranty thereof), or (vi) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of such Debt in a manner adverse to Borrowers, any Subsidiaries, Agents or Lenders. Borrowers shall, prior to entering into any such amendment or modification, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

**Section 5.6**    Consolidations, Mergers and Sales of Assets; Change in Control.  No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) consolidate or merge or amalgamate with or into any other Person (other than the merger of a Borrower or Subsidiary with and into another Borrower that is disclosed in writing to Agent within five (5) Business Days after the effective date thereof), or (b) consummate any Asset Dispositions other than Permitted Asset Dispositions.  No Borrower will suffer or permit to occur any Change in Control with respect to itself, any Subsidiary or any Guarantor.

**Section 5.7**    Purchase of Assets, Investments.  No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) acquire or enter into any agreement to acquire any assets other than in the Ordinary Course of Business, (b) engage or enter into any agreement to engage in any joint venture or partnership with any other person or (c) acquire or own or enter into any agreement to acquire or own any Investment in any Person, in each case other than Permitted Investments (including, without limitation, Permitted Acquisitions).

**Section 5.8**    Transactions with Affiliates.  Except as otherwise disclosed on Schedule 5.8, and except for transactions that are disclosed to Agent in advance of being entered (provided that no such disclosure is required for transaction of less than $100,000) into and which contain terms that are no less favorable to the applicable Borrower or any Subsidiary, as the case may be, than those which might be obtained from a third party not an Affiliate of any Credit Party, no Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of any Borrower; *provided* that, notwithstanding the foregoing, the restrictions set forth in this Section 5.8 shall not apply to: (a) transactions between or among any Borrowers (or an entity that becomes a Borrower as a result of such transaction); (b) Permitted Distributions;  (c) Permitted Investments; (d) Permitted Asset Dispositions or (e) the merger of a non-Credit Party Subsidiary with and into a Borrower or another non-Credit Party Subsidiary.

**Section 5.9**    Modification of Organizational Documents.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, amend or otherwise modify any Organizational Documents of such Person, except for Permitted Modifications.

**Section 5.10**    Modification of Certain Agreements.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, amend or otherwise modify any Material Contract, which amendment or modification in any case:  (a) is contrary to the terms of this Agreement or any other Financing Document; (b) could reasonably be expected to be materially adverse to the rights, interests or privileges of the Agent or the Lenders or their ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on any Borrower or any Subsidiary; or (d) reduces in any material respect any rights or benefits of any Borrower or any Subsidiaries.  Each Borrower shall, no later than the next delivery date for a Compliance Certificate after entering into any

amendment or other modification of any of the foregoing documents, deliver to Agent executed copies of amendments or other modifications to such documents.

Section 5.11    Conduct of Business. No Borrower will, or will permit any Subsidiary to, directly or indirectly, engage in any line of business other than those businesses engaged in on the Closing Date and described on Schedule 5.11 and businesses reasonably related, ancillary or complementary thereto. No Borrower will, or will permit any Subsidiary to, other than in the Ordinary Course of Business, change its normal billing payment and reimbursement policies and procedures with respect to its Accounts (including, without limitation, the amount and timing of finance charges, fees and write-offs).

Section 5.12    Lease Payments. No Borrower will, or will permit any Subsidiary to, directly or indirectly, incur or assume (whether pursuant to a Guarantee or otherwise) any liability for rental payments except in the Ordinary Course of Business.

Section 5.13    Limitation on Sale and Leaseback Transactions. No Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into any arrangement with any Person whereby, in a substantially contemporaneous transaction, any Borrower or any Subsidiaries sells or transfers all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

Section 5.14    Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts. No Borrower will, or will permit any Subsidiary to, directly or indirectly, establish any new Deposit Account or Securities Account without prior written notice to Agent, and unless Agent, such Borrower or such Subsidiary and the bank, financial institution or securities intermediary at which the account is to be opened enter into a Deposit Account Control Agreement or Securities Account Control Agreement prior to or concurrently with the establishment of such Deposit Account or Securities Account. Borrowers represent and warrant that Schedule 5.14 lists all of the Deposit Accounts and Securities Accounts of each Borrower. The provisions of this Section requiring Deposit Account Control Agreements shall not apply to Deposit Accounts (i) exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit of Borrowers' employees and identified to Agent by Borrowers as such; *provided, however*, that at all times that any Obligations remain outstanding, Borrower shall maintain one or more separate Deposit Accounts to hold any and all amounts to be used for payroll, payroll Taxes and other employee wage and benefit payments, and shall not commingle any monies allocated for such purposes with funds in any other Deposit Account; (ii) exclusively holding petty cash, amounts on deposit in which do not exceed $100,000 in the aggregate for all such accounts; and (iii) exclusively holding deposits in connection with Permitted Liens under clauses (a), (b) and (m) of such definition (collectively referred to as the "**Excluded Accounts**").

Section 5.15    Compliance with Anti-Terrorism Laws. Agent hereby notifies Borrowers that pursuant to the requirements of Anti-Terrorism Laws, and Agent's policies and practices, Agent is required to obtain, verify and record certain information and documentation that identifies Borrowers and its principals, which information includes the name and address of each Borrower and its principals and such other information that will allow Agent to identify such party in accordance with Anti-Terrorism Laws. No Borrower will, or will permit any Subsidiary to, directly or indirectly, knowingly enter into any Material Contracts with any Blocked Person or any Person listed on the OFAC Lists. Each Borrower shall immediately notify Agent if such Borrower has knowledge that any Borrower, any additional Credit Party or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. No Borrower will, or will permit any Subsidiary to, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with

any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

**Section 5.16** <u>Agreements Regarding Receivables</u>. No Borrower may backdate, postdate or redate any of its invoices. No Borrower may make any sales on extended dating or credit terms beyond that customary in such Borrower's industry or outside of the Ordinary Course of Business. In addition to the Borrowing Base Certificate to be delivered in accordance with this Agreement, Borrower Representative shall notify Agent promptly upon any Borrower's learning thereof, in the event any Eligible Account becomes ineligible for any reason, other than the aging of such Account, and of the reasons for such ineligibility.

**Section 5.17** <u>Limitation on Parent</u>. Notwithstanding anything herein to the contrary, Parent shall not, directly or indirectly, (a) incur any Debt (other than (I) pursuant to the Financing Documents, and (II) guarantees of any lease agreements or other contracts that are entered into by any Borrower or Subsidiary in the Ordinary Course of Business and otherwise permitted under this Agreement, (b) engage in any business or conduct any activity, including, without limitation, making any Investment or ownership of any asset or other property (other than (I) directly making Investments in and owning (exclusively) EMSI Acquisition and (II) indirectly making Investments and owning assets and other property through its ownership of EMSI Acquisition to the extent otherwise permitted under this Agreement) or the making of any payment (other than payments to the extent otherwise permitted under this Agreement with respect to its own Equity Interests) or transfer any of its directly owned assets or other property, (c) consolidate or merge with or into any other Person, or (d) create or suffer to exist any Lien upon any property or assets directly now owned or hereafter acquired by Parent (other than the Liens created under the Financing Documents to which it is a party); *provided* that, Parent shall expressly be permitted to engage in the following: (i) the maintenance of its legal existence (including the ability to incur fees, costs and expenses related to such maintenance) and the performance of ministerial or administrative activities and payment of Taxes and administrative fees necessary for the maintenance of its existence; (ii) the performance of its obligations under the Financing Documents or any other Guarantees expressly permitted under Section 5.1 with respect to Debt and any Permitted Refinancing of any of the foregoing; (iii) participating in Tax, accounting and other administrative matters as a member of the consolidated group of Parent, the Borrowers and their Subsidiaries, in each case, not otherwise prohibited hereunder; (iv) the granting of (I) nonconsensual Liens and obligations arising by operation of law otherwise permitted under Section 5.2, (II) Liens to secure the Obligations and (III) Liens permitted pursuant to clauses (d) and (e) of the definition of Permitted Liens; (v) the receipt of and the making of Permitted Distributions in accordance with Section 5.4; (vi) establishing and maintaining bank accounts in the Ordinary Course of Business; (vii) entering into employment agreements, stock option and stock ownership plans and other customary arrangements with officers, consultants, investment bankers, advisors, employees and directors and performing the activities contemplated thereby, in each case, in the Ordinary Course of Business; (viii) the providing of customary indemnification to officers, consultants, managers and directors, in each case, in the Ordinary Course of Business; and (ix) activities that are reasonably incidental to the business or activities described in the foregoing subclauses (i) through (viii).

## ARTICLE 6 - FINANCIAL COVENANTS

**Section 6.1** <u>Additional Defined Terms</u>. The following additional definitions are hereby appended to Section 1.1 of this Agreement:

"**Defined Period**" means, (i) for purposes of calculating the Fixed Charge Coverage Ratio for any testing period ending (a) on or prior to December 31, 2019, the six (6) month period ending on the last day of such calendar month, and (b) after December 31, 2019, the twelve (12) month period ending on the last day of such calendar month and (ii) for purposes of calculating the Senior Net Leverage Ratio for any testing period, the twelve (12) month period ending on the last day of such calendar month.

"**EBITDA**" has the meaning provided in the Compliance Certificate.

"**Fixed Charge Coverage Ratio**" has the meaning provided in the Compliance Certificate.

"**Operating Cash Flow**" has the meaning provided in the Compliance Certificate.

"**Senior Net Leverage Ratio**" has the meaning provided in the Compliance Certificate.

**Section 6.2**    Fixed Charge Coverage Ratio.    Borrowers will not permit the Fixed Charge Coverage Ratio for any Defined Period, as tested monthly (commencing with the month ended May 31, 2019), to be less than 1.10 to 1.00.

**Section 6.3**    Senior Net Leverage Ratio.    Borrowers will not permit the Senior Net Leverage Ratio for any Defined Period, as tested monthly (commencing with the month ended May 31, 2019), to be greater than the applicable ratio set forth below:

| **Defined Period Ending Between** | **Maximum Ratio** |
|---|---|
| Closing Date and March 31, 2020 | 5.00 to 1.00 |
| April 1, 2020 and June 30, 2020 | 4.75 to 1.00 |
| July 1, 2020 and September 30, 2020 | 4.50 to 1.00 |
| October 1, 2020 and December 31, 2020 | 4.25 to 1.00 |
| January 1, 2021 and March 31, 2021 | 4.00 to 1.00 |
| April 1, 2021 and Termination Date | 3.50 to 1.00 |

**Section 6.4**    Evidence of Compliance.    Borrowers shall furnish to Agent, together with the financial reporting required of Borrowers in Section 4.1 hereof, a Compliance Certificate as evidence of Borrowers' compliance with the covenants in this Article and evidence that no Event of Default specified in this Article has occurred. The Compliance Certificate shall include, without limitation, (a) a statement and report, on a form approved by Agent, detailing Borrowers' calculations, and (b) if requested by Agent, back-up documentation (including, without limitation, invoices, receipts and other evidence of costs incurred during such quarter as Agent shall reasonably require) evidencing the propriety of the calculations.

**Section 6.5**    Borrowers' Right to Cure.    Notwithstanding anything to the contrary contained in Section 10.1, in the event of any Event of Default under any covenant set forth in Sections 6.2 or 6.3, the cash proceeds from any equity contribution (in the form of common equity or other equity having terms

CHICAGO/#3272775.8

acceptable to Agent, other than any Disqualified Equity Interests) made to Borrowers after the last day of the Defined Period to which such Event of Default relates and on or prior to the day that is ten (10) Business Days after the day on which financial statements are required to be delivered for the calendar month ending on the last day of such Defined Period will, at the request of Borrower Representative, be included in the calculation of Operating Cash Flow (as defined in the Compliance Certificate) solely for the purposes of determining compliance with such financial covenants at the end of such Defined Period and any subsequent Defined Period that includes the last month of such Defined Period (any such equity contribution, a "**Specified Equity Contribution**"); provided that:

(a)        Borrowers shall not be permitted to so request that a Specified Equity Contribution be included in the calculation of Operating Cash Flow with respect to any calendar month unless, after giving effect to such requested Specified Equity Contribution, there will be at least four (4) calendar months in the Relevant Six-Month Period (as defined below) in which no Specified Equity Contribution has been made;

(b)        the amount of any Specified Equity Contribution and the use of proceeds therefrom will be no greater than the amount required to cause Borrowers to be in compliance with the financial covenants;

(c)        there shall be no more than five (5) Specified Equity Contributions made in the aggregate after the Closing Date;

(d)        the proceeds of all Specified Equity Contributions will be applied to prepay the outstanding Term Loan in accordance with Section 2.1(a)(ii)(B)(vii);

(e)        all Specified Equity Contributions and the use of proceeds therefrom will be included in the calculation of Operating Cash Flow as set forth in this Section 6.7 but will be disregarded for all other purposes under the Financing Documents (including calculating Operating Cash Flow for any items governed by reference to EBITDA or Operating Cash Flow); and

(f)        any portion of the Term Loan prepaid with the proceeds of Specified Equity Contributions shall be deemed outstanding for purposes of determining compliance with the covenants set forth in Sections 6.2 and 6.3 for the Defined Period to which the Event of Default giving rise to the Specified Equity Contribution relates.

For purposes of this Section 6.5, the term "Relevant Six-Month Period" shall mean, with respect to any requested Specified Equity Contribution, the six-month period ending on (and including) the last day of the Defined Period in which Operating Cash Flow will be increased as a result of such Specified Equity Contribution.

## ARTICLE 7 - CONDITIONS

**Section 7.1**        Conditions to Closing.  The obligation of each Lender to make the initial Loans, of Agent to issue any Support Agreements on the Closing Date and of any LC Issuer to issue any Lender Letter of Credit on the Closing Date shall be subject to the receipt by Agent of each agreement, document and instrument set forth on the closing checklist prepared by Agent or its counsel, each in form and substance satisfactory to Agent, and such other closing deliverables reasonably requested by Agent and Lenders, and to the satisfaction of the following conditions precedent, each to the satisfaction of Agent and Lenders and their respective counsel in their sole discretion:

67

(a)  evidence of the consummation of the transactions (other than the funding of the Loan and the closing of any acquisition for which the proceeds of the Loan are purchase money) contemplated by the Operative Documents including, without limitation, the funding of any and all investments contemplated by the Operative Documents;

(b)  the payment of all fees, expenses and other amounts due and payable under each Financing Document;

(c)  since December 31, 2018, the absence of any Material Adverse Effect, or any event or condition which could reasonably be expected to result in such a Material Adverse Effect;

(d)  the receipt of the initial Borrowing Base Certificate, prepared as of the Closing Date;

(e)  evidence that Borrowers have Liquidity of at least $2,500,000 after giving effect to the funding of Loans on the Closing Date and payment of liabilities on such date in the Ordinary Course of Business; and

(f)  the receipt of an executed copy of the Settlement Agreement, which shall be in full force and effect.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document, each additional Operative Document and each other document, agreement and/or instrument required to be approved by Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

**Section 7.2**    <u>Conditions to Each Loan, Support Agreement and Lender Letter of Credit.</u>  The obligation of the Lenders to make a Loan (other than Revolving Loans made pursuant to Section 2.5(c)) or an advance in respect of any Loan, of Agent to issue any Support Agreement or of any LC Issuer to issue any Lender Letter of Credit (including on the Closing Date) is subject to the satisfaction of the following additional conditions:

(a)  in the case of a borrowing of a Revolving Loan, receipt by Agent of a Notice of Borrowing (or telephonic notice if permitted by this Agreement) and updated Borrowing Base Certificate, in the case of any Support Agreement or Lender Letter of Credit, receipt by Agent of a Notice of LC Credit Event in accordance with Section 2.5(a), and in the case of a Term Loan advance, receipt by Agent of a Notice of Borrowing;

(b)  the fact that, immediately after such borrowing and after application of the proceeds thereof or after such issuance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit;

(c)  the fact that, immediately before and after such advance or issuance, no Default or Event of Default shall have occurred and be continuing;

(d)  the fact that the representations and warranties of each Credit Party contained in the Financing Documents shall be true, correct and complete on and as of the date of such borrowing or issuance, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date;

CHICAGO/#3272775.8

(e) the fact that no event that could reasonably be expected to result in a Material Adverse Effect shall have occurred since the date of this Agreement; and

Each giving of a Notice of LC Credit Event hereunder, each giving of a Notice of Borrowing hereunder and each acceptance by any Borrower of the proceeds of any Loan made hereunder shall be deemed to be (y) a representation and warranty by each Borrower on the date of such notice or acceptance as to the facts specified in this Section, and (z) a restatement by each Borrower that each and every one of the representations made by it in any of the Financing Documents is true and correct as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

**Section 7.3** <u>Searches</u>. Before the Closing Date, and thereafter (as and when determined by Agent in its reasonable discretion), Agent shall have the right to perform, all at Borrowers' expense, the searches described in clauses (a), (b), and (c) below against Borrowers and any other Credit Party: (a) UCC searches with the Secretary of State of the jurisdiction in which the applicable Person is organized; (b) judgment, pending litigation, federal tax lien, personal property tax lien, and corporate and partnership tax lien searches, in each jurisdiction searched under clause (a) above; and (c) searches of applicable corporate, limited liability company, partnership and related records to confirm the continued existence, organization and good standing of the applicable Person and the exact legal name under which such Person is organized.

**Section 7.4** <u>Post Closing Requirements</u>. Borrowers shall complete each of the post closing obligations and/or provide to Agent each of the documents, instruments, agreements and information listed on <u>Schedule 7.4</u> attached hereto on or before the date set forth for each such item thereon (unless extended by Agent in its sole discretion), each of which shall be completed or provided in form and substance reasonably satisfactory to Agent.

## ARTICLE 8 - RESERVED

## ARTICLE 9 - SECURITY AGREEMENT

**Section 9.1** <u>Generally</u>. As security for the payment and performance of the Obligations and without limiting any other grant of a Lien and security interest in any Security Document, Borrowers hereby assign and grant to Agent, for the benefit of itself and Lenders, a continuing first priority Lien on and security interest in, upon, and to the personal property set forth on <u>Schedule 9.1</u> attached hereto and made a part hereof.

**Section 9.2** <u>Representations and Warranties and Covenants Relating to Collateral</u>.

(a) <u>Schedule 9.2</u> sets forth (i) each chief executive office and principal place of business of each Borrower and each of their respective Subsidiaries, and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of Borrowers regarding any of the Collateral are kept (except for Collateral that (A) is in transit or out for repair, (B) is in the possession of an employee in the Ordinary Course of Business, or (C) has a value not in excess of $50,000), which such <u>Schedule 9.2</u> indicates in each case which Borrower(s) have Collateral and/or books and records located at such address, and, in the case of any such address not owned by one or more of the Borrowers(s), indicates the nature of such location (e.g., leased business location operated by Borrower(s), third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.

(b) Without limiting the generality of Section 3.2, except with respect to any rights of any Borrower as a licensee under any license of Intellectual Property owned by another Person, and except

for the filing of financing statements under the UCC or filings made at any United States Governmental Authority with respect to Intellectual Property, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or consent of any other Person is required for (i) the grant by each Borrower to Agent of the security interests and Liens in the Collateral provided for under this Agreement and the other Security Documents (if any), or (ii) the exercise by Agent of its rights and remedies with respect to the Collateral provided for under this Agreement and the other Security Documents or under any applicable Law, including the UCC and neither any such grant of Liens in favor of Agent or exercise of rights by Agent shall violate or cause a default under any agreement between any Borrower and any other Person relating to any such collateral, including any license to which a Borrower is a party, whether as licensor or licensee, with respect to any Intellectual Property, whether owned by such Borrower or any other Person.

(c)     As of the Closing Date, no Borrower has any ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or investment property (other than equity interests in any Subsidiaries of such Borrower disclosed on Schedule 3.4) in each case with a value in excess of $50,000 in the aggregate and Borrowers shall give notice to Agent promptly (but in any event not later than the delivery by Borrowers of the next Compliance Certificate required pursuant to Section 4.1 above) upon the acquisition by any Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property.  No Person other than Agent or (if applicable) any Lender has "control" (as defined in Article 9 of the UCC) over any Deposit Account (other than Excluded Accounts under clause (iii) of the definition thereof), investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which any Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of Borrowers is maintained).

(d)     Borrowers shall not, and shall not permit any Credit Party to, take any of the following actions or make any of the following changes unless Borrowers have given at least thirty (30) days prior written notice to Agent of Borrowers' intention to take any such action (which such written notice shall include an updated version of any Schedule impacted by such change) and have executed any and all documents, instruments and agreements and taken any other actions which Agent may request after receiving such written notice in order to protect and preserve the Liens, rights and remedies of Agent with respect to the Collateral:  (i) change the legal name or organizational identification number of any Borrower as it appears in official filings in the jurisdiction of its organization, (ii) change the jurisdiction of incorporation or formation of any Borrower or Credit Party or allow any Borrower or Credit Party to designate any jurisdiction as an additional jurisdiction of incorporation for such Borrower or Credit Party, or change the type of entity that it is, (iii) change its chief executive office or principal place of business, or (iv) change the location of its records concerning the Collateral or move any Collateral to or place any Collateral on any location that is not then listed on the Schedules and/or establish any business location at any location that is not then listed on the Schedules (except that Borrowers may move any Collateral that (A) is in transit or out for repair, (B) is in the possession of an employee in the Ordinary Course of Business, or (C) has a value not in excess of $50,000).

(e)     Borrowers shall not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor, or allow any credit or discount thereon (other than adjustments, settlements, compromises, credits and discounts in the Ordinary Course of Business, made while no Default exists and in amounts which are not material with respect to the Account and which, after giving effect thereto, do not cause the Borrowing Base to be less than the Revolving Loan Outstandings) without the prior written consent of Agent.  Without limiting the generality of this Agreement or any other provisions of any of the Financing Documents relating to the rights of Agent after the occurrence and during the continuance of an Event of Default, Agent shall have the right, at any time after

Agent has taken an action described in Section 10.2, to: (i) exercise the rights of Borrowers with respect to the obligation of any Account Debtor to make payment or otherwise render performance to Borrowers and with respect to any property that secures the obligations of any Account Debtor or any other Person obligated on the Collateral, and (ii) adjust, settle or compromise the amount or payment of such Accounts.

(f)        Without limiting the generality of Sections 9.2(c) and 9.2(e):

(i)        Borrowers shall deliver to Agent all tangible Chattel Paper and all Instruments and documents owned by any Borrower and constituting part of the Collateral, in each case, with an aggregate value in excess of $50,000 duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Agent. Borrowers shall provide Agent with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by any Borrower and constituting part of the Collateral by having Agent identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC. Borrowers also shall deliver to Agent all security agreements securing any such Chattel Paper and securing any such Instruments. Borrowers will mark conspicuously all such Chattel Paper and all such Instruments and documents with a legend, in form and substance satisfactory to Agent, indicating that such Chattel Paper and such instruments and documents are subject to the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents. Borrowers shall comply with all the provisions of Section 5.14 with respect to the Deposit Accounts and Securities Accounts of Borrowers.

(ii)        Borrowers shall deliver to Agent all letters of credit with face amount in excess of $50,000 on which any Borrower is the beneficiary and which give rise to letter of credit rights owned by such Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Agent. Borrowers shall take any and all actions as may be necessary or desirable, or that Agent may request, from time to time, to cause Agent to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to Agent.

(iii)        Borrowers shall promptly advise Agent upon any Borrower becoming aware that it has any interests in any commercial tort claim with a value in excess of $50,000 that constitutes part of the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrowers shall, with respect to any such commercial tort claim, execute and deliver to Agent such documents as Agent shall request to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to any such commercial tort claim.

(iv)        Except for Accounts and Inventory in an aggregate amount of $50,000, no Accounts or Inventory or other Collateral shall at any time be in the possession or control of any warehouse, consignee, bailee or any of Borrowers' agents or processors without prior written notice to Agent and the receipt by Agent, if Agent has so requested, of warehouse receipts, consignment agreements or bailee lien waivers (as applicable) satisfactory to Agent prior to the commencement of such possession or control. Borrower has notified Agent that Inventory is currently located at the locations set forth on Schedule 9.2. Borrowers shall, upon the request of Agent, notify any such warehouse, consignee, bailee, agent or processor of the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents, instruct such Person to hold

71

all such Collateral for Agent's account subject to Agent's instructions and shall obtain an acknowledgement from such Person that such Person holds the Collateral for Agent's benefit.

(v)     Borrowers shall cause all equipment and other tangible Personal Property other than Inventory to be maintained and preserved in the same condition, repair and in working order as when new, ordinary wear and tear excepted, and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. Upon request of Agent, Borrowers shall promptly deliver to Agent any and all certificates of title, applications for title or similar evidence of ownership of all such tangible Personal Property with a value in excess of $50,000 and shall cause Agent to be named as lienholder on any such certificate of title or other evidence of ownership. Borrowers shall not permit any such tangible Personal Property to become fixtures to real estate unless such real estate is subject to a Lien in favor of Agent.

(vi)     Each Borrower hereby authorizes Agent to file without the signature of such Borrower one or more UCC financing statements relating to liens on personal property relating to all or any part of the Collateral, which financing statements may list Agent as the "secured party" and such Borrower as the "debtor" and which describe and indicate the collateral covered thereby as all or any part of the Collateral under the Financing Documents (including an indication of the collateral covered by any such financing statement as "all assets" of such Borrower now owned or hereafter acquired), in such jurisdictions as Agent from time to time determines are appropriate, and to file without the signature of such Borrower any continuations of or corrective amendments to any such financing statements, in any such case in order for Agent to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to the Collateral. Each Borrower also ratifies its authorization for Agent to have filed in any jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(vii)     As of the Closing Date, no Borrower holds, and after the Closing Date Borrowers shall promptly notify Agent in writing upon creation or acquisition by any Borrower of, any Collateral which constitutes a claim in excess of $50,000 against any Governmental Authority, including, without limitation, the federal government of the United States or any instrumentality or agency thereof, the assignment of which claim is restricted by any applicable Law, including, without limitation, the federal Assignment of Claims Act and any other comparable Law. Upon the request of Agent, Borrowers shall take such steps as may be necessary or desirable, or that Agent may request, to comply with any such applicable Law.

(viii)     Borrowers shall furnish to Agent from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Agent may reasonably request from time to time.

## ARTICLE 10 - EVENTS OF DEFAULT

**Section 10.1**     Events of Default. For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "**Event of Default**":

(a)     (i) any Borrower shall fail to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document, (ii) there shall occur any default in the performance of or compliance with any of the following sections of this Agreement: Section 2.11, Section 4.2(b), Section 4.4(c), Section 4.6 and Article 5, or (iii) there shall occur any default in the performance of or compliance with Section 4.1 and/or Article 6 of this Agreement and

72

Borrower Representative has received written notice from Agent or Required Lenders of such default; provided that Agent and Required Lenders agree that they shall not deliver such notice to Borrower Representative solely with respect to a default in the timely delivery of financial statements and other reports under Section 4.1 if such financial statements or other reports are delivered within five (5) Business Days after the applicable date for delivery set forth in Section 4.1 and Borrowers have not defaulted in the performance of the covenants set forth in Section 4.1 (or any of them) more than twice in the current calendar year (including, for purposes of such calculation, the subject default);

(b)     any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or in any other Financing Document (other than occurrences described in other provisions of this Section 10.1 for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied by the Credit Party or waived by Agent within fifteen (15) days after the earlier of (i) receipt by Borrower Representative of notice from Agent or Required Lenders of such default, or (ii) actual knowledge of any Borrower or any other Credit Party of such default;

(c)     any representation, warranty, certification or statement made by any Credit Party or any other Person in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) when made (or deemed made);

(d)     (i) failure of any Credit Party to pay when due or within any applicable grace period any principal, interest or other amount on Debt (other than the Loans), or the occurrence of any breach, default, condition or event with respect to any Debt (other than the Loans), if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt, or other liabilities having an individual principal amount in excess of $250,000 or having an aggregate principal amount in excess of $250,000 to become or be declared due prior to its stated maturity, or (ii) the occurrence of any breach or default under any terms or provisions of any Subordinated Debt Document or under any agreement subordinating the Subordinated Debt to all or any portion of the Obligations or the occurrence of any event requiring the prepayment of any Subordinated Debt;

(e)     any Credit Party or any Subsidiary of a Borrower shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

(f)     an involuntary case or other proceeding shall be commenced against any Credit Party or any Subsidiary of a Borrower seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of forty-five (45) days; or an order for relief shall be entered against any Credit Party or any Subsidiary of a Borrower under applicable federal bankruptcy, insolvency or other similar law in respect of (i) bankruptcy, liquidation, winding-up, dissolution or suspension of general operations, (ii) composition, rescheduling, reorganization, arrangement or readjustment of, or other relief from, or stay of proceedings to enforce, some or all of the debts or obligations, or (iii) possession, foreclosure, seizure or

73

retention, sale or other disposition of, or other proceedings to enforce security over, all or any substantial part of the assets of such Credit Party or Subsidiary;

(g)     (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Credit Party would be required to make a contribution to such Pension Plan, or would incur a liability or obligation to such Pension Plan, in excess of $250,000, (ii) a contribution failure occurs with respect to any Pension Plan that gives rise to a Lien under Section 303(k) of ERISA or Section 430(k) of the Code on the assets of a Credit Party or an event occurs that gives rise to a Lien under Section 4068 of ERISA on the assets of a Credit Party, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal that any Credit Party must pay exceeds $250,000;

(h)     one or more judgments or orders for the payment of money (to the extent not paid or  covered by insurance maintained in accordance with the requirements of this Agreement and as to which the relevant insurance company has acknowledged coverage) aggregating in excess of $250,000 shall be rendered against any or all Credit Parties and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgments or orders, or (ii) there shall be any period of twenty (20) consecutive days during which a stay of enforcement of any such judgments or orders, by reason of a pending appeal, bond or otherwise, shall not be in effect;

(i)     any Lien created by any of the Security Documents shall at any time fail to constitute a valid and perfected Lien on all of the Collateral purported to be encumbered thereby, subject to no prior or equal Lien except Permitted Liens, or any Credit Party shall so assert;

(j)     the indictment of any Credit Party by any Governmental Authority on any criminal felony charges or criminal charges for any crime of fraud or other crime of moral turpitude;

(k)     an event of default occurs under any Guarantee of any portion of the Obligations;

(l)     any Borrower makes any payment on account of any Debt that has been subordinated to any of the Obligations, other than payments specifically permitted by the terms of such subordination; and

(m)     if any Borrower is or becomes an entity whose equity is registered with the SEC, and/or is publicly traded on and/or registered with a public securities exchange, such Borrower's equity fails to remain registered with the SEC in good standing, and/or such equity fails to remain publicly traded on and registered with a public securities exchange.

Notwithstanding the foregoing, if a Credit Party fails to comply with any same provision of this Agreement two (2) times in any twelve (12) month period and Agent has given to Borrower Representative in connection with each such failure any notice to which Borrowers would be entitled under this Section before such failure could become an Event of Default, then all subsequent failures by a Credit Party to comply with such provision of this Agreement shall effect an immediate Event of Default (without the expiration of any applicable cure period) with respect to all subsequent failures by a Credit Party to comply with such provision of this Agreement, and Agent thereupon may exercise any remedy set forth in this Article 10 without affording Borrowers any opportunity to cure such Event of Default.

All cure periods provided for in this Section 10.1 shall run concurrently with any cure period provided for in any applicable Financing Documents under which the default occurred.

74

**Section 10.2** <u>Acceleration and Suspension or Termination of Revolving Loan Commitment and Term Loan Commitment</u>. Upon the occurrence and during the continuance of an Event of Default, Agent may, and shall if requested by Required Lenders, (a) by notice to Borrower Representative suspend or terminate the Revolving Loan Commitment and Term Loan Commitment and the obligations of Agent and the Lenders with respect thereto, in whole or in part (and, if in part, each Lender's Revolving Loan Commitment and Term Loan Commitment shall be reduced in accordance with its Pro Rata Share), and/or (b) by notice to Borrower Representative declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same; *provided*, *however*, that in the case of any of the Events of Default specified in Section 10.1(e) or 10.1(f) above, without any notice to any Borrower or any other act by Agent or the Lenders, the Revolving Loan Commitment and Term Loan Commitment and the obligations of Agent and the Lenders with respect thereto shall thereupon immediately and automatically terminate and all of the Obligations shall become immediately and automatically due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

**Section 10.3** <u>UCC Remedies</u>.

(a) Upon the occurrence of and during the continuance of an Event of Default under this Agreement or the other Financing Documents, Agent, in addition to all other rights, options, and remedies granted to Agent under this Agreement or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable Law; including, without limitation:

(i) the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

(ii) the right to (by its own means or with judicial assistance) enter any of Borrowers' premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrowers' original books and records, to obtain access to Borrowers' data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrowers shall not resist or interfere with such action (if Borrowers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrowers hereby irrevocably authorize such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);

(iii) the right to require Borrowers at Borrowers' expense to assemble all or any part of the Collateral and make it available to Agent at any place designated by Lender;

(iv) the right to notify postal authorities to change the address for delivery of Borrowers' mail to an address designated by Agent and to receive, open and dispose of all mail addressed to any Borrower; and/or

75

(v)     the right to enforce Borrowers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for Lenders) and to charge the collection costs and expenses, including attorneys' fees, to Borrowers, and (ii) the right, in the name of Agent or any designee of Agent or Borrowers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Borrowers' compliance with applicable Laws. Borrowers shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process. Such verification may include contacts between Agent and applicable federal, state and local regulatory authorities having jurisdiction over the Borrowers' affairs, all of which contacts Borrowers hereby irrevocably authorize.

(b)     Each Borrower agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. At any sale or disposition of Collateral, Agent may (to the extent permitted by applicable Law) purchase all or any part of the Collateral, free from any right of redemption by Borrowers, which right is hereby waived and released. Each Borrower covenants and agrees not to interfere with or impose any obstacle to Agent's exercise of its rights and remedies with respect to the Collateral. Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. Agent may sell the Collateral without giving any warranties as to the Collateral. Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If Agent sells any of the Collateral upon credit, Borrowers will be credited only with payments actually made by the purchaser, received by Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Agent may resell the Collateral and Borrowers shall be credited with the proceeds of the sale. Borrowers shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations.

(c)     Without restricting the generality of the foregoing and for the purposes aforesaid, each Borrower hereby appoints and constitutes Agent its lawful attorney-in-fact with full power of substitution in the Collateral, upon the occurrence and during the continuance of an Event of Default, to (i) use unadvanced funds remaining under this Agreement or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Notes, (ii) pay, settle or compromise all existing bills and claims, which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the Collateral, (iii) execute all applications and certificates in the name of such Borrower and to prosecute and defend all actions or proceedings in connection with the Collateral, and (iv) do any and every act which such Borrower might do in its own behalf; it being understood and agreed that this power of attorney in this subsection (c) shall be a power coupled with an interest and cannot be revoked.

(d)     Upon the occurrence of and during the continuance of an Event of Default under this Agreement or the other Financing Documents, Agent and each Lender is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrowers' Intellectual Property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this Article, Borrowers' rights under all licenses (whether as licensor or licensee); provided, *however*, that each Borrower shall have the right to exercise reasonable quality control with respect to the use of trademarks included in the Collateral.

**Section 10.4**     Cash Collateral. If (a) any Event of Default specified in Section 10.1(e) or 10.1(f) shall occur, (b) the Obligations shall have otherwise been accelerated pursuant to Section 10.2, or (c) the

Revolving Loan Commitment and the obligations of Agent and the Lenders with respect thereto shall have been terminated pursuant to Section 10.2, then without any request or the taking of any other action by Agent or the Lenders, Borrowers shall immediately comply with the provisions of Section 2.5(e) with respect to the deposit of cash collateral to secure the existing Letter of Credit Liability and future payment of related fees.

**Section 10.5**    Default Rate of Interest.  At the election of Agent or Required Lenders, after the occurrence of an Event of Default and for so long as it continues, (a) the Loans and other Obligations shall bear interest at rates that are three percent (3.0%) per annum in excess of the rates otherwise payable under this Agreement, and (b) the fee described in Section 2.5(b) shall increase by a rate that is three percent (3.0%) in excess of the rate otherwise payable under such Section; *provided, however*, that in the case of any Event of Default specified in Section 10.1(e) or 10.1(f) above, such default rates shall apply immediately and automatically without the need for any election or action of any kind on the part of Agent or any Lender.

**Section 10.6**    Setoff Rights.  During the continuance of any Event of Default, each Lender is hereby authorized by each Borrower at any time or from time to time, with reasonably prompt subsequent notice to such Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances (other than balances in any Excluded Account) held by such Lender or any of such Lender's Affiliates at any of its offices for the account of such Borrower or any of its Subsidiaries (regardless of whether such balances are then due to such Borrower or its Subsidiaries), and (b) other property at any time held or owing by such Lender to or for the credit or for the account of such Borrower or any of its Subsidiaries, against and on account of any of the Obligations then due and owing; except that no Lender shall exercise any such right without the prior written consent of Agent.  Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.  Each Borrower agrees, to the fullest extent permitted by law, that any Lender and any of such Lender's Affiliates may exercise its right to set off with respect to the Obligations as provided in this Section 10.6.

**Section 10.7**    Application of Proceeds.

(a)    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of such Borrower or any Guarantor of all or any part of the Obligations, and, as between Borrowers on the one hand and Agent and Lenders on the other, Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent.

(b)    Following the occurrence and continuance of an Event of Default, but absent the occurrence and continuance of an Acceleration Event, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in such order as Agent may from time to time elect.

(c)    Notwithstanding anything to the contrary contained in this Agreement, if an Acceleration Event shall have occurred, and so long as it continues, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in the following order: *first*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Agent with respect to this Agreement, the other Financing Documents or the Collateral; *second*,

77

to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Financing Documents or the Collateral; _third_, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); _fourth_, to the principal amount of the Obligations outstanding and to provide cash collateral to secure any and all Letter of Credit Liability and future payment of related fees, as provided for in Section 2.5(e); _fifth_ to any other indebtedness or obligations of Borrowers owing to Agent or any Lender under the Financing Documents; and _sixth_, to the Obligations owing to any Eligible Swap Counterparty in respect of any Swap Contracts. Any balance remaining shall be delivered to Borrowers or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

**Section 10.8**     Waivers.

(a)     Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable Law, each Borrower waives: (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Financing Documents, the Notes or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and Guarantees at any time held by Lenders on which any Borrower may in any way be liable, and hereby ratifies and confirms whatever Lenders may do in this regard; (ii) all rights to notice and a hearing prior to Agent's or any Lender's taking possession or control of, or to Agent's or any Lender's replevy, attachment or levy upon, any Collateral or any bond or security which might be required by any court prior to allowing Agent or any Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption Laws. Each Borrower acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the other Financing Documents and the transactions evidenced hereby and thereby.

(b)     Each Borrower for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Agent or any Lender with respect to the payment or other provisions of the Financing Documents, and to any substitution, exchange or release of the Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Borrower, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Borrower, Agent or any Lender for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)     To the extent that Agent or any Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loans or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Agent or any Lender of such requirements with respect to any future disbursements of Loan proceeds and Agent may at any time after such acquiescence require Borrowers to comply with all such requirements. Any forbearance by Agent or Lender in exercising any right or remedy under any of the Financing Documents, or otherwise afforded by applicable Law, including any failure to accelerate the maturity date of the Loans, shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Notes or as a reinstatement of the Loans or a waiver of such right of acceleration or the right to insist upon strict

CHICAGO/#3272775.8

compliance of the terms of the Financing Documents. Agent's or any Lender's acceptance of payment of any sum secured by any of the Financing Documents after the due date of such payment shall not be a waiver of Agent's and such Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of Taxes or other Liens or charges by Agent as the result of an Event of Default shall not be a waiver of Agent's right to accelerate the maturity of the Loans, nor shall Agent's receipt of any condemnation awards, insurance proceeds, or damages under this Agreement operate to cure or waive any Credit Party's default in payment of sums secured by any of the Financing Documents.

(d) Without limiting the generality of anything contained in this Agreement or the other Financing Documents, each Borrower agrees that if an Event of Default is continuing (i) Agent and Lenders shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Agent or Lenders shall remain in full force and effect until Agent or Lenders have exhausted all remedies against the Collateral and any other properties owned by Borrowers and the Financing Documents and other security instruments or agreements securing the Loans have been foreclosed, sold and/or otherwise realized upon in satisfaction of Borrowers' obligations under the Financing Documents.

(e) Nothing contained herein or in any other Financing Document shall be construed as requiring Agent or any Lender to resort to any part of the Collateral for the satisfaction of any of Borrowers' obligations under the Financing Documents in preference or priority to any other Collateral, and Agent may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of Borrowers' obligations under the Financing Documents. In addition, Agent shall have the right from time to time to partially foreclose upon any Collateral in any manner and for any amounts secured by the Financing Documents then due and payable as determined by Agent in its sole discretion, including, without limitation, the following circumstances: (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Agent may foreclose upon all or any part of the Collateral to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loans, Agent may foreclose all or any part of the Collateral to recover so much of the principal balance of the Loans as Lender may accelerate and such other sums secured by one or more of the Financing Documents as Agent may elect. Notwithstanding one or more partial foreclosures, any unforeclosed Collateral shall remain subject to the Financing Documents to secure payment of sums secured by the Financing Documents and not previously recovered.

(f) To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the Collateral any equitable right otherwise available to any Credit Party which would require the separate sale of any of the Collateral or require Agent or Lenders to exhaust their remedies against any part of the Collateral before proceeding against any other part of the Collateral; and further in the event of such foreclosure each Borrower does hereby expressly consent to and authorize, at the option of Agent, the foreclosure and sale either separately or together of each part of the Collateral.

**Section 10.9** Injunctive Relief. The parties acknowledge and agree that, in the event of a breach or threatened breach of any Credit Party's obligations under any Financing Documents, Agent and Lenders may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including, without limitation, maintaining any cash management and collection procedure described herein. However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision

of this Agreement. Each Credit Party waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief. By joining in the Financing Documents as a Credit Party, each Credit Party specifically joins in this Section as if this Section were a part of each Financing Document executed by such Credit Party.

**Section 10.10** <u>Marshalling; Payments Set Aside</u>. Neither Agent nor any Lender shall be under any obligation to marshal any assets in payment of any or all of the Obligations. To the extent that Borrower makes any payment or Agent enforces its Liens or Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 11 - AGENT

**Section 11.1** <u>Appointment and Authorization</u>. Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto. Subject to the terms of Section 11.16 and to the terms of the other Financing Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders. The provisions of this Article 11 are solely for the benefit of Agent and Lenders and neither any Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Credit Party. Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its agents, servicers, trustees, investment managers or employees.

**Section 11.2** <u>Agent and Affiliates</u>. Agent shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not Agent hereunder.

**Section 11.3** <u>Action by Agent</u>. The duties of Agent shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.

**Section 11.4** <u>Consultation with Experts</u>. Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**Section 11.5** <u>Liability of Agent</u>. Neither Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Financing Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction. Neither Agent nor any of its directors, officers, agents, trustees, investment managers,

80

servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Financing Document; (c) the satisfaction of any condition specified in any Financing Document; (d) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Credit Party. Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties. Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

**Section 11.6** <u>Indemnification</u>. Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by Agent hereunder or thereunder. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

**Section 11.7** <u>Right to Request and Act on Instructions</u>. Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

**Section 11.8** <u>Credit Decision</u>. Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents.

**Section 11.9** <u>Collateral Matters</u>. Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Loan Commitment and payment in full of all Obligations; or (ii) constituting property

81

sold or disposed of as part of or in connection with any disposition permitted under any Financing Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Financing Documents); and (b) subordinate any Lien granted to or held by Agent under any Security Document to a Permitted Lien that is allowed to have priority over the Liens granted to or held by Agent pursuant to the definition of "Permitted Liens".  Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

Section 11.10    Agency for Perfection.  Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent), it being understood and agreed that such rights and remedies may be exercised only by Agent.

Section 11.11    Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

Section 11.12    Assignment by Agent; Resignation of Agent; Successor Agent.

(a)    Agent may at any time assign its rights, powers, privileges and duties hereunder to (i) another Lender, or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrowers.  Following any such assignment, Agent shall give notice to the Lenders and Borrowers.  An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below.

(b)    Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; *provided, however,* that if Agent shall notify Borrowers and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Financing Documents, and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall

82

instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)    Upon (i) an assignment permitted by subsection (a) above, or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Financing Documents, the provisions of this Article and Section 11.12 shall continue in effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

**Section 11.13**    Payment and Sharing of Payment.

(a)    Revolving Loan Advances, Payments and Settlements; Interest and Fee Payments.

(i)    Agent shall have the right, on behalf of Revolving Lenders to disburse funds to Borrowers for all Revolving Loans requested or deemed requested by Borrowers pursuant to the terms of this Agreement.  Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Revolving Lender, other than any Non-Funding Lenders, will fund its Pro Rata Share of all Revolving Loans requested by Borrowers.  Each Revolving Lender shall reimburse Agent on demand, in accordance with the provisions of the immediately following paragraph, for all funds disbursed on its behalf by Agent pursuant to the first sentence of this clause (i), or if Agent so requests, each Revolving Lender will remit to Agent its Pro Rata Share of any Revolving Loan before Agent disburses the same to a Borrower.  If Agent elects to require that each Revolving Lender make funds available to Agent, prior to a disbursement by Agent to a Borrower, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's Pro Rata Share of the Revolving Loan requested by such Borrower no later than noon (Eastern time) on the date of funding of such Revolving Loan, and each such Revolving Lender shall pay Agent on such date such Revolving Lender's Pro Rata Share of such requested Revolving Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by Agent to Revolving Lenders from time to time.  If any Lender fails to pay the amount of its Pro Rata Share of any funds advanced by Agent pursuant to the first sentence of this clause (i) within one (1) Business Day after Agent's demand, Agent shall promptly notify Borrower Representative, and Borrowers shall immediately repay such amount to Agent.  Any repayment required by Borrowers pursuant to this Section 11.13 shall be accompanied by accrued interest thereon from and including the date such amount is made available to a Borrower to but excluding the date of payment at the rate of interest then applicable to Revolving Loans.  Nothing in this Section 11.13 or elsewhere in this Agreement or the other Financing Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or any Borrower may have against any Lender as a result of any default by such Lender hereunder.

(ii)    On a Business Day of each week as selected from time to time by Agent, or more frequently (including daily), if Agent so elects (each such day being a "**Settlement Date**"), Agent will advise each Revolving Lender by telephone, facsimile or e-mail of the amount of each such Revolving Lender's percentage interest of the Revolving Loan balance as of the close of business of the Business Day immediately preceding the Settlement Date.  In the event that

payments are necessary to adjust the amount of such Revolving Lender's actual percentage interest of the Revolving Loans to such Lender's required percentage interest of the Revolving Loan balance as of any Settlement Date, the Revolving Lender from which such payment is due shall pay Agent, without setoff or discount, to the Payment Account before 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date the full amount necessary to make such adjustment. Any obligation arising pursuant to the immediately preceding sentence shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified in the second preceding sentence, interest shall accrue on the unsettled amount at the rate of interest then applicable to Revolving Loans.

(iii) On each Settlement Date, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's percentage interest of principal, interest and fees paid for the benefit of Revolving Lenders with respect to each applicable Revolving Loan, to the extent of such Revolving Lender's Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving Lender before 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving Lender to Agent, as the same may be modified from time to time by written notice to Agent; *provided, however,* that, in the case such Revolving Lender is a Defaulted Lender, Agent shall be entitled to set off the funding short-fall against that Defaulted Lender's respective share of all payments received from any Borrower.

(iv) On the Closing Date, Agent, on behalf of Lenders, may elect to advance to Borrowers the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Pro Rata Share of such Loans to Borrowers in a timely manner on such date. If Agent elects to advance the initial Loans to Borrower in such manner, Agent shall be entitled to receive all interest that accrues on the Closing Date on each Lender's Pro Rata Share of such Loans unless Agent receives such Lender's Pro Rata Share of such Loans before 3:00 p.m. (Eastern time) on the Closing Date.

(v) It is understood that for purposes of advances to Borrowers made pursuant to this Section 11.13, Agent will be using the funds of Agent, and pending settlement, (A) all funds transferred from the Payment Account to the outstanding Revolving Loans shall be applied first to advances made by Agent to Borrowers pursuant to this Section 11.13, and (B) all interest accruing on such advances shall be payable to Agent.

(vi) The provisions of this Section 11.13(a) shall be deemed to be binding upon Agent and Lenders notwithstanding the occurrence of any Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to any Borrower or any other Credit Party.

(b)     <u>Term Loan Payments</u>.  Payments of principal, interest and fees in respect of the Term Loans will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.

(c)     <u>Return of Payments</u>.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Financing Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)     <u>Defaulted Lenders</u>.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "Lender" (or be included in the calculation of "Required Lenders" hereunder) for any voting or consent rights under or with respect to any Financing Document.

(e)     <u>Sharing of Payments</u>.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.8(d)) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section 11.13, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided, however,* that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (e) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 10.6) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (e) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (e) to share in the benefits of any recovery on such secured claim.

**Section 11.14**   <u>Right to Perform, Preserve and Protect</u>.  If any Credit Party fails to perform any obligation hereunder or under any other Financing Document, Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense.  Agent is further authorized by Borrowers and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations.  Each Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14.  Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.6.

**Section 11.15**   <u>Additional Titled Agents</u>.  Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional

Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents. Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

**Section 11.16** <u>Amendments and Waivers</u>.

(a) No provision of this Agreement or any other Financing Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required Lenders and any other Lender to the extent required under Section 11.16(b); *provided*, *however*, that the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

(b) In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i) if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii) if the rights or duties of Agent or LC Issuer are affected thereby, by Agent and LC Issuer, as the case may be;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all the Lenders directly affected thereby, (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or Reimbursement Obligation or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan or Reimbursement Obligation; (B) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to Section 2.1(b)(ii) or the rescission of a prior acceleration) of principal of any Loan or of any Reimbursement Obligation, or of interest on any Loan or Reimbursement Obligation (other than default interest) or any fees provided for hereunder (other than late charges) or postpone the date of termination of any commitment of any Lender hereunder; (C) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (D) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder); (E) amend, waive or otherwise modify this Section 11.16(b) or the definitions of the terms used in this Section 11.16(b) insofar as the definitions affect the substance of this Section 11.16(b); (F) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Financing Document or release any Borrower of its payment obligations under any Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; or (G) amend any of the provisions of Section 10.7 or amend any of the definitions Pro Rata Share, Revolving Loan Commitment, Term Loan Commitment, Revolving Loan Commitment Amount, Term Loan Commitment Amount, Revolving Loan Commitment Percentage, Term Loan Commitment Percentage or that provide for the Lenders to receive their Pro Rata Shares of any fees, payments, setoffs or proceeds of Collateral hereunder. It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment,

waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F) and (G) of the preceding sentence.

**Section 11.17** <u>Assignments and Participations</u>.

    (a)    <u>Assignments</u>.

    (i)    Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder. Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however,* that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above. Borrowers and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided, however,* that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

    (ii)    From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1). Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, each Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender). Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower Representative any prior Note held by it.

    (iii)    Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at the office of its servicer located in Bethesda, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof (the "**Register**"). The entries in the Register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent, or any taxing authority if requested for purposes of determining whether the Loans are maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and under Section 5f.103-1(c) of the United States Treasury Regulations.

    (iv)    Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest

87

in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however,* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)     Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "**Settlement Service**").  At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 11.17(a).  Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service.  With the prior written approval of Agent, Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service.  Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)     Participations.  Any Lender may at any time, without the consent of, or notice to, any Borrower or Agent, sell to one or more Persons (other than any Borrower or any Borrower's Affiliates or any Disqualified Lender) participating interests in its Loan, commitments or other interests hereunder (any such Person, a "**Participant**").  In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrowers and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by each Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  Each Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; *provided, however*, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders, and Lenders agree to share with each Participant, as provided in Section 11.5.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant, as applicable, and the principal amounts (and stated interest) of each Participant's interest in the Loans or other Obligations (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, Loans, Letters of Credit or its other obligations) to any Person except to the extent that such disclosure is necessary to establish that such commitment, Loan, Letter of Credit or other obligation is in registered form under Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Agent shall have no responsibility for maintaining a Participant Register.

(c)     Replacement of Lenders.  Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in Section 2.8(d), which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), (iii) any

Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Financing Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower Representative and Agent may, at its option, notify such Affected Lender and, in the case of Borrowers' election, the Agent, of such Person's intention to obtain, at Borrowers' expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender.  In the event Borrowers or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however,* that (A) Borrowers shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under Section 2.8(a) or Section 2.8(d), as applicable, of this Agreement through the date of such sale and assignment, and (B) Borrowers shall pay to Agent the $3,500 processing fee in respect of such assignment.  In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 11.17(c) and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 11.17(c), such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section 11.17(c) and Section 11.17(a).  Upon any such assignment and payment, such replaced Lender shall no longer constitute a "**Lender**" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)     Credit Party Assignments.  No Credit Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Agent and each Lender.

**Section 11.18**     Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist.

So long as Agent has not waived the conditions to the funding of Revolving Loans set forth in Section 7.2 any Lender may deliver a notice to Agent stating that such Lender shall cease making Revolving Loans due to the non-satisfaction of one or more conditions to funding Loans set forth in Section 7.2 and specifying any such non-satisfied conditions.  Any Lender delivering any such notice shall become a non-funding Lender (a "**Non-Funding Lender**") for purposes of this Agreement commencing on the Business Day following receipt by Agent of such notice, and shall cease to be a Non-Funding Lender on the date on which such Lender has either revoked the effectiveness of such notice or acknowledged in writing to each of Agent the satisfaction of the condition(s) specified in such notice, or Required Lenders waive the conditions to the funding of such Loans giving rise to such notice by Non-Funding Lender.  Each Non-Funding Lender shall remain a Lender for purposes of this Agreement to the extent that such Non-Funding Lender has Revolving Loans Outstanding in excess of $0; *provided, however,* that during any period of time that any Non-Funding Lender exists, and notwithstanding any provision to the contrary set forth herein, the following provisions shall apply:

(a)     For purposes of determining the Pro Rata Share of each Revolving Lender under clause (c) of the definition of such term, each Non-Funding Lender shall be deemed to have a Revolving

Loan Commitment Amount and Term Loan Commitment Amount as in effect immediately before such Lender became a Non-Funding Lender.

(b)     Except as provided in clause (a) above, the Revolving Loan Commitment Amount and Term Loan Commitment Amount of each Non-Funding Lender shall be deemed to be $0.

(c)     The Revolving Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Revolving Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date plus (ii) the aggregate Revolving Loan Outstandings of all Non-Funding Lenders as of such date.

(d)     The Term Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Term Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date plus (ii) the aggregate principal amount outstanding under the Term Loans of all Non-Funding Lenders as of such date.

(e)     Except as provided in clause (a) above, the Revolving Loan Commitment Amount and Term Loan Commitment Amount of each Non-Funding Lender shall be deemed to be $0.

(f)     Agent shall have no right to make or disburse Revolving Loans for the account of any Non-Funding Lender pursuant to Section 2.1(b)(i) to pay interest, fees, expenses and other charges of any Credit Party, other than reimbursement obligations that have arisen pursuant to Section 2.5(c) in respect of Letters of Credit issued at the time such Non-Funding Lender was not then a Non-Funding Lender.

(g)     Agent shall have no right to (i) make or disburse Revolving Loans as provided in Section 2.1(b)(i) for the account of any Revolving Lender that was a Non-Funding Lender at the time of issuance of any Letter of Credit for which funding or reimbursement obligations have arisen pursuant to Section 2.5(c), or (ii) assume that any Revolving Lender that was a Non-Funding Lender at the time of issuance of such Letter of Credit will fund any portion of the Revolving Loans to be funded pursuant to Section 2.5(c) in respect of such Letter of Credit.  In addition, no Revolving Lender that was a Non-Funding Lender at the time of issuance of any Letter of Credit for which funding or reimbursement obligations have arisen pursuant to Section 2.5(c), shall have an obligation to fund any portion of the Revolving Loans to be funded pursuant to Section 2.5(c) in respect to such Letter of Credit, or to make any payment to Agent or the L/C Issuer, as applicable, under Section 2.5(f)(ii) in respect of such Letter of Credit, or be deemed to have purchased any interest or participation in such Letter of Credit from Agent or the L/C Issuer, as applicable, under Section 2.5(f)(i).

(h)     To the extent that Agent applies proceeds of Collateral or other payments received by Agent to repayment of Revolving Loans pursuant to Section 10.7, such payments and proceeds shall be applied first in respect of Revolving Loans made at the time any Non-Funding Lenders exist, and second in respect of all other outstanding Revolving Loans.

**Section 11.19**   <u>Buy-Out Upon Refinancing</u>.  MCF shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

**Section 11.20** <u>Definitions</u>. As used in this Article 11, the following terms have the following meanings:

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business, or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender, in each case, other than a Disqualified Lender.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to Agent.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Financing Document.

"**Disqualified Lender**" means (i) competitors of the Sponsor identified in writing by name by the Borrower or the Sponsor from time to time to the Agent and the Lenders, (ii) competitors of Parent and the Borrowers identified in writing by name by the Borrower or the Sponsor from time to time to the Administrative Agent and the Lenders, or (iii) any Subsidiary or Affiliate of a competitor identified pursuant to clause (ii) above of Holdings or the Borrower identified in writing by name by the Borrower or the Sponsor from time to time to the Administrative Agent and the Lenders (including, without limitation, in the case of each of clauses (i), (ii) and (iii), those Persons identified after receipt of notice (which shall be required by the assigning Lender) of any potential assignment or participation); provided that (a) it being agreed that a "competitor" shall not include any institutional lender, bona fide debt fund or investment vehicle that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business which is managed, sponsored or advised by any Person controlling, controlled by or under common control with such competitor and for which no personnel involved with the investment of such competitor (x) makes (or has the right to make or participates with others in making) any investment decisions or (y) has access to information (other than information publicly available) relating to the Borrower, (b) any Disqualified Lender pursuant to clause (i) above shall at no time constitute a Disqualified Lender upon the occurrence and during the continuance of an Event of Default arising under Section 9.1(a), Section 9.1(j) or Section 9.1(k) hereof and (c) no Person that is a Lender at the time of such identification may be designated as a Disqualified Lender.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by Agent; provided, however, that notwithstanding the foregoing, (x) "Eligible Assignee" shall not include any Borrower or any of a Borrower's Affiliates, and (y) no proposed assignee intending to assume all or any portion of the Revolving Loan Commitment or any unfunded portion of the Term Loan Commitment shall be an Eligible Assignee unless such proposed assignee either already holds a portion of such Revolving Loan Commitment or Term Loan Commitment, or has been approved as an Eligible Assignee by Agent; provided that, no Disqualified Lender shall be an Eligible Assignee.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day

next succeeding such day, *provided, however*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

## ARTICLE 12 - MISCELLANEOUS

**Section 12.1**     Survival.  All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents and the other Operative Documents.  The provisions of Section 2.10 and Articles 11 and 12 shall survive the payment of the Obligations (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement and any judgment with respect to any Obligations, including any final foreclosure judgment with respect to any Security Document, and no unpaid or unperformed, current or future, Obligations will merge into any such judgment.

**Section 12.2**     No Waivers.  No failure or delay by Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that any Borrower or any other Credit Party has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

**Section 12.3**     Notices.

(a)     All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such Lender who becomes a Lender after the date hereof, in an assignment agreement or in a notice delivered to Borrower Representative and Agent by the assignee Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to Agent and Borrower Representative; provided, however, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of Section 12.3(b) and (c).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this Section 12.3(a).

(b)     Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved from time to time by Agent, provided, however, that the foregoing shall not apply to notices sent directly to any Lender if such Lender has notified the Agent that it is incapable of receiving notices by electronic communication.  The Agent or Borrower Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided*, *however*, that approval of such procedures may be limited to particular notices or communications.

(c)     Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor, provided, however, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

Section 12.4     Severability.  In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 12.5     Headings.  Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

Section 12.6     Confidentiality.

(a)     Each Credit Party agrees (i) not to transmit or disclose provisions of any Financing Document to any Person (other than to Borrowers' advisors and officers on a need-to-know basis or as otherwise may be required by Law) without Agent's prior written consent, (ii) to inform all Persons of the confidential nature of the Financing Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions.

(b)     Agent and each Lender shall hold all non-public information regarding the Credit Parties and their respective businesses and obtained by Agent or any Lender pursuant to the requirements hereof in accordance with such Person's customary procedures for handling information of such nature, except that disclosure of such information may be made (i) to their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services that (x) are informed of the confidential nature of such information and (y) (1) are subject to customary confidentiality obligations of professional practice or (2) agree to be bound by the terms of this Section 12.6), (ii) to prospective transferees or purchasers of any interest in the Loans, the Agent or a Lender, *provided*, *however*, that any such Persons are bound by obligations of confidentiality, (iii) as required by Law, subpoena, judicial order or similar order and in connection with any litigation (in which case Agent or the applicable Lender agrees to inform the Credit Parties promptly thereof prior to such disclosure, to the extent not prohibited by law, rule or regulation), (iv) as may be required in connection with the examination, audit or similar investigation of such Person (in which case, Administrative Agent or such Lender agree, to the extent practicable and not prohibited by applicable Law, to inform Borrowers promptly thereof), and (v) to a Person that is a trustee, investment advisor or investment manager, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization. For the purposes of this Section, "**Securitization**" shall mean (A) the pledge of the Loans as collateral security for loans to a Lender, or (B) a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans.  Confidential information shall include only such information identified as such at the time provided to Agent and shall not include information that either:  (y) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person, or (z) is disclosed to such Person by a Person other than a

Credit Party, so long as Agent does not have actual knowledge that such Person is prohibited from disclosing such information. The obligations of Agent and Lenders under this Section 12.6 shall supersede and replace the obligations of Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Agent or any Lender prior to the date hereof.

**Section 12.7** <u>Waiver of Consequential and Other Damages</u>. To the fullest extent permitted by applicable Law, no party hereto shall assert, and each party hereto hereby waives, any claim against any party hereto (including, with respect to Agent and Lenders, the Indemnitees (as defined below)), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof; *provided*, that nothing in this Section 12.7 shall relieve the Borrowers of any obligation they may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the transactions contemplated hereby or thereby.

**Section 12.8** <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>.

(a) THIS AGREEMENT, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL DISPUTES AND OTHER MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD APPLY A DIFFERENT LAW.

(b) EACH PARTY HERETO HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER FINANCING DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. EACH PARTY HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTY BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

(c) Each Borrower, Agent and each Lender agree that each Loan (including those made on the Closing Date) shall be deemed to be made in, and the transactions contemplated hereunder and in any other Financing Document shall be deemed to have been performed in, the State of New York.

**Section 12.9** <u>WAIVER OF JURY TRIAL</u>. (a) **EACH BORROWER, AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A**

**COURT AND NOT BEFORE A JURY. EACH BORROWER, AGENT AND EACH LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH BORROWER, AGENT AND EACH LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

Section 12.10    Publication; Advertisement.

(a)    Publication.   No Credit Party will directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of MCF or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Law, subpoena or judicial or similar order, in which case the applicable Credit Party shall give Agent prior written notice of such publication or other disclosure, or (ii) with MCF's prior written consent.

(b)    Advertisement.   Each Lender and each Credit Party hereby authorizes MCF to publish the name of such Lender and Credit Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which MCF elects to submit for publication. In addition, each Lender and each Credit Party agrees that MCF may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date. With respect to any of the foregoing, MCF shall provide Borrowers with an opportunity to review and confer with MCF regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, MCF may, from time to time, publish such information in any media form desired by MCF, until such time that Borrowers shall have requested MCF cease any such further publication.

Section 12.11    Counterparts; Integration.   This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto. This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.12    No Strict Construction.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 12.13    Lender Approvals.   Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent or Lenders with respect to any matter that is the subject of this Agreement, the other Financing Documents may be granted or withheld by Agent and Lenders in their sole and absolute discretion and credit judgment.

95

**Section 12.14**    Expenses; Indemnity

(a)       Borrowers hereby agree to promptly pay (i) all reasonable and documented costs and expenses of Agent (including, without limitation, the documented and reasonable fees, costs and expenses of counsel to, and independent appraisers and consultants retained by Agent) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the Financing Documents, in connection with the performance by Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all Financing Documents, and (B) any periodic public record searches conducted by or at the request of Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all documented and out-of-pocket costs and expenses of Agent in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents; (iv) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder; and (v) all documented costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not Agent or Lenders are a party thereto.

(b)       Each Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and the officers, directors, employees, trustees, agents, investment advisors and investment managers, collateral managers, servicers, and counsel of Agent and Lenders (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by Agent or Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under this Agreement) and the use or intended use of the proceeds of the Loans and Letters of Credit, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from (i) the gross negligence or willful misconduct of such Indemnitee or any of their officers, directors, employees, trustees, agents, investment advisors and investment managers, collateral managers, servicers, or counsel, as determined by a final non-appealable judgment of a court of competent

jurisdiction or (ii) a dispute among Indemnitees. To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them. Notwithstanding the foregoing, this Section 12.14(b) shall not apply to Taxes, other than Taxes that represent losses, claims, damages, liabilities or expenses arising from any non-Tax claim.

(c)     Notwithstanding any contrary provision in this Agreement, the obligations of Borrowers under this Section 12.14 shall survive the payment in full of the Obligations and the termination of this Agreement. NO INDEMNITEE SHALL BE RESPONSIBLE OR LIABLE TO THE BORROWERS OR TO ANY OTHER PARTY TO ANY FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 12.15**   Reserved.

**Section 12.16**   Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Credit Party for liquidation or reorganization, should any Credit Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Credit Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a fraudulent preference reviewable transaction or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**Section 12.17**   Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Borrowers and Agent and each Lender and their respective successors and permitted assigns.

**Section 12.18**   USA PATRIOT Act Notification.  Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrower and such other information that will allow Agent or such Lender, as applicable, to identify Borrowers in accordance with the USA PATRIOT Act.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

*(Signature Page to Credit and Security Agreement)*

**IN WITNESS WHEREOF**, intending to be legally bound, each of the parties have caused this Agreement to be executed the day and year first above mentioned.

**BORROWER**
**REPRESENTATIVE:**

**EXAMINATION MANAGEMENT SERVICES, INC.,** a Nevada corporation

By: _____

Jeff Robertson
Chief Financial Officer

Address:

Examination Management Services, Inc.
3050 Regent Boulevard, Suite 400
Irving, Texas 75063

Attn: Chief Financial Officer
Facsimile: 214-689-3644
E-Mail: jrobertson@emsinet.com

With a copy to:

Examination Management Services, Inc.
3050 Regent Boulevard, Suite 400
Irving, TX 75063

Attn: General Counsel
Facsimile: 877-768-3246
E-Mail: BVidrik@emsinet.com

**OTHER BORROWERS:**

**EMSI HOLDING COMPANY,** a Delaware corporation

By: _____

Jeff Robertson
Chief Financial Officer

**EMSI ACQUISITION, INC.,** a Delaware corporation

By: _____

Jeff Robertson
Chief Financial Officer

(*Signature Page to Credit and Security Agreement*)

**AGENT:**

**MIDCAP FINANCIAL TRUST**, a Delaware statutory trust

By: Apollo Capital Management, L.P.
Its: Investment Manager

By: Apollo Capital Management GP, LLC
Its: General Partner

By: _____
Maurice Amsellem
Authorized Signatory

Address:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: Account Manager for EMSI transaction
Facsimile: 301-941-1450
E-mail: notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: General Counsel
Facsimile: 301-941-1450
E-mail: legalnotices@midcapfinancial.com

Payment Account Designation:

Wells Fargo Bank, N.A. (McLean, VA)
ABA #: 121-000-248
Account Name: MidCap Funding IV Trust - Collections
Account #: 2000036282803
Attention: EMSI

**(*Signature Page to Credit and Security Agreement*)**

**LENDER:**                                  **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By: _____
      Maurice Amsellem
      Authorized Signatory

Address:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for EMSI transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com

## ANNEXES, EXHIBITS AND SCHEDULES

**ANNEXES**

Annex A    Commitment Annex

**EXHIBITS**

Exhibit A    Reserved
Exhibit B    Form of Compliance Certificate
Exhibit C    Borrowing Base Certificate
Exhibit D    Form of Notice of Borrowing
Exhibit E    Form of Payment Notification

**SCHEDULES**

Schedule 2.1   Scheduled Principal Payments
Schedule 3.1   Existence, Organizational ID Numbers, Foreign Qualification, Prior Names
Schedule 3.4   Capitalization
Schedule 3.6   Litigation
Schedule 3.15   Brokers
Schedule 3.17   Material Contracts
Schedule 3.18   Environmental Compliance
Schedule 3.19   Intellectual Property
Schedule 4.4   Insurance
Schedule 5.1   Debt; Contingent Obligations
Schedule 5.2   Liens
Schedule 5.7   Permitted Investments
Schedule 5.8   Affiliate Transactions
Schedule 5.11   Business Description
Schedule 5.14   Deposit Accounts and Securities Accounts
Schedule 7.4   Post-Closing Obligations
Schedule 9.1   Collateral
Schedule 9.2   Location of Collateral

**ANNEX A TO CREDIT AGREEMENT (COMMITMENT ANNEX)**

| Lender | Revolving Loan Commitment Amount | Revolving Loan Commitment Percentage | Term Loan Commitment Amount | Term Loan Commitment Percentage |
|---|---|---|---|---|
| MidCap Financial Trust | $20,000,000 | 100% | $6,000,000 | 100% |
| TOTALS | $20,000,000 | 100% | $6,000,000 | 100% |

**EXHIBIT A TO CREDIT AGREEMENT (RESERVED)**

CHICAGO/#3272775.8

**EXHIBIT B TO CREDIT AGREEMENT (FORM OF COMPLIANCE CERTIFICATE)**

**COMPLIANCE CERTIFICATE**

This Compliance Certificate is given by _____, a Responsible Officer of Examination Management Services, Inc. (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of April 26, 2019 among the Borrower Representative, EMSI Holding Company, EMSI Acquisition, Inc. and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust (as successor by assignment from MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The undersigned Responsible Officer hereby certifies to Agent and Lenders that:

(a)     the financial statements delivered with this certificate in accordance with Section 4.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrowers and their Consolidated Subsidiaries as of the dates and the accounting period covered by such financial statements (except with respect to interim financial information for the absence of footnotes and normal year-end adjustments);

(b)     I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrowers and their Consolidated Subsidiaries during the accounting period covered by such financial statements and such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes a Default or an Event of Default, except as set forth in Schedule 1 hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrowers have taken, are undertaking and propose to take with respect thereto;

(c)     except as noted on Schedule 2 attached hereto, the Credit Agreement contains a complete and accurate list of all business locations of Borrowers and Guarantors and all names under which Borrowers and Guarantors currently conduct business; Schedule 2 specifically notes any changes in the names under which any Borrower or Guarantor conduct business;

(d)     except as noted on Schedule 3 attached hereto, the undersigned has no knowledge of (i) any federal or state tax liens having been filed against any Borrower, Guarantor or any Collateral or (ii) any failure of any Borrower or Guarantors to make required payments of withholding or other tax obligations of any Borrower or Guarantors during the accounting period to which the attached statements pertain or any subsequent period;

(e)     Schedule 5.14 to the Credit Agreement contains a complete and accurate statement of all deposit accounts and investment accounts maintained by Borrowers and Guarantors;

(f)     except as noted on Schedule 4 attached hereto and Schedule 3.6 to the Credit Agreement, the undersigned has no knowledge of any: (i) material Litigation pending against, or to such Borrower's knowledge threatened against or affecting, any Credit Party; (ii) inquiries, investigations or proceedings concerning the business affairs, practices, licensing or reimbursement entitlements of any Borrower or

Exhibit B – Page 1

Guarantor; or (iii) any default by any Borrower or Guarantor under any Material Contract to which it is a party, which breach or default could reasonably be expected to have a Material Adverse Effect;

(g)     except as noted on <u>Schedule 5</u> attached hereto, no Borrower or Guarantor has acquired, by purchase, by the approval or granting of any application for registration (whether or not such application was previously disclosed to Agent by Borrowers) or otherwise, any Intellectual Property that is registered with any United States Governmental Authority, or has filed with any such United States Governmental Authority, any new application for the registration of any Intellectual Property that has not previously been reported to Agent on <u>Schedule 3.19</u> to the Credit Agreement or any <u>Schedule 5</u> to any previous Compliance Certificate delivered by the Company to Agent;

(j)     except as noted on <u>Schedule 6</u> attached hereto, no Borrower or Guarantor has acquired, by purchase or otherwise, any Chattel Paper, Letter of Credit Rights, Instruments, Documents or Investment Property, in each case with a value in excess of $50,000 in the aggregate, that has not previously been reported to Agent on any <u>Schedule 6</u> to any previous Compliance Certificate delivered by Borrower Representative to Agent;

(k)     except as noted on <u>Schedule 7</u> attached hereto, no Borrower or Guarantor is aware of any commercial tort claim with a value in excess of $50,000 that has not previously been reported to Agent on any <u>Schedule 7</u> to any previous Compliance Certificate delivered by Borrower Representative to Agent; and

(l)     Borrowers and Guarantors (if any) are in compliance with the covenants contained in Article 6 of the Credit Agreement, and in any Guarantee constituting a part of the Financing Documents, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made: See attached worksheets. Such calculations and the certifications contained therein are true, correct and complete.

The foregoing certifications and computations are made as of _____, 201__ (end of month) and as of _____, 201__.

Sincerely,

**EXAMINATION MANAGEMENT SERVICES, INC.**

By:_____
Name:_____
Title:_____

## **EBITDA Worksheet  (Attachment to Compliance Certificate)**

EBITDA for the applicable Defined Period is calculated as follows:

Borrowers' and their Subsidiaries' consolidated net earnings (or loss),      $_____

*Minus*: without duplication, the sum of the following amounts of Borrowers and their Subsidiaries for such period to the extent included in determining consolidated net earnings (or loss) for such period:

| | | |
|---|---|---|
| (i) | any extraordinary, unusual or non-recurring gains | $_____ |
| (ii) | non-cash gains or profits, | $_____ |
| (iii) | any non-cash gain attributable to the write-up of any asset, and | $_____ |
| (iv) | interest income | $_____ |

*Plus*: without duplication, the sum of the following amounts of Borrowers and their Subsidiaries for such period to the extent included in determining consolidated net earnings (or loss) for such period (other than with respect to clause (x) below):

| | | |
|---|---|---|
| (i) | non-cash extraordinary or non-cash non-recurring expenses or losses (including non-cash adjustments due to changes in accounting) and other non-cash charges, non-cash losses from discontinued operations or non-cash restructuring charges (in each case as determined in accordance with GAAP), | $_____ |
| (ii) | non-cash compensation expense, or other non-cash expenses or charges, arising from the granting of stock options, stock appreciation rights or similar equity arrangements minus the amount of any such expenses or charges when paid in cash to the extent not deducted in the computation of net earnings (or loss), | $_____ |
| (iii) | interest expense, | $_____ |
| (iv) | tax expense based on income, profits or capital, including federal, foreign, state, franchise and similar Taxes (and for the avoidance of doubt, specifically excluding any sales Taxes), | $_____ |
| (v) | depreciation and amortization for such period, | $_____ |
| (vi) | any non-cash loss attributable to the write-down of any asset (other than accounts receivable and inventory), | $_____ |

CHICAGO/#3272775.8

(vii)  fees, costs and expenses related to (x) the consummation of the transactions contemplated under this Agreement, (y) any amendments, waivers, restatements, supplements or modifications thereto to the extent approved by the Agent (such approval not to be unreasonably withheld) and (z) audit, examination or monitoring undertaken by Agent or its designee under this Agreement,                                                                                      $_____

(viii)  reasonable out-of-pocket expense reimbursements and indemnity payments pursuant to the terms of the Sponsor Management Agreement not to exceed $200,000 in any twelve-month period and management, consulting, monitoring and/or advisory fees paid or accrued under the Sponsor Management Agreement, to the extent permitted to be paid under Section 5.3,                                          $_____

(ix)  proceeds from business interruption insurance, solely to the extent not included in determining consolidated net earnings,                        $_____

(x)  non-cash charges resulting from the grant of stock options or other equity related incentives to any director, officer or employee of Parent or any Subsidiary of Parent pursuant to a written plan or agreement approved by the board of directors of the applicable Person,                                                                                    $_____

(xi)  cash bonuses paid to management in conjunction with the closing of the transactions contemplated on the Closing Date in an amount not to exceed $550,000,                                                            $_____

(xii)  cash and non-cash operational restructuring costs (including but not limited to third party consultants, employee severance or retention pay, or duplicate compensation expenses) with respect to actions that have been or will be taken and that are expected to have a continuing impact in an aggregate amount not to exceed $500,000 in total prior to the second anniversary of the Closing Date, excluding any amounts previously incurred and included in the historical EBITDA figures in the below table (or such greater amount approved by Agent),                                                    $_____

(xiii)  cash and non-cash lease termination and lease continuation expenses in conjunction with any branch virtualization efforts, not to exceed $900,000 in total prior to the second anniversary of the Closing Date of this Agreement, in conjunction with any branch virtualization efforts                                                              $_____

(xiv)  non-recurring, extraordinary or unusual losses, charges and expenses not to exceed $200,000 in any twelve-month period and any amounts in excess of $200,000 to be approved by Agent in its discretion (such approval not to be unreasonably withheld),              $_____

(xv)    without duplication, documented fees paid to, or invoiced by, third party consultants after the Closing Date through the first anniversary following the Closing Date, in an aggregate amount not to exceed $100,000, to the extent such charges are non-recurring and not expected to be replaced with salary or other compensation expense to permanent employees or other workers,    $_____

(xvi)    costs, fees and expenses paid in connection with (1) Investments permitted under clause (p) of the definition of "Permitted Investment" and issuances of Equity Interests of the Parent otherwise permitted under this Agreement and (2) Permitted Acquisitions, whether or not consummated, in an aggregate amount not to exceed $500,000 in any twelve month period (or such greater amount as Agent shall agree),    $_____

(xvii)    board of director fees and expenses in an amount not to exceed $200,000 in any fiscal year ("**BOD Fees**"), and    $_____

(xviii)    litigation fees and expenses associated with the class action lawsuits, D&O insurance claim and any other legal proceedings outside the normal course of business, not to exceed $150,000 for the fiscal year ended March 31, 2020 and not to be included as an adjustment to EBITDA for any period ending thereafter    $_____

EBITDA for the Defined Period:    $_____

For the purposes of calculating EBITDA for any period of 12 consecutive months (each, a "**Reference Period**"), if at any time during such Reference Period (and after the Closing Date), Parent or any of its Subsidiaries shall have made a Permitted Acquisition or other Permitted Investment permitted under clause (j) of the definition thereof in connection with a Permitted Acquisition, EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto (including pro forma adjustments arising out of events that have occurred, are directly attributable to such Permitted Acquisition or such Permitted Investment in connection with a Permitted Acquisition, are factually supportable, and are expected to have a continuing impact, in each case reasonably acceptable to the Agent) or in such other manner acceptable to Agent as if any such Permitted Acquisition or such Permitted Investment in connection with a Permitted Acquisition or adjustment occurred on the first day of such Reference Period.

For the purposes of calculating EBITDA for any period of 12 consecutive months, EBITDA shall be deemed to be the corresponding amount set forth next to such month as follows; provided, that EBITDA for the period from April 2018 through March 2019 shall be deemed to be an amount for Borrowers and their Subsidiaries as adjusted in a manner consistent with the adjustments to EBITDA reflected in the months set forth immediately below; provided, that EBITDA for the period of April 2019 shall be deemed to be an amount for the Borrowers and their Subsidiaries as adjusted in a manner consistent with the adjustments to EBITDA reflected in the months set forth immediately below:

| Month | EBITDA |
|---|---|
| April 2018 | $559,000 |

Exhibit B – Page 5

| | |
|---|---|
| May 2018 | $515,000 |
| June 2018 | $763,000 |
| July 2018 | $232,000 |
| August 2018 | $513,000 |
| September 2018 | $385,000 |
| October 2018 | $463,000 |
| November 2018 | $649,000 |
| December 2018 | $754,000 |
| January 2019 | $490,000 |
| February 2019 | $572,000 |
| March 2019 | $500,000 |

CHICAGO/#3272775.8

## **Fixed Charge Coverage Ratio Worksheet (Attachment to Compliance Certificate)**

<u>Fixed Charges</u> for the applicable Defined Period is calculated as follows:

| | |
|---|---|
| Cash interest expense (excluding any commitment, underwriting and similar fees paid to Agent or any Lender and any amendment or forbearance fees), net of cash interest income, included in the determination of net income of Borrowers and their Consolidated Subsidiaries for the Defined Period ("**Total Interest Expense**") | $_____ |

*Plus*:   Payments of principal for the Defined Period with respect to all Debt (including the portion of scheduled payments under capital leases allocable to principal but excluding (i) payments of principal of Debt on or prior to the Closing Date, (ii) mandatory prepayments required by Section 2.1, (iii) scheduled repayments of Revolving Loans and other Debt subject to reborrowing to the extent not accompanied by a concurrent and permanent reduction of the Revolving Loan Commitment (or equivalent loan commitment)), (iv) the payment of any earnouts, and (v) payments in respect of the Settlement Agreement                          $_____

*Plus*:   management, consulting, monitoring and/or advisory fees paid under the Sponsor Management Agreement during the Defined Period                          $_____

Fixed Charges for the applicable Defined Period:                          $_____


<u>Operating Cash Flow</u> for the applicable Defined Period is calculated as follows:

EBITDA for the Defined Period (calculated pursuant to the EBITDA Worksheet)                          $_____

*Minus:*   Unfinanced capital expenditures for the Defined Period (excluding any Waco Relocation Expenses capitalized during the Defined Period)                          $_____

*Minus:*   income or franchise Taxes paid in cash for the Defined Period                          $_____

Operating Cash Flow for the Defined Period:

                          $_____

<u>Covenant Compliance:</u>

Fixed Charge Coverage Ratio (Ratio of Operating Cash Flow to Fixed Charges) for the Defined Period                          ___ to 1.0

Minimum Fixed Charge Coverage for the Defined Period                          1.1 to 1.0

In Compliance                          Yes/No

**Senior Net Leverage Ratio Worksheet (Attachment to Compliance Certificate)**

<u>Senior Net Debt</u> for the applicable Defined Period is calculated as follows with respect to Borrowers and their Consolidated Subsidiaries:

| | | |
|---|---|---|
| Average daily principal balance of the Revolving Loans for the one month period ending on the last day of the applicable measurement period (the "**Defined Period**") | | $_____ |
| Plus: | Outstanding principal balance of the Term Loan as of the last day of the Defined Period | _____ |
| | Letter of Credit Liabilities as of the last day of the Defined Period | _____ |
| | Outstanding principal balance of all other Debt of Borrowers and their Consolidated Subsidiaries as of the last day of the Defined Period (and, for the avoidance of doubt, excluding the Settlement Agreement) | _____ |
| Total Debt | | $_____ |
| Less: | Outstanding principal balance of Subordinated Debt as of the last day of the Defined Period | _____ |
| | Borrowers' Qualified Cash; provided that the amount of such Qualified Cash deducted from Total Debt shall not exceed 50% of EBITDA for the twelve fiscal month period ending on the last day of the most recent month for which financial statements have been delivered pursuant to Section 4.1(a) | _____ |
| <u>Senior Net Debt:</u> | | $_____ |
| Adjusted EBITDA: | | _____ |
| EBITDA for the Defined Period (calculated pursuant to the EBITDA worksheet) | | $_____ |
| Plus: | Pro Forma Acquisition EBITDA (as defined below) for each Permitted Acquisition (and each proposed Permitted Acquisition for determining compliance with the requirement of Section 5.7) | |
| | Permitted Acquisition #1: _____<br>Permitted Acquisition #2: _____<br>Permitted Acquisition #3: _____ | |
| | | _____ |
| Adjusted EBITDA | | $_____ |
| Senior Net Debt to Adjusted EBITDA Ratio (ratio of Senior Net Debt to Adjusted EBITDA for the Defined Period) | | ____ to 1.0 |

Exhibit B – Page 8

| | |
|---|---|
| Maximum Permitted Senior Net Debt to Adjusted EBITDA Ratio for the Defined Period | _____ to 1.0 |
| In Compliance | Yes/No |

"Pro Forma Acquisition EBITDA" means (i) EBITDA (calculated in the same manner as EBITDA is calculated on this Exhibit C) attributable to each Permitted Acquisition (with such pro forma adjustments as are reasonably acceptable to Agent based upon data presented to Agent to its reasonable satisfaction) consummated during the one (1) year period preceding the date of determination calculated solely for a number of months immediately preceding the consummation of the applicable Permitted Acquisition, which number equals twelve (12) minus the number of months following the consummation of the applicable Permitted Acquisition for which financial statements of Borrowers and their Consolidated Subsidiaries have been delivered to Agent pursuant to Section 4.1, and (ii) for purposes of determining compliance with Section 5.7, EBITDA (calculated in the same manner as EBITDA is calculated in this Compliance Certificate) of the target of any proposed Permitted Acquisition (adjusted with such pro forma adjustments as are reasonably acceptable to Agent based upon data presented to Administrative Agent to its reasonable satisfaction) calculated for the twelve (12) months immediately preceding the consummation of the proposed Permitted Acquisition.

CHICAGO/#3272775.8

**EXHIBIT C TO CREDIT AGREEMENT (BORROWING BASE CERTIFICATE)**

Exhibit C – Page 1

CHICAGO/#3272775.8

**MidCap Funding IV Trust**

**Borrowing Base Report**

BBR Date: _____ <--Enter borrowing date _____

Name: **Examination Management Services, Inc.** _____ <--Days Since Last Collat

| | Genzyme | Other Payors | Total |
|---|---|---|---|
| **Billed Accounts Receivable** | | | |
| 1-30 Days Past Date of Invoice | | | |
| 31-60 Days Past Date of Invoice | | | |
| 61-90 Days Past Date of Invoice | | | |
| 91-120 Days Past Date of Invoice | | | |
| 121-150 Days Past Date of Invoice | | | |
| 151-180 Days Past Date of Invoice | | | |
| > 180 Days Past Date of Invoice | | | |
| 1. **Total Billed A/R** | | | |
| | | | |
| **Less: Ineligible A/R** | | | |
| > 120 Days Past Date of Invoice | | | |
| Plus: A/R aged 121-125 Days Past Invoice Date | | | |
| > 155 Days Past Service Date | | | |
| Related Party Payor | | | |
| Unbilled A/R | | | |
| Progress Billings | | | |
| Contras - A/P & Rebates | | | |
| Deferred Revenue | | | |
| Consignment | | | |
| Individual Payor | | | |
| Government Payor | | | |
| Foreign Payor | | | |
| Denominated in Foreign Currency | | | |
| Cross Aged @ 50% | | | |
| Late Fees | | | |
| Insolvent or Bankrupt Payor | | | |
| Doubtful Account | | | |
| Concentration Limit | | | |
| Other Ineligibles | | | |
| 2. **Total Ineligible A/R** | | | |
| | | | |
| 3. **Total Eligible A/R** | | | |
| | | | |
| Liquidity Factor | | | |
| 4. **Net Eligible A/R** | | | |
| | | | |
| **Less: Reserves** | | | |
| Credit Balances Aged > 125 Days | | | |
| Unposted Cash | | | |
| 5. **Net Eligible A/R After Reserves** | | | |

Computation of Availability

6. Total Eligible Accounts:
7a. (**Less**): Eligible Cash Posted Since Last Aging _____ <--Enter all cash collectio
7b. **Add**: A/R since last aging
7c. **Plus/(Minus**): Adjustments _____ <--Add back cash collecti
8. Net Eligible Accounts
9. Advance Rate
10. **Net Availability**

Computation of Loan

14. Facility Limit
15. Available to Borrow (not to exceed limit)

16. Loan Balance on Prior Borrowing Base Certificate
17. (**Less**): Cash Collections since last Borrowing Base Certificate
18. **Increase/(Decrease**): Adjustments
19. Loan Advances
20. Ending Loan Balance

21. Letter of Credit Outstandings
22. Overall Reserve _____ <--Represents one month

23. Remaining Availability (Lines 15-20-21-22)

Pursuant to, and in accordance with, the terms and provisions of the Financing Documents  ("Documents"), between Midcap Financial Trust ("Secured Party") and Examination Management Services, Inc. ("Borrower"), Borrower is executing and delivering to Secured Party this Borrowing Base Report accompanied by supporting data (collectively referred to as "Report").  Borrower warrants and represents to Secured Party that this Report is true, correct, and based on information contained in Borrower's own financial accounting records.
Borrower, by the execution of this Report:
(a)  Hereby ratifies, confirms, and affirms all of the terms, and further certifies that the Borrower is in compliance with the Loan Documents as of April 26, 2019.(b)  Hereby certifies that the Borrower has paid all State and Federal payroll witholding taxes immediately due and payable through January 00, 1900.Capitalized Terms used herein and not otherwise defined shall have the meaning ascribed to them in the Loan and Security Agreement between Secured Party and Borrower dated April 26, 2019.

(Responsible Officer's Signature)

_____
Name:
Title:

**EXHIBIT D TO CREDIT AGREEMENT (FORM OF NOTICE OF BORROWING)**

**NOTICE OF BORROWING**

This Notice of Borrowing is given by _____, a Responsible Officer of Examination Management Services, Inc. (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of April 26, 2019 among the Borrower Representative, EMSI Holding Company, EMSI Acquisition, Inc. and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust (as successor by assignment from MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to borrow $_____ of Revolving Loans on _____, 201__. Attached is a Borrowing Base Certificate complying in all respects with the Credit Agreement and confirming that, after giving effect to the requested advance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit.

The undersigned officer hereby certifies that, both before and after giving effect to the request above (a) each of the conditions precedent set forth in Section 7.2 have been satisfied, (b) all of the representations and warranties contained in the Credit Agreement and the other Financing Documents are true, correct and complete as of the date hereof, except to the extent such representation or warranty relates to a specific date, in which case such representation or warranty is true, correct and complete as of such earlier date, and (c) no Default or Event of Default has occurred and is continuing on the date hereof.

**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this Notice of Borrowing this _____ day of _____, 201__.

Sincerely,

**EXAMINATION MANAGEMENT SERVICES, INC.**

By:_____
Name:_____
Title:_____

Exhibit D – Page 1

**EXHIBIT E TO CREDIT AGREEMENT (PAYMENT NOTIFICATION)**

**PAYMENT NOTIFICATION**

This Payment Notification is given by _____, a Responsible Officer of Examination Management Services, Inc. (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of April 26, 2019 among the Borrower Representative, EMSI Holding Company, EMSI Acquisition, Inc. and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust (as successor by assignment from MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

Please be advised that funds in the amount of $_____ will be wire transferred to Agent on _____, 201_. Such funds shall constitute [an optional] [a mandatory] prepayment of the Term Loans, with such prepayments to be applied in the manner specified in Section 2.1(a)(iii). [Such mandatory prepayment is being made pursuant to Section _____ of the Credit Agreement.]

Fax to MCF Operations 301-941-1450 no later than noon Eastern time.

Note: Funds must be received in the Payment Account by no later than noon Eastern time for same day application

**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this Payment Notification this _____ day of _____, 201__.

Sincerely,

**EXAMINATION MANAGEMENT SERVICES, INC.**

By:_____
Name:_____
Title:_____

**Schedule 2.1 - Amortization**

Commencing on the date which is the first day of the ninth full calendar month after the Closing Date, and continuing on the first day of each calendar month thereafter, Borrowers shall pay to Agent as a principal payment under the Term Loan an amount equal to the Amortization Payment (defined below) as an amortization payment in respect of each advance under the Term Loan.  The term "**Amortization Payment**" means the principal payment based upon a thirty-six (36) month straight-line amortization of equal monthly principal payments. Notwithstanding the payment schedule set forth above, the outstanding principal amount of the Term Loan shall become immediately due and payable in full on the Termination Date.

**Schedule 3.1 – Existence, Organizational ID Numbers, Foreign Qualification, Prior Names**

| Credit Party | DBA Name of Project | Type of Entity / State of Formation | States of Foreign Qualification (if any) | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years |
|---|---|---|---|---|---|---|---|
| Examination Management Services, Inc. | EMSI | Nevada Corporation | All 50 States | NV20011253713 | 75-1444139 | 3050 Regent Boulevard, Suite 400, Irving, TX 75063 | EMSI, ICS Merrill, Leprechaun, LepMed, Inc. |
| EMSI Holding Company | N/A | Delaware Corporation | Arizona, Delaware, Texas | 3909792 | 20-2134789 | 3050 Regent Boulevard, Suite 400, Irving, TX 75063 | None |
| EMSI Acquisition, Inc. | N/A | Delaware Corporation | None (other than jurisdiction of organization) | 5854266 | 47-5418624 | 3050 Regent Boulevard, Suite 400, Irving, TX 75063 | None |
| EMSI Holdco, Inc. | N/A | Delaware Corporation | None (other than jurisdiction of organization) | 5854260 | 47-5411305 | 3050 Regent Boulevard, Suite 400, Irving, TX 75063 | None |

**Schedule 3.4 – Capitalization**

| Name of Entity | Record Owner | Certificate No. | No. Shares/Interest | Percentage Of Issued Shares Owned |
|---|---|---|---|---|
| EMSI Holdco, Inc. | EMSI Equity, LLC | C-1 | 1,000 | 100% |
| EMSI Acquisition, Inc. | EMSI Holdco, Inc. | C-1 | 1,000 | 100% |
| EMSI Holding Company | EMSI Acquisition, Inc. | 7 | 500,000 | 100% |
| Examination Management Services, Inc. | EMSI Holding Company | 2 | 69,100 | 100% |

**Schedule 3.6 – Litigation**

1. Amiee Hofer et. al. v. EMSI / Federal District Court / Dallas, Texas (settlement pending court approval)

2. Cynthia Rose V. Pan v. EMSI / Attorney Claim Letter / Warwick, Rhode Island (claim believed to be abandoned)

3. William Small v. EMSI / Court of Common Pleas / Schuylkill County, Pennsylvania

4. Brooke Clark v. EMSI / Attorney Claim Letter / Florida (claim believed to be abandoned)

5. Maria Gonzalez et. al. v. EMSI, Laboratory Corporation of America Holdings and Soko United, Inc. / Federal District Court / San Diego, California (settlement pending court approval)

6. Shannon Sanchez et. al. v. EMSI / Superior Court of California / Santa Clara County (settlement pending court approval)

7. Scott Weiner v. EMSI / Attorney Claim Letter / Virginia Beach, Virginia (claim believed to be abandoned)

8. Greg Riedl v. Examination Management Services, Inc. / California Labor Commissioner Notice of Claim, Claim No.: 07-86828 JL / California Labor Commissioner, Oakland, California.

9. 5Star Life Insurance v. EMSI /Attorney Claim Letter / Texas

10. EMSI v. AAJ Technologies /AAJ Technologies v. EMSI / Federal District Court / Dallas, Texas (settlement pending)

11. Dennis Daniel v. EMSI / Attorney Claim Letter / Columbia, South Carolina

12. Janee Samson v. JetBlue Airways Corporation and EMSI / Circuit Court of Florida / Broward County

13. Andrea Techaria v. EMSI / California Labor Commissioner Notice of Claim, Claim No.: WC-CM-591221-SS / California Labor Commissioner, San Bernardino, CA

CHICAGO/#3290887.5A

**Schedule 3.15 – Brokers**

Lincoln International, LLC, an Illinois limited liability company

**Schedule 3.17 – Material Contracts**

(ii)

1. Genzyme Corporation

2. Prudential

3. USAA Life

4. American General (AIG)

5. Primerica

6. Legal and General

7. Northwestern Mutual

8. Aegon/Transamerica/Money Services

9. State Farm

10. US Health Group

**Schedule 3.18 – Environmental Compliance**

None.

CHICAGO/#3290887.5A

**Schedule 3.19 – Intellectual Property**

COPYRIGHTS

| Copyright Title | Registration No. | Registration Date | Status | Jurisdiction | Owner |
|---|---|---|---|---|---|
| Understanding Diabetes Mellitus to Improve Coding Practices. | TXu001809315 | 6/7/2012 | Registered | U.S. | Examination Management Services, Inc. (formerly LepMed, Inc.) |
| Examination Management Services, Inc., examiner's training manual, May 1988. | TX0002356858 | 6/20/1988 | Registered | U.S. | Examination Management Services, Inc. |

TRADEMARKS

**Trademark Applications**

| Trademark/Service Mark | Serial Number | Filing Date | Goods/Services |
|---|---|---|---|
| INSIGHT | 88347142 | 3/19/2019 | 35, 38 |

**Trademarks**

| Trademark/Service Mark | Registration Number | Registration Date | Goods/Services |
|---|---|---|---|
| CHECKRX | 3855672 | 10/5/2010 | 36 |
| Design only  | 5052817 | 10/4/2016 | 35, 42, 44 |
| Design only  | 4963849 | 5/24/2016 | 45 |
| Design only  | 5144283 | 2/21/2017 | 36, 42, 44, 45 |
| EMSI and Design  | 5269522 | 8/22/2017 | 35, 38, 44 |
| EMSI and Design  | 3315299 | 10/23/2007 | 36, 42, 44, 45 |
| EMSI and Design  | 3203336 | 1/30/2007 | 42 |
| EMSI and Design  | 3063474 | 2/28/2006 | 36 |
| EMSI and Design  | 3111532 | 7/4/2006 | 44 |
| EMSI and Design  | 3063476 | 2/28/2006 | 45 |
| EMSI in Stylized Letters  | 3315298 | 10/23/2007 | 36, 42, 44, 45 |
| HEALTHY HOUSE CALLS | 4256005 | 12/11/2012 | 35, 44 |

8

| HEALTHY HOUSE CALLS and Design | 4333494 | 5/14/2013 | 35, 44 |
| POWERFUL INFORMATION IMPROVED OUTCOMES | 5028117 | 8/23/2016 | 36, 42, 44, 45 |
| STRATUS IQ and Design | 4961047 | 5/17/2016 | 42 |
| STRATUSIQ | 4871630 | 12/15/2015 | 42 |

PATENTS

| TITLE | DATE FILED | APPLICATION NUMBER | STATUS | OWNER |
|---|---|---|---|---|
| Systems and Methods for Automatically Generating Structured Output Documents Based on Structural Rules | 03/11/2019 | 16/299,071 | Pending | Examination Management Services, Inc. |

9

LICENSES

| Licensor | Description |
|---|---|
| ApplicInt, Inc. | **IGOMobile** – Laptop and iPad-based applications used by EMSI field examiners to conduct electronic paramedical exams. |
| ApplicInt, Inc. | **CRL eSlip** – iPad-based module within IGOMobile that allows EMSI field examiners to create and deliver an electronic lab slip to CRL (lab). |
| ApplicInt, Inc. | **OneTouch** – iPad-based module within IGOMobile that proactively collects signatures for medical record special authorizations. |
| eNoah iSolutions, Inc. | **eAPS** – Core application inside of the EMSI Insight platform.  Utilized for EMSI Underwriting services for medical record summaries. |

CHICAGO/#3290887.5A

### Schedule 4.4
### MINIMUM INSURANCE REQUIREMENTS - ASSET-BASED LOANS

#### *General Requirements*

1. Insurance coverages must be as stated in these Minimum Insurance Requirements; provided, however, except for changes or additional coverages that may be required under a post-closing obligations schedule or letter agreement and are not reflected in the insurance certificates delivered at closing, if there is any conflict between these Minimum Insurance Requirements and the limits, deductible or retention amounts or specific coverages stated in the insurance certificates accepted by Agent at closing and included as part of this Schedule 4.4, such certificates shall govern and control.

2. Carrier must be rated A-VII or better (by A.M. Best). Carrier must be a third party commercial insurer unless Agent shall otherwise approve. All captive programs or self-insurance programs must be reviewed and approved by Agent and must provide coverages comparable to those required herein.

3. Borrower must provide annual premium for the coverages shown and a list of premiums that remain unpaid for the term of the applicable policy. Premiums in respect of liability insurance may, if approved by the Agent, be paid via a premium finance agreement acceptable to Agent. As part of such approval, Agent may require escrow of three (3) months of payments under such premium finance agreement.

4. If any policy provides coverage for multiple locations or entities, then the following additional requirements shall apply: (A) all premiums in respect of casualty coverages shall be allocated based upon then prevailing standards in the industry; and (B) all premiums in respect of liability coverages shall be allocated in accordance with an allocation model which will objectively allocate the premium cost to each location based upon the rating supplied by the insurer's underwriters or as otherwise approved by Agent.

5. Deductibles and retention amounts for all coverages shall be consistent with industry standards, but no greater than any amount specified by these requirements.

6. Higher limits and special coverages in addition to those indicated may be required depending upon the nature of operations (property size, liability profile, loss history, etc.).

7. These Minimum Insurance Requirements are effective as of the Closing Date and until further notice by Agent. Agent reserves the absolute right to modify, amend or supplement these requirements at any time and from time to time during the term of the Loan and Borrower will be required to satisfy any such modified, amended or supplemented requirements after commercially reasonable notice to Borrower from Agent of such modification, amendment or supplement.

8. The certificate holder for all certificates should read as follows:

    MidCap Financial Trust, as Agent
    MidCap Funding IV Trust, as Agent
    Their successors and/or assigns ATIMA
    c/o MidCap Financial Services, LLC, as servicer
    7255 Woodmont Ave, Suite 200
    Bethesda, MD 20814
    Attn: Loan Servicing

#### *Property Insurance Requirements*

1. Coverage shall be evidenced by Acord 28 form (Evidence of Insurance), signed by authorized agent and an actual loss payee/mortgagee endorsement.

2. Must be an "all risks" or Special Form and be at least as broad in scope as the Insurance Services Office "Causes of Loss – Special Form". Must include coverage for mold-related losses.

3. Must provide for no coinsurance, or must provide agreed amount endorsement to suspend the application of any coinsurance provision. If coinsurance is suspended via agreed amount endorsement, agreed amount must be annually reevaluated and approved by Agent.

4. Must reflect building coverage greater than or equal to replacement cost without taking into account any depreciation (if blanket limit or loss limit is indicated on the policy, declared building value must be shown on the certificate). Renewal amount shall be adjusted by Borrower, subject to Agent's approval, to maintain proper insurable values.

5. Must reflect coverage greater than or equal to the combined amount of (a) replacement cost of contents other than stock/inventory, as valued by Agent, without taking into account any depreciation, plus (b) selling price of stock/inventory (or replacement value of stock/inventory if selling price coverage is unavailable). If blanket limit or loss limit is indicated on the policy, declared value of business personal property and selling price coverage amount for stock/inventory **per location** must be shown on the evidence of insurance. Renewal amount shall be adjusted by Borrower, subject to Agent's approval, to maintain proper insurable values.

6. On stock/inventory consisting of high value pharmaceuticals or other inventory for which similarly situated companies typically carry such coverage, borrower must maintain crime coverage for theft, disappearance and destruction, in a limit equal to the liquidation value of such high value stock/inventory.

7. Must provide (A) business interruption and contingent business interruption coverage in a limit at least equal to gross rental income for the Base BI Period (for rental properties) or fixed expenses and gross profits (for owner-occupied properties), (B) an extended period of indemnity for the Extended BI Period and (C) extra expense coverage. Business

interruption/extra expense must be written without coinsurance or must be subject to an agreed amount endorsement. For third party leased properties, use of tenant's business interruption insurance does **not** satisfy this requirement unless the property is leased to a single tenant and the tenant is contractually obligated to continue rent payments without abatement and without rights to terminate the lease upon a casualty. Base BI Period is 12 months. Extended BI Period is 180 days for hospitals, 180 days for nursing homes and 360 days for all other properties.

8. Must provide building Law and Ordinance coverage. Must reflect coverage equal to minimum of 5% of replacement value for demolition and 20% of replacement value for building ordinance/increased cost of construction.

9. **For all locations in first tier coastal counties in North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas, and the entire states of Florida and Hawaii and entire territories of Puerto Rico and Guam:** Must provide windstorm/hail coverage. Coverage amounts shall be equal to the building replacement value, with deductibles of up to 5% of the replacement value of building and business personal property (valued at selling price for stock/inventory) at each location.

10. **For properties in FEMA flood zones A, AO, AH, AE, A1-A30, AR, A99, V, VE, V1-V30 and D:** Must provide flood coverage in the maximum amount available under FEMA's flood insurance plans. Agent may require additional flood coverage beyond the FEMA amounts if replacement values of building and of business personal property (valued at selling price for stock/inventory) on ground/flood levels exceed available FEMA insurance. Flood insurance for properties in Zone D may be waived by Agent with evidence of minimal flood risk acceptable to Agent.

11. **For properties located in Seismic Zones 3 and 4:** Must provide earth movement (or, if earth movement is unavailable, earthquake) coverage. Coverage amounts shall be equal to fifty percent (50%) of the replacement value of building and business personal property (valued at selling price for stock/inventory), with deductibles of up to 5% of the coverage amount at each location. Agent may require higher earthquake or earth movement coverage in its discretion.

9. Must include coverage for certified acts of terrorism unless otherwise approved by Agent (exclusion for non-certified or domestic terrorism is acceptable).

10. **During periods of substantial repair, restoration, construction or vacancy:** Builder's risk coverage shall be required. Must reflect building coverage greater than or equal to completed value as valued by Agent (if blanket limit or loss limit is indicated on the policy, declared building value must be shown on the evidence of insurance). Renewal amount shall be adjusted by Borrower, subject to Agent's approval, to maintain proper insurable values.

11. Must provide for insurer's waiver of subrogation as to any insured claim for which insured has waived the right of recovery prior to the loss (including for claims against tenants of the property) [this requirement not applicable if landlord and tenant are affiliated and insured under the same casualty policy]

12. Agent shall be included as sole Mortgagee and Lenders Loss Payee with respect to all collateral upon which Agent is purported to be granted a lien. Second lien lenders with whom Agent has executed an intercreditor agreement may be shown as mortgagee, but not loss payee unless such subordination agreement states that Agent's lien on the applicable property is subordinate. No other persons or entities may be reflected as mortgagee or loss payee or additional interest unless Agent shall have consented thereto in writing.

13. **For properties insured by third-party tenants:** the Borrower (landlord) may NOT be shown as loss payee as to any real property or fixture coverages.

### *General & Excess Liability Requirements*
*(for entities that render professional services, general and excess liability coverages may be provided in same policy as professional liability coverages below)*

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent and an actual endorsement reflecting additional insured status and subrogation waivers.

2. Coverage must be provided on an occurrence basis Commercial General Liability form (unless policy is combined with professional liability and Agent has approved claims made coverage)

3. Policy limit shall be no less than $1,000,000 per occurrence/$3,000,000 in the aggregate for primary coverage and $5,000,000 per occurrence/aggregate for excess. Additional excess/umbrella liability coverage shall be required in amounts, if any, consistent with industry standards or as otherwise required by Agent.

4. Agent must be included as Additional Insured. All borrowers, general partners (for partnership borrowers) and management companies must be additional named insureds.

5. Must provide for no products liability exclusion unless approved by Agent. Must cover products and completed work liability. Must denote sublimits for products, personal and advertising liability.

6. **First named insured under policy MUST** be a named borrower or must agree (in a document acceptable in form and content to Agent) to be bound by these requirements.

7. **For all excess coverage policies:** policy must provide coverage for punitive damages in all states where allowed by law.

### *Automobile Liability Requirements*
1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent

2. Must provide business auto policy form coverage for Owned, Non-Owned, and Hired autos

3. Policy limits must be consistent with industry standards and in amounts approved by Agent. Additional excess/umbrella liability coverage shall be required in amounts, if any, consistent with industry standards.

### *Workers' Compensation And Employer's Liability Requirements*

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent
2. Must provide Statutory Workers' Compensation
3. Employer's Liability coverage in an amount acceptable to Agent and consistent with the general liability limit.

### *Professional Liability Requirements*

[applicable only to borrowers providing professional services and related party tenants providing professional services ("Required Insureds")]

Require Insureds shall carry primary and excess general and professional liability insurance in amounts consistent with industry standards, but in any event no less than $1,000,000 per occurrence/$3,000,000 in the aggregate per insured location. Primary coverage may be provided through any combination of third party commercial general and professional liability insurance and comparable coverage provided through a captive arrangement (with or without fronting). Excess coverage shall be provided through third party commercial carriers unless Agent shall otherwise approve in writing.

In determining the minimum insurance requirements, all policy amounts shall be no less than the amounts determined to be appropriate pursuant to an actuarial study performed by a reputable third party actuary and approved by Agent. Borrower shall perform, or cause to be performed, a third party actuarial study for each policy period and shall adjust the policy amounts to be no less than the projected losses determined by such study

Third Party Commercial General And Professional Liability and Excess Coverage:

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent
2. Coverage must be provided on an occurrence basis (or, if approved by Agent, on a claims made basis with tail, nose and retroactive features approved by Agent). Any retroactive date must be noted on the certificate.
**3.** Policy deductible or self-retention limit shall be no greater than $100,000 per occurrence unless Agent shall otherwise approve in writing.
4. Agent must be included as Additional Insured. All borrowers, general partners (for partnership borrowers) and management companies must be additional named insureds.
**5.** First named insured under policy **MUST** be a named borrower or must agree (in a document acceptable in form and content to Agent) to be bound by these requirements.
**6. For all excess coverage policies**: policy must provide coverage for punitive damages in all states where allowed by law.

Captive Insurance General And Professional Liability Insurance:

The terms of the captive insurance program must be acceptable to Agent and must be supported by third party actuarial studies acceptable to Agent. All requirements above for Third Party Commercial General And Professional Liability and Excess Insurance shall apply to this coverage, and:

1. Policy must have built in reinstatement provisions should the limits be exhausted and need to be reinstated.
2. Carrier shall be a licensed domestic, Cayman Island (Class B) or Bermuda unrestricted insurance company.
3. Capital and surplus of the carrier shall be no less than amounts to be specified by Agent from time to time. Capitalization, surplus and premium amounts shall be supported by a third party actuarial study acceptable to Agent.

### *Miscellaneous Additional Coverages*

The following additional insurance coverages are required when so noted below. All policy limits, retentions and deductibles must be consistent with industry standards and in amounts approved by Agent:

1. Technology errors and omissions            **REQUIRED? (Y/N):**    **N**   
   Applicable to all borrowers engaged in the development or sale of software or software-related services (including hardware with embedded software).

2. Clinical trials liability insurance            **REQUIRED? (Y/N):**    **N**   
   Applicable to all borrowers engaged in the performance of clinical trials.

3. Key person insurance            **REQUIRED? (Y/N):**    **N**   
   In amounts and on the insured lives specified below, and with coverage conditions approved by Agent:

   _____      _____

   _____      _____

4. Directors and officers liability            **REQUIRED? (Y/N):**    **N**   
   Must meet the following additional requirements:
   - Coverages A and B, covering all past, present, and future directors or officers
   - Confirmation as to whether "entity" coverage is included or excluded
   - Non-imputation clause
   - Punitive damages where permitted by law
   - Continuity of coverage endorsement

5. Fidelity (crime)            **REQUIRED? (Y/N):**    **Y**   
   Must meet the following additional requirements:
   - Coverages commensurate with specific exposures
   - Automatic coverage (90 days) for newly acquired/formed entities, premises, and/or benefit plans
   - Include coverage for Employee Dishonesty as required by ERISA
   - Limit knowledge of occurrence to directors, officers, or risk management representative

6. Employment Practices Liability            **REQUIRED? (Y/N):**    **N**   
   Must meet the following additional requirements:
   - must include duty to defend coverage with special handling endorsement
   - must include part-time, temporary, leased and seasonal employees and independent contractors if such constitute any material part of workforce
   - must include coverage for discrimination, sexual harassment, retaliation and wrongful discharge, and breach of express or implied employment contracts

**Schedule 5.1 – Debt; Continuing Obligations**

None.

**Schedule 5.2 – Liens**

Lien with respect to item 4 referenced on Schedule 5.7 to secure up to $600,000 of Purchase Card Obligations of EMSI to Wells Fargo Bank, N.A.

**EXAMINATION MANAGEMENT SERVICES, INC.**

None.

12

**Schedule 5.7 – Permitted Investments**

1. Promissory Note in the amount of $125,000 dated, April 17, 2015, between EMSI, Paramedicals.com, Sakar, LLC, Medex Exams, LLC, Medex Exams PR, Inc. and Carlos Barba.
2. Promissory Note in the amount of $50,000 dated, April 17, 2015, between EMSI, Paramedicals.com, Sakar, LLC, Medex Exams, LLC, Medex Exams PR, Inc. and Carlos Barba.
3. Loan Parties invest funds overnight in the ordinary course of business to earn short term interest.
4. Certificate of deposit with Wells Fargo in the amount of $600,000 to support the company's purchasing card program.

With respect to items 1 and 2, the debt for these have been written off, but EMSI receives a small amount under each monthly from Medex Exams PR, Inc. The other companies went bankrupt.

**Schedule 5.8 – Affiliate Transactions**

Sale Bonus Agreement dated as of November 27, 2018 with Robert Fahlman.

**Schedule 5.11 – Business Description**

| Credit Party | Business Description |
|---|---|
| Examination Management Services, Inc. | Information services provider serving life, health and property/casualty insurers and employers, as well as pharma companies and CROs. |
| EMSI Holding Company | Holding Company of Examination Management Services, Inc. |
| EMSI Acquisition, Inc. | Holding Company of EMSI Holding Company |
| EMSI Holdco, Inc. | Holding Company of EMSI Acquisition, Inc. |

**Schedule 5.14 – Deposit Accounts and Securities Accounts**

| Loan Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| EMSI Holding Company | Wells Fargo | 2000012920037 | DE EMSI Holding Company bank account managed by Stewart Company |
| Examination Management Services, Inc. | BMO Harris Bank | 26591235 | NV Examination Management Services, Inc. bank account managed by Stewart Company |
| Examination Management Services, Inc. | JPMorgan Chase | 475053648 | Medical Claims Account managed by United Health Group[1] |
| Examination Management Services, Inc. | JPMorgan Chase | 475053656 | Flexible Spending Account managed by United Health Group[2] |
| Examination Management Services, Inc. | Wells Fargo | 4121914451 | All Examination Management Services, Inc. accounts zero into this account, all Examination Management Services, Inc. wires are initiated from this account, Main operating account, Payroll Taxes and Ceridian payrolls pay from this account |
| Examination Management Services, Inc. | Wells Fargo | 4121914485 | All Examination Management Services, Inc. non trade AR deposits are made into this account by Desktop Deposit, wire or ACH. All funds ZBA into the funding account at the end of the day until Cash Dominion started on Nov 22nd. Now all available funds are pulled to pay down the line of credit. No payments can be made from this account. |
| Examination Management Services, Inc. | Wells Fargo | 4121914477 | All Examination Management Services, Inc. trade AR deposits are made into this account by Lockbox, Desktop Deposit, wire, or ACH. ZBA to EMSI Funding at the end of the day until Cash Dominion started on Nov 22nd. Now all available funds are pulled to pay down the line of credit. No payments can be made from this account |
| Examination Management Services, Inc. | Wells Fargo | 9600129242 | Examination Management Services, Inc. AP checking account, Nacha ACH files are released for contractor runs and T&E's from this account, zeroes in to Examination Management Services, Inc. funding |
| Examination Management Services, Inc. | Wells Fargo | 9600129316 | Examination Management Services, Inc. Payroll account, only manual payroll checks are issued from this account, zeroes into Examination Management Services, Inc. funding |
| Examination Management Services, Inc. | Wells Fargo | 4121948491 | Initiates ACH payments to Copy services from this account. ACH is the only function turned on in this account. ZBA to Examination Management Services, Inc. funding account |
| Examination Management Services, Inc. | Wells Fargo | 9600129261 | Checking account to issue Medical Record payments to Doctor Offices In Waco, ZBA to Examination Management Services, Inc. Funding |
| Examination Management Services, Inc. | Wells Fargo | 9600129276 | Checking account to issue Medical Record payments to Doctor Offices in Jacksonville, ZBA to Examination Management Services, Inc. Funding |

---

[1]    This account is under United Health Group's and tax ID number.

[2]    This account is under United Health Group's and tax ID number.

| | | | |
|---|---|---|---|
| Examination Management Services, Inc. | Wells Fargo | 9600129295 | Checking account to issue Legal record payments, ZBA to Examination Management Services, Inc. funding; In process to phase out |
| Examination Management Services, Inc. | Wells Fargo | 4121914469 | Deposit account for all credit card receipt payments, very small volume through Paypal, ZBA to Examination Management Services, Inc. funding |
| Examination Management Services, Inc. | Wells Fargo | 4121914493 | Postage meters initiate EFT payments from this account to refill their machines.  There are Examination Management Services, Inc. Wire or Check writing capabilities on this account.  ZBA to EMSI funding |

**Schedule 7.4 – Post Closing Requirements**

Borrowers shall satisfy and complete each of the following obligations, or provide Agent each of the items listed below, as applicable, on or before the date indicated below, all to the satisfaction of Agent in its reasonable discretion:

1.      within ten (10) Business Days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), Borrowers shall deliver to Agent original equity certificates and corresponding powers with respect to the equity interests of EMSI Holding and EMSI Acquisition, bearing only such legends as acceptable to Agent in is reasonable discretion;

2.      within thirty (30) days of the Closing Date (or such later date as agreed to by the Agent in its sole discretion), Borrowers shall deliver to Agent insurance endorsements, in form and substance satisfactory to Agent, evidencing compliance with Section 4.4 of the Credit Agreement (Maintenance of Tangible Property; Insurance);

3.      within thirty (30) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), Borrowers shall close the Deposit Account numbers 9600129295 and 4229005897 maintained with Wells Fargo Bank N.A.; and

4.      within thirty (30) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), Borrowers shall deliver the landlord agreements required pursuant to Section 4.11(d) of the Credit Agreement with respect to the Irving, TX, Waco, TX and Jacksonville, FL locations.

Borrower's failure to complete and satisfy any of the above obligations on or before the date indicated above, or Borrower's failure to deliver any of the above listed items on or before the date indicated above (in each case, unless extended by the Agent in its sole discretion), shall constitute an immediate an automatic Event of Default.

CHICAGO/#3272775.8

## Schedule 9.1 – Collateral

The Collateral consists of all of Borrower's assets, including without limitation, all of Borrower's right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising:

(a) all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located;

(b) all of Borrowers' books and records relating to any of the foregoing; and

(c) any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Notwithstanding anything contained in this Agreement to the contrary, the term "Collateral" shall not include and a security interest shall not attach to (collectively, the "**Excluded Collateral**"): (i) any rights or interest in any contract lease, Permit, license, or license agreement covering real or personal property of any Borrower if, and only for so long as, under the terms of such contract, lease, Permit, license, or license agreement, or applicable Law with respect thereto, the grant of a Lien therein is prohibited as a matter of Law or under the terms of such contract, lease, Permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, Permit, license or license agreement has not been obtained; (ii) any asset with respect to which the costs of obtaining, perfecting or maintaining a security interest in such asset exceeds the fair market value thereof or the practical benefit to the Lenders afforded thereby (as determined by Agent in consultation with the Borrower Representative) (provided that (A) the foregoing exclusions of clauses (i) and (ii) shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is ineffective under the applicable anti-assignment provisions (including Section 9-406, 9-407, 9-408, or 9-409) of the UCC or other applicable Law; or (2) to apply to the extent that any consent or waiver has been obtained that would permit Agent's Lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, Permit, license, or license agreement and (B) the foregoing exclusions of clauses (i) and (ii) shall in no way be construed to limit, impair, or otherwise affect any of Agent's or any Lender's continuing Liens in and upon any rights or interests of any Borrower in or to (1) monies due or to become due under or in connection with any described contract, lease, Permit, license or license agreement, (including any Accounts or Equity Interests) or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, Permit, license or license agreement) or (iii) any United States intent-to-use trademark applications to the extent that, and solely during the period in which the grant of a security interest therein would impair the validity or enforceability of such intent-to use trademark applications under applicable Law, provided that upon submission to and acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral.

CHICAGO/#3272775.8

**Schedule 9.2 – Location of Collateral**

| Owner/Lessee | Owned or Leased | Branch Name | Address | Lease (if applicable) |
|---|---|---|---|---|
| Examination Management Services, Inc. | Leased | Panther Way | 109 W. Panther Way, Hewitt, TX 76643 | Commercial Lease dated on or about July 17, 2018 between Crew Property Management, LLC and EMSI |
| Examination Management Services, Inc. | Leased | Irving (Corporate Headquarters) | 3050 Regent Blvd., Suites #100, #110, #140, #200, #300, #400, Irving, TX 75063 | Business Complex Lease dated June 9, 2004 between PS Business Parks, LP, successor in interest to TPLP Office Park Properties, LP and EMSI (as Amended) |
| Examination Management Services, Inc. | Leased | Jacksonville | 9485 Regency Square Blvd., Suite 320 & 310, Jacksonville, FL 32225 | Office Lease dated November 10, 2005 between Kinasha Corporation, N.V. and EMSI (as Amended) |
| Examination Management Services, Inc. | Leased | Waco | CP 1, 8300 Central Park Drive, Waco, TX | Commercial Lease dated May 23, 2005 between Waco Central Park, Ltd., successor in interest to Huaco Realty Partnership One and EMSI (as Amended) |

**Chief Executive Offices**

| Owner/Lessee | Owned or Leased | Chief Executive Office of: | Address | Lease (if applicable) |
|---|---|---|---|---|
| Examination Management Services, Inc. | Leased | Examination Management Services, Inc.  EMSI Holding Company  EMSI Acquisition, Inc.  EMSI Holdco, Inc. | 3050 Regent Blvd., Suites #100, #110, #140, #200, #300, #400, Irving, TX 75063 | Business Complex Lease dated June 9, 2004 between PS Business Parks, LP, successor in interest to TPLP Office Park Properties, LP and EMSI (as Amended) |

**Third Party Locations**

| Credit Party | Landlord/Owner | Address |
|---|---|---|
| Examination Management Services, Inc. | SafeGuard Document Storage | 2843 Cullen St., Fort Worth, TX 76107 |
| Examination Management Services, Inc. | Vital Media Security | Undisclosed |
| Examination Management Services, Inc. | Aaron's Self-Service Storage | 400 Texas Central Parkway, Waco, TX 76712 |
| Examination Management Services, Inc. | Public Storage | 8830 Long St., Lenexa, KS 66215 |

# TABLE OF CONTENTS

**Page**

ARTICLE 1 -      DEFINITIONS ................................................................1

    Section 1.1      Certain Defined Terms................................................1
    Section 1.2      Accounting Terms and Determinations ...........................30
    Section 1.3      Other Definitional and Interpretive Provisions...............31
    Section 1.4      Time is of the Essence ................................................31

ARTICLE 2 -      LOANS AND LETTERS OF CREDIT ...............................31

    Section 2.1      Loans...................................................................31
    Section 2.2      Interest, Interest Calculations and Certain Fees................37
    Section 2.3      Notes ..................................................................38
    Section 2.4      Reserved ..............................................................38
    Section 2.5      Letters of Credit and Letter of Credit Fees .....................38
    Section 2.6      General Provisions Regarding Payment; Loan Account......41
    Section 2.7      Maximum Interest....................................................42
    Section 2.8      Taxes; Capital Adequacy ...........................................42
    Section 2.9      Appointment of Borrower Representative .......................45
    Section 2.10     Joint and Several Liability; Rights of Contribution; Subordination and Subrogation......................................46
    Section 2.11     Collections and Lockbox Account.................................48
    Section 2.12     Termination; Restriction on Termination ........................49

ARTICLE 3 -      REPRESENTATIONS AND WARRANTIES ......................50

    Section 3.1      Existence and Power.................................................50
    Section 3.2      Organization and Governmental Authorization; No Contravention .................50
    Section 3.3      Binding Effect........................................................51
    Section 3.4      Capitalization.........................................................51
    Section 3.5      Financial Information................................................51
    Section 3.6      Litigation..............................................................51
    Section 3.7      Ownership of Property...............................................51
    Section 3.8      No Default ............................................................51
    Section 3.9      Labor Matters.........................................................51
    Section 3.10     Regulated Entities....................................................52
    Section 3.11     Margin Regulations..................................................52
    Section 3.12     Compliance With Laws; Anti-Terrorism Laws .................52
    Section 3.13     Taxes...................................................................52
    Section 3.14     Compliance with ERISA ...........................................52
    Section 3.15     Consummation of Operative Documents; Brokers.............53
    Section 3.16     Related Transactions.................................................53
    Section 3.17     Material Contracts....................................................53
    Section 3.18     Compliance with Environmental Requirements; No Hazardous Materials ........54
    Section 3.19     Intellectual Property.................................................54
    Section 3.20     Solvency ..............................................................55
    Section 3.21     Full Disclosure.......................................................55
    Section 3.22     Interest Rate ..........................................................55
    Section 3.23     Subsidiaries...........................................................55

**TABLE OF CONTENTS**

(continued)

**Page**

ARTICLE 4 -  AFFIRMATIVE COVENANTS ...................................................................55
    Section 4.1    Financial Statements and Other Reports...............................................55
    Section 4.2    Payment and Performance of Obligations ............................................56
    Section 4.3    Maintenance of Existence ....................................................................56
    Section 4.4    Maintenance of Tangible Property; Insurance ......................................57
    Section 4.5    Compliance with Laws and Material Contracts.....................................58
    Section 4.6    Inspection of Property, Books and Records...........................................58
    Section 4.7    Use of Proceeds ...................................................................................58
    Section 4.8    Estoppel Certificates ...........................................................................58
    Section 4.9    Notices of Litigation and Defaults.......................................................59
    Section 4.10   Hazardous Materials; Remediation.......................................................59
    Section 4.11   Further Assurances ...............................................................................59
    Section 4.12   Reserved ..............................................................................................61
    Section 4.13   Power of Attorney.................................................................................61
    Section 4.14   Borrowing Base Collateral Administration ...........................................61
    Section 4.15   Maintenance of Permits .......................................................................61
    Section 4.16   HIPAA Compliance ..............................................................................61
    Section 4.17   Minimum Balance................................................................................62
    Section 4.18   Accounts Receivable and Billing Systems ...........................................62

ARTICLE 5 -  NEGATIVE COVENANTS......................................................................62
    Section 5.1    Debt; Contingent Obligations ..............................................................62
    Section 5.2    Liens ....................................................................................................62
    Section 5.3    Distributions ........................................................................................62
    Section 5.4    Restrictive Agreements........................................................................62
    Section 5.5    Payments and Modifications of Subordinated Debt ..............................62
    Section 5.6    Consolidations, Mergers and Sales of Assets; Change in Control.....................63
    Section 5.7    Purchase of Assets, Investments ..........................................................63
    Section 5.8    Transactions with Affiliates .................................................................63
    Section 5.9    Modification of Organizational Documents ..........................................63
    Section 5.10   Modification of Certain Agreements ....................................................63
    Section 5.11   Conduct of Business.............................................................................64
    Section 5.12   Lease Payments....................................................................................64
    Section 5.13   Limitation on Sale and Leaseback Transactions...................................64
    Section 5.14   Deposit Accounts and Securities Accounts; Payroll and Benefits
                   Accounts ..............................................................................................64
    Section 5.15   Compliance with Anti-Terrorism Laws .................................................64
    Section 5.16   Agreements Regarding Receivables .....................................................65
    Section 5.17   Limitation on Parent ............................................................................65

ARTICLE 6 -  FINANCIAL COVENANTS ....................................................................66
    Section 6.1    Additional Defined Terms ....................................................................66
    Section 6.2    Fixed Charge Coverage Ratio...............................................................66
    Section 6.3    Senior Net Leverage Ratio...................................................................66
    Section 6.4    Evidence of Compliance ......................................................................66
    Section 6.5    Borrowers' Right to Cure .....................................................................67

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 7 -      CONDITIONS ..................................................................................... 67

    Section 7.1      Conditions to Closing .................................................................... 67
    Section 7.2      Conditions to Each Loan, Support Agreement and Lender Letter of
                  Credit ........................................................................................... 68
    Section 7.3      Searches ....................................................................................... 69
    Section 7.4      Post Closing Requirements ........................................................... 69

ARTICLE 8 -      RESERVED ......................................................................................... 69

ARTICLE 9 -      SECURITY AGREEMENT .................................................................. 69

    Section 9.1      Generally ...................................................................................... 69
    Section 9.2      Representations and Warranties and Covenants Relating to Collateral ............ 69

ARTICLE 10 -     EVENTS OF DEFAULT ...................................................................... 72

    Section 10.1     Events of Default .......................................................................... 72
    Section 10.2     Acceleration and Suspension or Termination of Revolving Loan
                  Commitment and Term Loan Commitment .................................... 75
    Section 10.3     UCC Remedies ............................................................................. 75
    Section 10.4     Cash Collateral ............................................................................. 77
    Section 10.5     Default Rate of Interest ................................................................ 77
    Section 10.6     Setoff Rights ................................................................................ 77
    Section 10.7     Application of Proceeds ................................................................ 77
    Section 10.8     Waivers ........................................................................................ 78
    Section 10.9     Injunctive Relief .......................................................................... 79
    Section 10.10    Marshalling; Payments Set Aside ................................................. 80

ARTICLE 11 -     AGENT ................................................................................................ 80

    Section 11.1     Appointment and Authorization .................................................... 80
    Section 11.2     Agent and Affiliates ..................................................................... 80
    Section 11.3     Action by Agent ........................................................................... 80
    Section 11.4     Consultation with Experts ............................................................ 80
    Section 11.5     Liability of Agent ......................................................................... 81
    Section 11.6     Indemnification ............................................................................ 81
    Section 11.7     Right to Request and Act on Instructions ...................................... 81
    Section 11.8     Credit Decision ............................................................................ 81
    Section 11.9     Collateral Matters ........................................................................ 82
    Section 11.10    Agency for Perfection ................................................................... 82
    Section 11.11    Notice of Default .......................................................................... 82
    Section 11.12    Assignment by Agent; Resignation of Agent; Successor Agent ....... 82
    Section 11.13    Payment and Sharing of Payment ................................................. 83
    Section 11.14    Right to Perform, Preserve and Protect ......................................... 85
    Section 11.15    Additional Titled Agents .............................................................. 86
    Section 11.16    Amendments and Waivers ............................................................ 86
    Section 11.17    Assignments and Participations .................................................... 87
    Section 11.18    Funding and Settlement Provisions Applicable When Non-Funding
                  Lenders Exist ............................................................................... 89

-iii-

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 11.19 | Buy-Out Upon Refinancing | 90 |
| Section 11.20 | Definitions | 91 |
| ARTICLE 12 - | MISCELLANEOUS | 92 |
| Section 12.1 | Survival | 92 |
| Section 12.2 | No Waivers | 92 |
| Section 12.3 | Notices | 92 |
| Section 12.4 | Severability | 93 |
| Section 12.5 | Headings | 93 |
| Section 12.6 | Confidentiality | 93 |
| Section 12.7 | Waiver of Consequential and Other Damages | 94 |
| Section 12.8 | GOVERNING LAW; SUBMISSION TO JURISDICTION | 94 |
| Section 12.9 | WAIVER OF JURY TRIAL | 94 |
| Section 12.10 | Publication; Advertisement | 95 |
| Section 12.11 | Counterparts; Integration | 95 |
| Section 12.12 | No Strict Construction | 95 |
| Section 12.13 | Lender Approvals | 96 |
| Section 12.14 | Expenses; Indemnity | 96 |
| Section 12.15 | Reserved | 97 |
| Section 12.16 | Reinstatement | 97 |
| Section 12.17 | Successors and Assigns | 97 |
| Section 12.18 | USA PATRIOT Act Notification | 97 |

## COMPOSITE EXHIBIT B-1  TO
## MOTION FOR RELIEF FROM STAY

## AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT
## DATED JUNE 17, 2019

## AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT

**THIS AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT** (this "Agreement") dated as of June 17, 2019 is by and among **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation, **EMSI HOLDING COMPANY**, a Delaware corporation, **EMSI ACQUISITION, INC.**, a Delaware corporation (individually each a "Borrower" and collectively, "Borrowers"), the financial institutions or other entities from time to time parties hereto (individually, each a "Lender" and collectively, "Lenders") and **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust, as successor-in-interest to MidCap Financial Trust, a Delaware statutory trust, as Agent (in such capacity, "Agent") and as a Lender.

## RECITALS:

WHEREAS, Borrowers, Agent, and Lenders are parties to that certain Credit and Security Agreement dated as of April 26, 2019 (as amended hereby and as may be further amended, restated, modified or otherwise supplemented from time to time, the "Credit Agreement"), pursuant to which Lenders have agreed to make loans and other extensions of credit to Borrowers in accordance with the terms thereof. Capitalized terms used but not defined in this Agreement shall have the meanings that are set forth in the Credit Agreement;

WHEREAS, Borrowers, Agent and Lenders desire to amend certain financial covenants as enumerated within the Credit Agreement;

WHEREAS, this Agreement shall constitute a Financing Document, these Recitals shall be construed as part of this Agreement, and capitalized terms used but not otherwise defined in this Agreement shall have the meanings described to them in the Credit Agreement.

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises and covenants set forth below, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Amendment to Calculation of EBITDA. The EBITDA Worksheet (Attachment to Compliance Certificate) as part of Exhibit B to the Credit Agreement is hereby deleted in its entirety and replaced with Exhibit B, attached hereto and incorporated by reference.

2.  Conditions to Effectiveness. The obligation of Agent and Lenders to enter into this Agreement shall be subject to the satisfaction of the following conditions precedent, each in form and substance satisfactory to Agent:

    (a)  This Agreement shall have been executed by each Borrower and acknowledged by Guarantor;

    (b)  No Default or Event of Default under the Credit Agreement or any other Financing Document shall have occurred and be continuing;

    (c)  Borrowers shall pay on demand all reasonable legal fees and expenses incurred in connection with the preparation, drafting, negotiation and enforcement of this Agreement and any and all related documents; and

(d)     After giving effect to this Agreement and the transactions contemplated hereby, the warranties and representations of Borrowers contained in the Financing Documents shall be true, correct and complete on and as of the date hereof, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date.

3.    <u>Reference to and Effect on Financing Documents</u>.

(a)     Except as specifically amended above, the Credit Agreement and the other Financing Documents shall remain in full force and effect. Notwithstanding anything contained herein, the terms of this Agreement are not intended to and do not effect a novation of the Credit Agreement or any other Financing Document. Each Borrower hereby ratifies and reaffirms each of the terms and conditions of the Financing Documents and all of its obligations thereunder.

(b)     The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of Lenders or Agent under the Credit Agreement or any of the other Financing Documents.

(c)     Upon the effectiveness of this Agreement each reference in (i) the Credit Agreement to "this Agreement," "hereunder," "hereof," or words of similar import and (ii) any other Financing Document to "the Agreement" or "the Credit Agreement" shall, in each case and except as otherwise specifically stated therein, mean and be a reference to the Credit Agreement as amended hereby.

4.    <u>Miscellaneous</u>.

(a)     <u>Successors and Assigns</u>. This Agreement shall be binding on and shall inure to the benefit of Borrowers, Agent, and Lenders and their respective successors and permitted assigns.

(b)     <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all other understandings, oral or written, with respect to the subject matter hereof.

(c)     <u>Fees and Expenses</u>. Borrowers shall be responsible for the payment of all expenses and fees of Agent and all reasonable fees of Agent's counsel incurred in connection with the preparation of this Agreement and any related documents. Each Borrower hereby authorizes Agent to deduct all of such fees set forth in this Section 4 from the proceeds of the Revolving Credit Loans made under the Credit Agreement.

(d)     <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(e)     <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable

2

law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)     Counterparts.  This Agreement may be executed in any number of separate original counterparts (or telecopied counterparts with original execution copy to follow) and by the different parties on separate counterparts, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(g)     Incorporation of Credit Agreement Provisions.  The provisions contained in Section 12.8 (Governing Law; Submission to Jurisdiction) and Section 12.9 (Waiver of Jury Trial) of the Credit Agreement are incorporated herein by reference to the same extent as if reproduced herein in their entirety.

*[Signatures follow]*

3

**IN WITNESS WHEREOF**, intending to be legally bound, each of the parties have caused this Agreement to be executed the day and year first above mentioned.

**AGENT:**            **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____
          Maurice Amsellem
          Authorized Signatory

**LENDER:**            **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____
          Maurice Amsellem
          Authorized Signatory

**BORROWERS:**      **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada Corporation

By:_____

      James Calver
      Chief Executive Officer

**EMSI HOLDING COMPANY**, a Delaware corporation

By:_____

      James Calver
      Chief Executive Officer

**EMSI ACQUISITION, INC.**, a Delaware corporation

By:_____

      James Calver
      Chief Executive Officer

SIGNATURE PAGE TO AMENDMENT NO. 1
TO CREDIT AND SECURITY AGREEMENT

## <u>EXHIBIT B</u>

## <u>EBITDA WORKSHEET  (ATTACHMENT TO COMPLIANCE CERTIFICATE)</u>

<u>EBITDA</u> for the applicable Defined Period is calculated as follows:

Borrowers' and their Subsidiaries' consolidated net earnings (or loss),                    $_____

*Minus*: without duplication, the sum of the following amounts of Borrowers and their Subsidiaries for such period to the extent included in determining consolidated net earnings (or loss) for such period:

    (i)    any extraordinary, unusual or non-recurring gains                    $_____

    (ii)    non-cash gains or profits,                    $_____

    (iii)    any non-cash gain attributable to the write-up of any asset, and                    $_____

    (iv)    interest income                    $_____

*Plus*:    without duplication, the sum of the following amounts of Borrowers and their Subsidiaries for such period to the extent included in determining consolidated net earnings (or loss) for such period (other than with respect to clause (x) below):

    (i)    non-cash extraordinary or non-cash non-recurring expenses or losses (including non-cash adjustments due to changes in accounting) and other non-cash charges, non-cash losses from discontinued operations or non-cash restructuring charges (in each case as determined in accordance with GAAP),                    $_____

    (ii)    non-cash compensation expense, or other non-cash expenses or charges, arising from the granting of stock options, stock appreciation rights or similar equity arrangements minus the amount of any such expenses or charges when paid in cash to the extent not deducted in the computation of net earnings (or loss),                    $_____

    (iii)    interest expense,                    $_____

    (iv)    tax expense based on income, profits or capital, including federal, foreign, state, franchise and similar Taxes (and for the avoidance of doubt, specifically excluding any sales Taxes),                    $_____

(v)    depreciation and amortization for such period,    $_____

(vi)    any non-cash loss attributable to the write-down of any asset (other than accounts receivable and inventory),    $_____

(vii)    fees, costs and expenses related to (x) the consummation of the transactions contemplated under this Agreement, (y) any amendments, waivers, restatements, supplements or modifications thereto to the extent approved by the Agent (such approval not to be unreasonably withheld) and (z) audit, examination or monitoring undertaken by Agent or its designee under this Agreement,    $_____

(viii)    reasonable out-of-pocket expense reimbursements and indemnity payments pursuant to the terms of the Sponsor Management Agreement not to exceed $200,000 in any twelve-month period and management, consulting, monitoring and/or advisory fees paid or accrued under the Sponsor Management Agreement, to the extent permitted to be paid under Section 5.3,    $_____

(ix)    proceeds from business interruption insurance, solely to the extent not included in determining consolidated net earnings,    $_____

(x)    non-cash charges resulting from the grant of stock options or other equity related incentives to any director, officer or employee of Parent or any Subsidiary of Parent pursuant to a written plan or agreement approved by the board of directors of the applicable Person,    $_____

(xi)    cash bonuses paid to management in conjunction with the closing of the transactions contemplated on the Closing Date in an amount not to exceed $550,000,    $_____

(xii)    cash and non-cash operational restructuring costs (including but not limited to third party consultants, employee severance or retention pay, or duplicate compensation expenses) with respect to actions that have been or will be taken and that are expected to have a continuing impact in an aggregate amount not to exceed $800,000 in total prior to the second anniversary of the Closing Date, excluding any amounts previously incurred and included in the historical EBITDA figures in the below table (or such greater amount approved by Agent),    $_____

(xiii)    cash and non-cash lease termination and lease continuation expenses in conjunction with any branch virtualization efforts, not to exceed $900,000 in total prior to the second anniversary of the Closing Date of this Agreement, in conjunction with any branch virtualization efforts                    $_____

(xiv)    non-recurring, extraordinary or unusual losses, charges and expenses not to exceed $200,000 in any twelve-month period and any amounts in excess of $200,000 to be approved by Agent in its discretion (such approval not to be unreasonably withheld),                    $_____

(xv)    without duplication, documented fees paid to, or invoiced by, third party consultants after the Closing Date through the first anniversary following the Closing Date, in an aggregate amount not to exceed $100,000, to the extent such charges are non-recurring and not expected to be replaced with salary or other compensation expense to permanent employees or other workers,                    $_____

(xvi)    costs, fees and expenses paid in connection with (1) Investments permitted under clause (p) of the definition of "Permitted Investment" and issuances of Equity Interests of the Parent otherwise permitted under this Agreement and (2) Permitted Acquisitions, whether or not consummated, in an aggregate amount not to exceed $500,000 in any twelve month period (or such greater amount as Agent shall agree),                    $_____

(xvii)    board of director fees and expenses in an amount not to exceed $200,000 in any fiscal year ("**BOD Fees**"), and                    $_____

(xviii)    litigation fees and expenses associated with the class action lawsuits, D&O insurance claim and any other legal proceedings outside the normal course of business, not to exceed $150,000 for the fiscal year ended March 31, 2020 and not to be included as an adjustment to EBITDA for any period ending thereafter                    $_____

EBITDA for the Defined Period:                    $_____

For the purposes of calculating EBITDA  for any period of 12 consecutive months (each, a "**Reference Period**"), if at any time during such Reference Period (and after the Closing Date), Parent or any of its Subsidiaries shall have made a Permitted Acquisition or other Permitted Investment permitted under clause (j) of the definition thereof in connection with a Permitted Acquisition, EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto (including pro forma adjustments arising out of events that have occurred, are directly

attributable to such Permitted Acquisition or such Permitted Investment in connection with a Permitted Acquisition, are factually supportable, and are expected to have a continuing impact, in each case reasonably acceptable to the Agent) or in such other manner acceptable to Agent as if any such Permitted Acquisition or such Permitted Investment in connection with a Permitted Acquisition or adjustment occurred on the first day of such Reference Period.

For the purposes of calculating EBITDA for any period of 12 consecutive months, EBITDA shall be deemed to be the corresponding amount set forth next to such month as follows; provided, that EBITDA for the period from April 2018 through March 2019 shall be deemed to be an amount for Borrowers and their Subsidiaries as adjusted in a manner consistent with the adjustments to EBITDA reflected in the months set forth immediately below; provided, that EBITDA for the period of April 2019 shall be deemed to be an amount for the Borrowers and their Subsidiaries as adjusted in a manner consistent with the adjustments to EBITDA reflected in the months set forth immediately below:

| Month | EBITDA |
|---|---|
| April 2018 | $559,000 |
| May 2018 | $515,000 |
| June 2018 | $763,000 |
| July 2018 | $232,000 |
| August 2018 | $513,000 |
| September 2018 | $385,000 |
| October 2018 | $463,000 |
| November 2018 | $649,000 |
| December 2018 | $754,000 |
| January 2019 | $490,000 |
| February 2019 | $572,000 |
| March 2019 | $500,000 |

## REAFFIRMATION OF PAYMENT GUARANTY

The undersigned hereby acknowledges and consents to the foregoing Amendment No. 1 to Credit and Security Agreement, and reaffirms that the Payment Guaranty made by the undersigned in favor of Agent and the Lenders pursuant to the Financing Documents, shall remain unaffected and in full force and effect.

Dated:  __June_____ __17__, 2019

**GUARANTOR**:                    **EMSI HOLDCO, INC.**, a Delaware corporation

By:_____
James Calver
Chief Executive Officer

<u>**COMPOSITE EXHIBIT B-2 TO**</u>
<u>**MOTION FOR RELIEF FROM STAY**</u>

<u>**AMENDMENT NO. 2 TO CREDIT AND SECURITY AGREEMENT**</u>
<u>**DATED JANUARY 31, 2020**</u>

## AMENDMENT NO. 2 TO CREDIT AND SECURITY AGREEMENT

**THIS AMENDMENT NO. 2 TO CREDIT AND SECURITY AGREEMENT** (this "Agreement") dated as of January 31, 2020 is by and among **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation, **EMSI HOLDING COMPANY**, a Delaware corporation, **EMSI ACQUISITION, INC.**, a Delaware corporation (individually each a "Borrower" and collectively, "Borrowers"), the financial institutions or other entities from time to time parties hereto (individually, each a "Lender" and collectively, "Lenders") and **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust, as successor-in-interest to MidCap Financial Trust, a Delaware statutory trust, as Agent (in such capacity, "Agent") and as a Lender.

## RECITALS:

WHEREAS, Borrowers, Agent, and Lenders are parties to that certain Credit and Security Agreement dated as of April 26, 2019 (as amended hereby and as may be further amended, restated, modified or otherwise supplemented from time to time, the "Credit Agreement"), pursuant to which Lenders have agreed to make loans and other extensions of credit to Borrowers in accordance with the terms thereof. Capitalized terms used but not defined in this Agreement shall have the meanings that are set forth in the Credit Agreement;

WHEREAS, Borrowers, Agent and Lenders desire to amend certain financial covenants as enumerated within the Credit Agreement;

WHEREAS, this Agreement shall constitute a Financing Document, these Recitals shall be construed as part of this Agreement, and capitalized terms used but not otherwise defined in this Agreement shall have the meanings described to them in the Credit Agreement.

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises and covenants set forth below, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Amendment to Schedule 2.1</u>. Schedule 2.1 – Amortization, to the Credit Agreement is hereby deleted in its entirety and replaced with <u>Schedule 2.1</u> attached hereto and incorporated by reference.

2. <u>Conditions to Effectiveness</u>. The obligation of Agent and Lenders to enter into this Agreement shall be subject to the satisfaction of the following conditions precedent, each in form and substance satisfactory to Agent:

    (a) This Agreement shall have been executed by each Borrower and acknowledged by Guarantor;

    (b) No Default or Event of Default under the Credit Agreement or any other Financing Document shall have occurred and be continuing, other than the Borrowers failure to satisfy the financial covenant set forth in Section 6.3 of the Credit Agreement in that they failed to not permit the Senior Net Leverage Ratio for the Defined Period ending November 30, 2019, to be greater than 5.00 to 1.00, and any Defaults or Events of Default arising from such failure (including failure to give notice of such

default in accordance with Section 4.9 (Notice of Litigation and Defaults) of the Credit Agreement) (collectively, the "Specified Defaults");

(c) Borrowers shall pay on demand all reasonable legal fees and expenses incurred in connection with the preparation, drafting, negotiation and enforcement of this Agreement and any and all related documents; and

(d) After giving effect to this Agreement and the transactions contemplated hereby, the warranties and representations of Borrowers contained in the Financing Documents (other than Section 3.8 (No Default) of the Credit Agreement solely as a result of the Specified Defaults) shall be true, correct and complete on and as of the date hereof, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date.

3.  Reference to and Effect on Financing Documents.

(a) Except as specifically amended above, the Credit Agreement and the other Financing Documents shall remain in full force and effect. Notwithstanding anything contained herein, the terms of this Agreement are not intended to and do not effect a novation of the Credit Agreement or any other Financing Document. Each Borrower hereby ratifies and reaffirms each of the terms and conditions of the Financing Documents and all of its obligations thereunder.

(b) The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of Lenders or Agent under the Credit Agreement or any of the other Financing Documents.

(c) Upon the effectiveness of this Agreement each reference in (i) the Credit Agreement to "this Agreement," "hereunder," "hereof," or words of similar import and (ii) any other Financing Document to "the Agreement" or "the Credit Agreement" shall, in each case and except as otherwise specifically stated therein, mean and be a reference to the Credit Agreement as amended hereby.

4.  Miscellaneous.

(a) Successors and Assigns. This Agreement shall be binding on and shall inure to the benefit of Borrowers, Agent, and Lenders and their respective successors and permitted assigns.

(b) Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all other understandings, oral or written, with respect to the subject matter hereof.

(c) Fees and Expenses. Borrowers shall be responsible for the payment of all expenses and fees of Agent and all reasonable fees of Agent's counsel incurred in connection with the preparation of this Agreement and any related documents. Each Borrower

hereby authorizes Agent to deduct all of such fees set forth in this Section 4 from the proceeds of the Revolving Credit Loans made under the Credit Agreement.

(d)     <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(e)     <u>Severability</u>.   Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)     <u>Counterparts</u>.  This Agreement may be executed in any number of separate original counterparts (or telecopied counterparts with original execution copy to follow) and by the different parties on separate counterparts, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(g)     <u>Incorporation of Credit Agreement Provisions</u>.   The provisions contained in Section 12.8 (Governing Law; Submission to Jurisdiction) and Section 12.9 (Waiver of Jury Trial) of the Credit Agreement are incorporated herein by reference to the same extent as if reproduced herein in their entirety.

*[Signatures follow]*

**IN WITNESS WHEREOF**, intending to be legally bound, each of the parties have caused this Agreement to be executed the day and year first above mentioned.

AGENT:                     **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____
Maurice Amsellem
Authorized Signatory

LENDER:                    **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____
Maurice Amsellem
Authorized Signatory

SIGNATURE PAGE TO AMENDMENT NO. 2
TO CREDIT AND SECURITY AGREEMENT

CHICAGO/#3403019

**BORROWERS:**     **EXAMINATION MANAGEMENT SERVICES, INC.,** a Nevada Corporation

By: _____
James Calver
Chief Executive Officer

**EMSI HOLDING COMPANY,** a Delaware corporation

By: _____
James Calver
Chief Executive Officer

**EMSI ACQUISITION, INC.,** a Delaware corporation

By: _____
James Calver
Chief Executive Officer

SIGNATURE PAGE TO AMENDMENT NO. 2
TO CREDIT AND SECURITY AGREEMENT

CHICAGO/#3403019

**Schedule 2.1 - Amortization**

Commencing on February 3, 2020, and continuing on the first day of each calendar month thereafter, Borrowers shall pay to Agent as a principal payment under the Term Loan an amount equal to the Amortization Payment (defined below) as an amortization payment in respect of each advance under the Term Loan.  The term "Amortization Payment" means the principal payment based upon a thirty-six (36) month straight-line amortization of equal monthly principal payments. Notwithstanding the payment schedule set forth above, the outstanding principal amount of the Term Loan shall become immediately due and payable in full on the Termination Date.

## REAFFIRMATION OF PAYMENT GUARANTY

The undersigned hereby acknowledges and consents to the foregoing Amendment No. 2 to Credit and Security Agreement, and reaffirms that the Payment Guaranty made by the undersigned in favor of Agent and the Lenders pursuant to the Financing Documents, shall remain unaffected and in full force and effect.

Dated: _____January_____ _31_, 2020

**GUARANTOR:**                    **EMSI HOLDCO, INC.**, a Delaware corporation

By:_____
     James Calver
     Chief Executive Officer

CHICAGO/#3403019

## COMPOSITE EXHIBIT B-3  TO
## MOTION FOR RELIEF FROM STAY


## AMENDMENT NO. 3 TO CREDIT AND SECURITY AGREEMENT
## DATED FEBRUARY 26, 2020

## FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT

This **FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT** (this "Agreement") dated as of February 26, 2020, is made by and among **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation, **EMSI HOLDING COMPANY**, a Delaware corporation, **EMSI ACQUISITION, INC.**, a Delaware corporation, (collectively, the "Borrowers", and each, individually, a "Borrower"), **BEECKEN PETTY O'KEEFE FUND IV, L.P.**, a Delaware limited partnership ("Fund IV"), and **BEECKEN PETTY O'KEEFE FUND IV-A, L.P.**, a Delaware limited partnership ("Fund IV-A" and together with Fund IV, individually and collectively, "Guarantor"),and **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust, individually as a Lender, and as Agent.

## R E C I T A L S:

**WHEREAS**, Agent and Borrowers have entered into certain financing arrangements pursuant to that certain Credit and Security Agreement, dated as of April 26, 2019, among Agent, Borrowers, Lenders and the other Credit Parties from time to time party thereto (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Credit Agreement");

**WHEREAS**, pursuant to that certain letter agreement entered into as of August 19, 2019, by and among Agent, the Lenders, and the Borrowers (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Overadvance Letter") Agent and the Lenders agreed to provide an Overadvance (as defined in the Overadvance Letter) in the maximum principal amount of $2,000,000, to the Borrowers for a limited period of time, all as described more fully in the Overadvance Letter.

**WHEREAS**, the Overadvance is guaranteed by Guarantors pursuant to that certain Guaranty of Collection (Overadvance), dated as of August 19, 2019 (as amended and restated on the date hereof, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Forbearance Guaranty");

**WHEREAS**, Events of Default under the Credit Agreement have occurred and are continuing;

**WHEREAS**, Borrowers have requested that, subject to the terms and conditions of this Agreement, Agent and Lenders (i) increase the Overadvance amount and extend the time in which it will be available, and (ii) forbear from exercising their rights as a result of such Events of Default, which are continuing, notwithstanding such Events of Default; and

**WHEREAS**, Agent and Lenders are willing to agree to such changes to the Overadvance, document such modified Overadvance as an amendment to the Credit Agreement and forbear from exercising certain of their rights and remedies solely for the period and on the terms and conditions specified herein.

**NOW, THEREFORE**, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1

## DEFINITIONS

1.1.    **Interpretation**.  All capitalized terms used herein (including the recitals hereto) will have the respective meanings ascribed thereto in the Credit Agreement unless otherwise defined herein.  The foregoing recitals, together with all exhibits attached hereto, are incorporated by this reference and made a part of this Agreement.  Unless otherwise provided herein, all section and exhibit references herein are to the corresponding sections and exhibits of this Agreement.

1.2.    **Additional Definitions**.  As used herein, the following terms will have the respective meanings given to them below:

(a)     "Budget" means the 13-week cash flow forecast attached as Exhibit B hereto, as amended from time to time as set forth herein.

(b)     "Existing Defaults" means, collectively, the Events of Default identified on Exhibit A hereto.

(c)     "Forbearance Period" means the period commencing on the date hereof and ending on the date which is the earliest of (i) May 31, 2020, as may be extended pursuant to the last sentence of this definition; (ii) at Agent's election, the occurrence or existence of any Event of Default (including, without limitation, the failure of Borrower to comply with any of the requirements set forth in this Agreement (including without limitation Section 5.2(b) relating to the Budget)), other than the Existing Defaults; or (iii) the occurrence of any Termination Event. The May 31, 2020, date in clause (i) of this definition shall be extended to July 31, 2020 automatically and without any need for amendment so long as, on or before May 31, 2020, Agent has acknowledged in writing to Borrowers that the following terms have been satisfied: (1) Borrowers have delivered to Agent an executed copy (or copies) of the purchase agreement (or purchase agreements) related to a Strategic Transaction which purchase agreement(s) shall be in form and substance acceptable to Agent in its good faith credit judgment (including, without limitation, that such purchase agreement(s) shall include so-called "Sungard provisions" limiting the purchaser's opportunities to not proceed to closing of the Strategic Transaction), and such purchase agreement(s) shall provide for Sufficient Net Cash Proceeds to be paid to Borrowers at the closing of such Strategic Transaction, and (2) Borrowers have delivered to Agent an updated then-current Budget, in form acceptable to Agent in its good faith credit judgment, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement and showing sufficient anticipated cash receipts to cover expenses for the duration of time until the closing of the Strategic Transaction.

(d)     "KPO Sale" means the sale of all, or substantially all, of the assets of or equity in entities composing Borrower's knowledge process outsourcing operations, consummated

in accordance with the terms and provisions of the Financing Documents and this Agreement, cash proceeds of which are used to repay the Obligations in full at the closing thereof.

(e) "MPS Sale" means the sale of all, or substantially all, of the assets of or equity in entities composing Borrower's mobile phlebotomy services operations, consummated in accordance with the terms and provisions of the Financing Documents and this Agreement, cash proceeds of which are used to repay the Obligations at the closing thereof.

(f) "Strategic Transaction" means any of (i) a KPO Sale, (ii) a MPS Sale or (iii) both a KPO Sale and MPS Sale.

(g) "Sufficient Net Cash Proceeds" means, (i) in the case of a KPO Sale, sufficient net cash proceeds to repay the Obligations in full and (ii) in the case of a MPS Sale, sufficient net cash proceeds to repay the Term Loan and related Obligations in full (and, for the avoidance of doubt, the changes to the Credit Agreement provided for herein, including the Temporary Overadvance and Forbearance Guaranty, would remain in effect under the terms of this Agreement).

(h) "Termination Event" means (i) the initiation of any action by any Borrower, any other Credit Party or any Releasing Party (as defined herein) to invalidate or limit the enforceability of any of the acknowledgments set forth in Section 2, the release set forth in Section 8.6 or the covenant not to sue set forth in Section 8.7 or (ii) the occurrence of an Event of Default under Sections 10.1(e) or (f) of the Credit Agreement.

(i) "Variance Report Date" means March 3, 2020, and each Tuesday thereafter.

## SECTION 2

## ACKNOWLEDGMENTS

2.1. **Acknowledgment of Obligations**. Each Borrower hereby acknowledges, confirms and agrees that as of the close of business on February 25, 2020, (a) Borrowers are indebted to Lenders in respect of the Revolving Loans, including the Overadvance, in the principal amount of approximately $17,800,000, and (b) Borrowers are indebted to Lenders in respect of the Term Loans in the aggregate principal amount of $3,500,000. Each Borrower hereby acknowledges, confirms and agrees that all such Loans and Letter of Credit Liabilities, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by any Borrower to Lenders, are unconditionally owing by Borrowers to Lenders, without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2. **Acknowledgment of Security Interests**. Each Credit Party hereby acknowledges, confirms and agrees that Agent has, and will continue to have, valid, enforceable and perfected first-priority continuing liens upon and security interests in the Collateral heretofore granted to Agent, for the benefit of Agent and Lenders, pursuant to the Credit Agreement and the Financing Documents or otherwise granted to or held by Agent, for the benefit of Agent and Lenders.

2.3. **Binding Effect of Documents**. Each Credit Party hereby acknowledges, confirms and agrees that: (a) this Agreement constitutes a Financing Document, (b) each of the Credit

Agreement and the other Financing Documents to which it is a party has been duly executed and delivered to Agent by such Credit Party, and each is and will remain in full force and effect as of the date hereof except as modified pursuant hereto, (c) the agreements and obligations of such Credit Party contained in such documents and in this Agreement constitute the legal, valid and binding Obligations of such Credit Party, enforceable against it in accordance with their respective terms (except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles), and such Credit Party has no valid defense to the enforcement of such Obligations, and (d) Agent and Lenders are and will be entitled to the rights, remedies and benefits provided for under the Credit Agreement and the other Financing Documents and applicable law (except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles).

## SECTION 3

## FORBEARANCE IN RESPECT OF EXISTING DEFAULTS

3.1.     **Acknowledgment of Defaults**.  Each Credit Party hereby acknowledges and agrees that the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles Agent and Lenders to exercise their rights and remedies under the Credit Agreement, the other Financing Documents, applicable law and otherwise.  Each Credit Party represents and warrants that as of the date hereof, no Events of Default exist other than the Existing Defaults.  Each Credit Party hereby acknowledges and agrees that, subject only to the terms of this Agreement, Agent and Lenders have the right to declare the Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Financing Documents.

3.2.     **Forbearance**.

(a)       In reliance upon the representations, warranties and covenants of the Credit Party contained in this Agreement, and subject to the terms and conditions of this Agreement and any documents or instruments executed in connection herewith, Agent and Lenders agree to forbear during the Forbearance Period from exercising their rights and remedies under the Credit Agreement, the other Financing Documents and applicable law in respect of the Existing Defaults.

(b)       Upon the expiration or termination of the Forbearance Period, the agreement of Agent and Lenders to forbear will automatically and without further action terminate and be of no force and effect, it being expressly agreed that the effect of such termination will be to permit Agent and Lenders to exercise immediately all rights and remedies under the Credit Agreement the other Financing Documents and applicable law, including, but not limited to, (i) ceasing to make any further Loans, including, without limitation, any Overadvances, and (ii) accelerating all of the Obligations under the Credit Agreement and the other Financing Documents, in all events, without any further notice to any Credit Party, passage of time or forbearance of any kind.

3.3.    **No Waivers; Reservation of Rights**.

(a)     Agent and Lenders have not waived, are not by this Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and Agent and Lenders have not agreed to forbear with respect to any of their rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Existing Defaults to the extent expressly set forth herein) occurring at any time.

(b)     Subject to Section 3.2 above (solely with respect to the Existing Defaults), Agent and Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Financing Documents as a result of any other Events of Default occurring at any time.  Agent and Lenders have not waived any of such rights or remedies, and nothing in this Agreement, and no delay on their part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

3.4.    **Additional Events of Default**.  The parties hereto acknowledge, confirm and agree that any misrepresentation by any Credit Party, or any failure of any Credit Party to comply with the covenants, conditions and agreements contained in this Agreement, the Credit Agreement or any other Financing Document or in any other agreement, document, or instrument at any time executed or delivered by any Credit Party with, to or in favor of Agent or any Lenders will constitute an immediate Event of Default under this Agreement, the Credit Agreement, and the other Financing Documents.  In the event that any Person, other than Agent or Lenders, at any time exercises for any reason (including, without limitation, by reason of any Existing Defaults, any other present or future Event of Default, or otherwise) any of its rights or remedies against any Borrower or any obligor providing credit support for any Borrower's obligations to such other Person, or against any Borrower's or such obligor's properties or assets, such event will constitute an immediate Event of Default hereunder and an Event of Default under the Credit Agreement and the other Financing Documents (without any notice or grace or cure period).

## SECTION 4

## AMENDMENTS TO FINANCING DOCUMENTS

4.1.    Agent, Lenders and Borrowers hereby agree that the Credit Agreement is amended as follows: to add the following new definitions in appropriate alphabetical order:

"Third Amendment" means that certain Forbearance Agreement and Third Amendment to Credit and Security Agreement dated as of February 26, 2020 (as amended or otherwise modified), by and among the Borrowers and Agent.

"Temporary Overadvance" means (a) during the period from August 19, 2019 up to but not including the date of the Third Amendment, $2,000,000, and (b) from and after the date of the Third Amendment, $4,000,000; provided that upon the expiration or termination of the Forbearance Period, the Temporary Overadvance shall be automatically reduced to $0.

4.2.    The definition of "Borrowing Base" set forth in Section 1.1 of the Credit Agreement is hereby is hereby deleted in its entirety and replaced with the following:

"**Borrowing Base**" means:

(a)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *plus*

(b)    the Temporary Overadvance; *minus*

(c)    the amount of any reserves and/or adjustments provided for in this Agreement.

4.3.    Section 7.2(c) of the Credit Agreement is hereby amended by inserting the following phrase immediate after the reference to "Event of Default" therein:  "(other than the "Existing Defaults" during the "Forbearance Period" (as such terms are defined in the Third Amendment))".

4.4.    Notwithstanding anything to the contrary in the Credit Agreement, Borrowers agree that no Letters of Credit may be requested and issued under the Credit Agreement.

4.5.    Notwithstanding anything to the contrary in the Credit Agreement, any regularly scheduled principal payments that are due in respect of the Term Loans during the Forbearance Period shall not be payable until the expiration or termination of the Forbearance Period.

4.6.    Upon the effectiveness of this Forbearance Agreement, the Overadvance shall be deemed terminated and no longer available under the Overadvance Letter and all amounts advanced pursuant thereto or outstanding thereunder (whether prior to, on or after the date of the Third Amendment) shall be deemed advanced and outstanding pursuant to the Temporary Overadvance component of the Borrowing Base under the Credit Agreement.

## SECTION 5

## OTHER COVENANTS

5.1.    **Financial Covenants Compliance**.  Notwithstanding anything to the contrary in the Credit Agreement, the Credit Parties shall not be required to comply with the financial covenants set forth in Article 6 of the Credit Agreement during the Forbearance Period.

5.2.    **Budget**.  During the Forbearance Period, Borrowers shall continue to cause all Collateral proceeds to be remitted directly to Borrowers' Lockbox Account in accordance with Section 2.11 of the Credit Agreement, for application to the Obligations,. Borrowers shall only use proceeds of Revolving Loan advances to pay such expenses set forth in the Budget, as and when such expenses are due and payable in accordance with the Budget.

(a)    On each Variance Report Date, Borrowers shall deliver to Agent (i) an updated Budget which shall be in form reasonably acceptable to Agent, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement, prepared by

Borrowers' management, adding an additional week to the end of the then existing Budget that is in form reasonably acceptable to Agent, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement, (ii) a reconciliation that compares Borrowers budgeted to actual performance (a) for the prior week ending Saturday and (b) for the cumulative period commencing on the date hereof and ending the Saturday prior to such Variance Report Date, (iii) such other data and information as requested by Agent.

(b)      (i) Borrowers' actual sales for the period commencing on the date hereof and ending as of the Friday prior to each such Variance Report Date shall not be less than the amount of sales in the Budget for such cumulative period by more than ten percent (10%), and (ii) Borrowers' actual disbursements for the period commencing on the date hereof and ending as of the Friday prior to each such Variance Report Date shall not exceed the amount of disbursements in the Budget for such cumulative period by more than five percent (5%).

5.3.    **Sale Milestones**.

(a)      Borrowers have advised Agent that they have engaged Lincoln International as an investment banker under and pursuant to that certain Letter Agreement dated as of February 6, 2020. Borrowers shall continue to retain and engage Lincoln International or another investment banker on terms and conditions, and such investment banker to be, reasonably acceptable to Agent (the "Investment Banker"). All fees, costs and expenses of the Investment Banker shall be solely the responsibility of Borrowers, and in no event will Agent or any Lender have any liability or responsibility of any kind with respect to the Investment Banker (including, without limitation, as to the payment of any of the Investment Banker's fees, costs or expenses), and Agent and Lenders will not have any obligation or liability of any kind or nature to Borrowers, the Investment Banker, or any other Person by reason of any acts or omissions of the Investment Banker.

(b)      Borrowers shall cause the Investment Banker to provide Agent and Lenders (on not less than a weekly basis) with such information, drafts, and reports, and to make the Investment Banker available for weekly discussions by phone with Agent and Lenders, regarding the status and prospects of a Strategic Transaction. Borrowers may participate in such discussions at the times agreed to by the Investment Banker, Agent and Lenders pursuant to the immediately preceding sentence, provided that any Borrower's failure to elect to do so will not prevent Agent or any Lender from proceeding with such discussions. Borrowers shall cause the Investment Banker to maintain an appropriate data room to which Agent, Lenders, their respective counsel, and any other consultant or financial advisor engaged by Agent, or by Agent's counsel, will have unlimited access and review rights at all times.

(c)      On or before March 13, 2020, Borrowers shall have received at least one bona fide indication of interest for a Strategic Transaction from one or more prospective purchasers or investors, which indications of interest and prospective purchasers are all reasonably acceptable to Agent.

(d)      On or before April 30, 2020, Borrowers shall have received at least one letter of intent for a Strategic Transaction from bona fide prospective purchaser and Borrowers shall have authorized Borrowers' management and professionals to work expeditiously to document and close such Strategic Transaction(s).

(e)     On or before May 31, 2020, (i) Borrowers shall have delivered to Agent an executed copy (or copies) of the purchase agreement (or purchase agreements) related to a Strategic Transaction which purchase agreement(s) shall be in form and substance acceptable to Agent in its good faith credit judgment (including, without limitation, that such purchase agreement(s) shall include so-called "Sungard provisions" limiting the purchaser's opportunities to not proceed to closing of the Strategic Transaction), and such purchase agreement(s) shall provide for Sufficient Net Cash Proceeds to be paid to Borrowers at the closing of such Strategic Transaction, and (ii) Borrowers have delivered to Agent an updated then-current Budget, in form acceptable to Agent in its good faith credit judgment, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement and showing sufficient anticipated cash receipts to cover expenses for the duration of time until the closing of the Strategic Transaction

5.4.    **Compliance with Information Requests**.    Borrowers shall provide weekly updates to and shall participate in weekly discussions with Agent and Lenders, and shall promptly comply with Agent's and Lenders' reasonable requests for information, concerning the Strategic Transaction, the Credit Parties' financial status, management, operations and Collateral in accordance with the Credit Agreement.

5.5.    **Lender-Side Consultant**.    Borrowers acknowledge and agree that Agent (or its counsel) and Lenders have the right to retain a financial advisor or a consultant (the "Lender-Side Consultant") to provide certain advisory services in connection with, among other things, the Strategic Transaction, the Credit Parties' financial status, management, operations and Collateral and that Borrowers are required to reimburse Agent for all reasonable and documented out-of-pocket costs and expenses Agent or its counsel may incur in connection with such engagement in accordance with Section 12.14(a) of the Credit Agreement.  In the event that Agent, Lenders or Agent's counsel engage a Lender-Side Consultant, (i) the Credit Parties shall provide such Lender-Side Consultant with access to all places of business, officers, consultants and employees of the Credit Parties during normal business hours, upon reasonable prior notice by Agent or the Lender-Side Consultant, and (ii) the Credit Parties shall promptly provide to such Lender-Side Consultant, at the Credit Parties' premises (or electronically, if regularly maintained in such format), such books, records, financial information concerning the Credit Parties' financial condition, businesses, assets, and liabilities as such Lender-Side Consultant may reasonably request from time to time.

5.6.    **Forbearance and Amendment Fee**.    In consideration of Agent's and Lenders' agreements set forth in this Agreement, Borrowers hereby agree to pay to Agent, for the ratable benefit of the Lenders, a fee in the amount of $200,000 (the "Forbearance and Amendment Fee"), which Forbearance and Amendment Fee shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

5.7.    **Deferred Revolving Loan Origination Fee**. In further consideration of Agent's and Lenders' agreements set forth in this Agreement, Borrowers hereby agree that in lieu of any fee otherwise due under Section 2.2(e) of the Credit Agreement, if any, there shall be a fee as compensation for the costs of Lenders being prepared to make funds available to Borrowers under the Agreement, equal to an amount determined by *multiplying* the highest Revolving Loan

Commitment in effect from and after the Closing Date *by* two percent (2.00%), which fee shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

5.8. **Overadvance Amendment Fee**. Agent and Lenders agree that the Overadvance Amendment Fee, as defined in and required to be paid under that certain Amendment No. 1 to Overadvance Letter between Borrowers, Agent and Lender dated as of October 22, 2019, in the amount of $50,000, shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

## SECTION 6

## REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants as of the date hereof that it has the full power and authority to execute, deliver and perform this Agreement and to incur the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate, limited liability company or limited partnership, as applicable, action. Each Credit Party hereby further represents and warrants as of the date hereof that (a) the representations and warranties made respectively by such Credit Party in the Financing Documents are true and correct in all material respects (except with respect to the Existing Defaults and to the extent that such representation or warranty relates to a specific date, in which case such representation and warranty shall be true as of such earlier date); and (b) the execution and delivery by such Credit Party of this Agreement and the performance by such Credit Part of its obligations hereunder: (i) do not and will not violate any law or regulation applicable to such Credit Party; (ii) do not and will not violate any material agreement, order, decree or judgment by which such Credit Party is bound; and (3) do not and will not violate or conflict with, result in a breach of or constitute (with notice, lapse of time, or otherwise) a default under any material agreement, mortgage, indenture or other contractual obligation to which such Credit Party is a party, or by which such Credit Party's properties are bound. Each Credit Party represents and warrants that as of the date of this Agreement, upon the effectiveness of this Agreement, except the Existing Defaults, no Default or Event of Default has occurred and is continuing.

## SECTION 7

## CONDITIONS TO EFFECTIVENESS OF CERTAIN
## PROVISIONS OF THIS AGREEMENT

The terms and provisions of this Agreement will be effective immediately upon satisfaction of the following conditions precedent:

(a) Agent's receipt of this Agreement, duly authorized, executed and delivered by each Credit Party (including, without limitation, written evidence of appropriate corporate consents and resolutions);

(b) Agent's receipt of the Forbearance Guaranty;

9

(c)     Agent's receipt of a copy of (i) the form of non-disclosure agreement ("NDA") to be executed by prospective purchasers, investors, or other Persons in connection with the Strategic Transaction, in form and substance acceptable to Agent, (ii) a detailed list of the Persons whom have executed and delivered a NDA, and (iii) a detailed list of the Persons to whom the Investment Banker has sent or intends to send the NDA;

(d)     Agent's receipt of (i) a confidential information memorandum ("CIM") relating to the Strategic Transaction, in form and substance acceptable to Agent, (ii) a detailed list of the Persons whom have received the CIM; and

(e)     Agent's receipt of all fees and other amounts payable on or prior to the closing date of this Agreement, including all attorneys', consultants' and other professionals' fees and expenses incurred by Agent or Lenders, if requested Agent.

## SECTION 8

## MISCELLANEOUS

8.1.    **Continuing Effect of Credit Agreement**.  Except as modified pursuant hereto, no other changes or modifications to the Credit Agreement or any other Financing Document are intended or implied by this Agreement and in all other respects the Credit Agreement and the other Financing Documents hereby are ratified and reaffirmed by all parties hereto as of the date hereof. To the extent of any conflict between the terms of this Agreement, the Credit Agreement and the other Financing Documents, the terms of this Agreement will govern and control.  The Credit Agreement and this Agreement will be read and construed as one agreement.

8.2.    **Costs and Expenses**.  In addition to, and without in any way limiting, the obligations of Borrowers set forth in Section 12.14 of the Credit Agreement, each Borrower absolutely and unconditionally agrees to pay to Agent, on demand by Agent at any time, whether or not all or any of the transactions contemplated by this Agreement are consummated:  all fees, costs and expenses incurred by Agent and any of its directors, officers, employees or agents (including, without limitation, fees, costs and expenses incurred of any counsel to Agent), regardless of whether Agent or any such other Person is a prevailing party, in connection with (a) the preparation, negotiation, execution, delivery or enforcement of this Agreement, the Credit Agreement, any Guarantee, the other Financing Documents and any agreements, documents or instruments contemplated hereby and thereby, and (b) any investigation, litigation or proceeding related to this Agreement, the Credit Agreement, any Guarantee or any other Financing Document or any act, omission, event or circumstance in any matter related to any of the foregoing.

8.3.    **Further Assurances**.  At Borrowers' expense, the parties hereto will execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

8.4.    **Successors and Assigns; No Third-Party Beneficiaries**.  This Agreement will be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.  No Person other than the parties hereto and, in the case of Sections 8.6 and 8.7 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-

party beneficiary rights (other than the rights of the Releasees under Sections 8.6 and 8.7 hereof) are hereby expressly disclaimed.

8.5.    **Survival of Representations, Warranties and Covenants**.  All representations, warranties, covenants and releases of each Borrower made in this Agreement or any other document furnished in connection with this Agreement will survive the execution and delivery of this Agreement, and no investigation by Agent or any Lender, or any closing, will affect the representations and warranties or the right of Agent and Lenders to rely upon them.

8.6.    **RELEASE**.

(a)    IN CONSIDERATION OF THE AGREEMENTS OF AGENT AND LENDERS CONTAINED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, EACH CREDIT PARTY, ON BEHALF OF ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER SUBSIDIARIES, DIVISIONS AND PREDECESSORS (EACH CREDIT PARTY AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "RELEASING PARTIES" AND INDIVIDUALLY AS A "RELEASING PARTY"), HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY RELEASES, REMISES AND FOREVER DISCHARGES AGENT, EACH LENDER, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR RESPECTIVE PRESENT AND FORMER SUBSIDIARIES, DIVISIONS, PREDECESSORS, OFFICERS, DIRECTORS, EMPLOYEES, TRUSTEES, AGENTS, INVESTMENT ADVISORS AND INVESTMENT MANAGERS, COLLATERAL MANAGERS, SERVICERS, AND COUNSEL (AGENT, LENDERS AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "RELEASEES" AND INDIVIDUALLY AS A "RELEASEE"), OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, DAMAGES AND ANY AND ALL OTHER CLAIMS, COUNTERCLAIMS, DEFENSES, RIGHTS OF SET-OFF, DEMANDS AND LIABILITIES WHATSOEVER (INDIVIDUALLY, A "CLAIM" AND COLLECTIVELY, "CLAIMS") OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, AT LAW OR IN EQUITY, WHICH ANY RELEASING PARTY OR ANY OF ITS SUCCESSORS, ASSIGNS, OR OTHER LEGAL REPRESENTATIVES MAY NOW OR HEREAFTER OWN, HOLD, HAVE OR CLAIM TO HAVE AGAINST THE RELEASEES OR ANY OF THEM FOR, UPON, OR BY REASON OF ANY CIRCUMSTANCE, ACTION, CAUSE OR THING WHATSOEVER WHICH ARISES AT ANY TIME ON OR PRIOR TO THE DATE OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, FOR OR ON ACCOUNT OF, OR IN RELATION TO, OR IN ANY WAY IN CONNECTION WITH THIS AGREEMENT, THE CREDIT AGREEMENT, ANY OF THE OTHER FINANCING DOCUMENTS OR ANY OF THE TRANSACTIONS HEREUNDER OR THEREUNDER. RELEASING PARTIES HEREBY REPRESENT TO THE RELEASEES THAT THEY HAVE NOT ASSIGNED OR TRANSFERRED ANY INTEREST IN ANY CLAIMS AGAINST ANY RELEASEE PRIOR TO THE DATE HEREOF.

(b)    EACH CREDIT PARTY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE RELEASE SET FORTH ABOVE MAY BE PLEADED AS A FULL AND COMPLETE DEFENSE TO ANY CLAIM AND MAY BE USED AS A BASIS FOR AN

VP/#22827544.8

INJUNCTION AGAINST ANY ACTION, SUIT OR OTHER PROCEEDING WHICH MAY BE INSTITUTED, PROSECUTED OR ATTEMPTED IN BREACH OF THE PROVISIONS OF SUCH RELEASE.

(c)     EACH CREDIT PARTY AGREES THAT NO FACT, EVENT, CIRCUMSTANCE, EVIDENCE OR TRANSACTION WHICH COULD NOW BE ASSERTED OR WHICH MAY HEREAFTER BE DISCOVERED WILL AFFECT IN ANY MANNER THE FINAL, ABSOLUTE AND UNCONDITIONAL NATURE OF THE RELEASE SET FORTH ABOVE.

8.7.    **COVENANT NOT TO SUE**.    EACH RELEASING PARTY HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY COVENANTS AND AGREES WITH AND IN FAVOR OF EACH RELEASEE THAT IT WILL NOT SUE (AT LAW, IN EQUITY, IN ANY REGULATORY PROCEEDING OR OTHERWISE) ANY RELEASEE ON THE BASIS OF ANY CLAIM RELEASED, REMISED AND DISCHARGED BY ANY RELEASING PARTY PURSUANT TO SECTION 8.6 ABOVE.  IF ANY RELEASING PARTY VIOLATES THE FOREGOING COVENANT, EACH CREDIT PARTY, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER MEMBERS, MANAGERS,     SHAREHOLDERS,     AFFILIATES,     SUBSIDIARIES,     DIVISIONS, PREDECESSORS, DIRECTORS, OFFICERS, ATTORNEYS, EMPLOYEES, AGENTS, LEGAL REPRESENTATIVES AND OTHER REPRESENTATIVES, AGREES TO PAY, IN ADDITION TO SUCH OTHER DAMAGES AS ANY RELEASEE MAY SUSTAIN AS A RESULT OF SUCH VIOLATION, ALL ATTORNEYS' FEES AND COSTS INCURRED BY ANY RELEASEE AS A RESULT OF SUCH VIOLATION.

8.8.    **Severability**.  Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable will not impair or invalidate the remainder of this Agreement.

8.9.    **Reviewed by Attorneys**.  Each Credit Party represents and warrants to Agent and Lenders that it (a) understands fully the terms of this Agreement and the consequences of the execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement with, and have this Agreement reviewed by, such attorneys and other persons as such Credit Party may wish, and (c) has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto will be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

8.10.   **Disgorgement**.  If Agent or any Lender is, for any reason, compelled by a court or other tribunal of competent jurisdiction to surrender or disgorge any payment, interest or other consideration described hereunder to any person because the same is determined to be void or voidable as a preference, fraudulent conveyance, impermissible set-off or for any other reason, such indebtedness or part thereof intended to be satisfied by virtue of such payment, interest or other consideration will be revived and continue as if such payment, interest or other consideration

12

had not been received by Agent or such Lender, and Borrowers will be liable to, and will indemnify, defend and hold Agent or such Lender harmless for, the amount of such payment or interest surrendered or disgorged. The provisions of this Section will survive repayment of the Obligations or any termination of the Credit Agreement or any other Financing Document.

8.11. **Tolling of Statute of Limitations**. Each and every statute of limitations or other applicable law, rule or regulation governing the time by which Agent must commence legal proceedings or otherwise take any action against any Credit Party with respect to any breach or default that exists on or prior to the expiration or termination of the Forbearance Period and arises under or in respect of the Credit Agreement or any other Financing Document shall be tolled during the Forbearance Period. Each Credit Party agrees, to the fullest extent permitted by law, not to include such period of time as a defense (whether equitable or legal) to any legal proceeding or other action by Agent in the exercise of its rights or remedies referred to in the immediately preceding sentence.

8.12. **Relationship**. Each Credit Party agrees that the relationship between Agent and such Credit Party and between each Lender and Credit Party is that of creditor and debtor and not that of partners or joint venturers. This Agreement does not constitute a partnership agreement, or any other association between Agent and any Credit Party or between any Lender and any Credit Party. Each Credit Party acknowledges that Agent and each Lender has acted at all times only as a creditor to such Credit Party within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Agent or any Lender attempted to exercise any control over such Credit Party or its business or affairs. Each Borrower further acknowledges that Agent and each Lender has not taken or failed to take any action under or in connection with its respective rights under the Credit Agreement or any of the other Financing Documents that in any way or to any extent has interfered with or adversely affected such Borrower's ownership of Collateral.

8.13. **No Effect on Rights Under Subordination Agreements**. Agent's agreement pursuant to Section 3.2 of this Agreement shall not extend to any of Agent's rights or remedies under any Subordination Agreement in favor of Agent  governing the Subordinated Debt which may arise as a result of the Existing Defaults, it being understood that the Existing Defaults shall at all times constitute Events of Default for purposes of any applicable Subordination Agreement in favor of Agent, and Agent shall at all times be permitted to enforce all rights and remedies in respect thereof (including, without limitation, blocking payments to any holders of Subordinated Debt in accordance with the Subordination Agreement).

8.14. **Governing Law; Submission to Jurisdiction**. THIS AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING GOVERNING LAW AND SUBMISSION TO JURISDICTION SET FORTH IN SECTION 12.8 OF THE CREDIT AGREEMENT, AND SUCH PROVISIONS ARE HEREBY INCORPORATED HEREIN BY THIS REFERENCE, MUTATIS MUTANDIS.

8.15. **Waivers**.

(a) **Mutual Waiver of Jury Trial**. THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE

BETWEEN AGENT OR ANY LENDER AND ANY BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR THE CREDIT AGREEMENT OR THE OTHER FINANCING DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

(b) **Waivers by Borrowers**. Borrowers hereby waive any rights any Borrower may have upon payment in full of the Obligations to require Agent to terminate its security interest in the Collateral, other collateral or in any other property of any Borrower until termination of the Credit Agreement in accordance with its terms and the execution by each Borrower of an agreement indemnifying Agent from any loss or damage Agent may incur as the result of dishonored checks or other items of payment received by Agent from any Borrower or any account debtor and applied to the obligations and releasing and indemnifying, in the same manner as described in Section 8.6 of this Agreement, the Releasees from all claims arising on or before the date of such termination. Borrowers acknowledge that the foregoing waiver is a material inducement to Agent in entering into this Agreement and that Agent is relying upon the foregoing waiver in its future dealings with Borrowers.

8.16. **Counterparts**. This Agreement may be executed and delivered via facsimile or email (in .pdf format) transmission with the same force and effect as if an original were executed and may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

[*signatures on following page*]

14

**IN WITNESS WHEREOF**, this Agreement is executed and delivered as of the day and year first above written.

**BORROWERS:**

**EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation

By: _____
William Keys
Chief Financial Officer

**EMSI HOLDING COMPANY**, a Delaware corporation

By: _____
William Keys
Chief Financial Officer

**EMSI ACQUISITION, INC.**, a Delaware corporation

By: _____
William Keys
Chief Financial Officer

GUARANTORS:

**BEECKEN PETTY O'KEEFE FUND IV,**
**L.P.,** a Delaware limited partnership

By: _____
      Troy Phillips
      Partner

**BEECKEN PETTY O'KEEFE FUND IV-**
**A, L.P.,** a Delaware limited partnership

By: _____
      Troy Phillips
      Partner

[Signatures continue on following page.]

SIGNATURE PAGE TO FORBEARANCE
AGREEMENT AND THIRD AMENDMENT TO
CREDIT AND SECURITY AGREEMENT

VP/#22827544

**AGENT AND LENDER:**

**MIDCAP FUNDING IV TRUST**, a Delaware
statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

    By:  Apollo Capital Management GP, LLC
    Its:   General Partner


By: _____
        Maurice Amsellem
        Authorized Signatory

**<u>EXHIBIT A</u>**
**TO**
**FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT**

**<u>Existing Events of Default</u>**

1.　　An Event of Default under Section 10.1(a)(iii) of the Credit Agreement as a result of Borrowers failure to satisfy the financial covenant set forth in Section 6.3 of the Credit Agreement in that they failed to not permit the Senior Net Leverage Ratio for the Defined Period ending November 30, 2019, to be greater than 5.00 to 1.00.

2.　　An Event of Default under Section 10.1(b) of the Credit Agreement as a result of Borrowers failure to give notice of the above described default in accordance with Section 4.9 (Notice of Litigation and Defaults) of the Credit Agreement.

3.　　An Event of Default under Section 10.1(a)(iii) of the Credit Agreement as a result of Borrowers failure to satisfy the financial covenants set forth in Section 6.2 of the Credit Agreement in that they failed to not permit the Fixed Charge Coverage Ratio Ratio for the Defined Period ending December 31, 2019, to be less than 1.10 to 1.00 and Section 6.3 of the Credit Agreement in that they failed to not permit the Senior Net Leverage Ratio for the Defined Period ending December 31, 2019, to be greater than 5.00 to 1.00.

2.　　An Event of Default under Section 10.1(b) of the Credit Agreement as a result of Borrowers failure to give notice of the above described defaults in accordance with Section 4.9 (Notice of Litigation and Defaults) of the Credit Agreement.

VP/#22827544.8

## EXHIBIT B
## TO
## FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT

## Budget

[See Attached]

**EMSI Consolidated**
**Thirteen Week Cash Flow**

| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total for the 13 week period | Total For Prior 13 week period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning Date | | 24-Feb-20 | 2-Mar-20 | 9-Mar-20 | 16-Mar-20 | 23-Mar-20 | 30-Mar-20 | 6-Apr-20 | 13-Apr-20 | 20-Apr-20 | 27-Apr-20 | 4-May-20 | 11-May-20 | 18-May-20 | | |
| Week Ending Date | | 1-Mar-20 | 8-Mar-20 | 15-Mar-20 | 22-Mar-20 | 29-Mar-20 | 5-Apr-20 | 12-Apr-20 | 19-Apr-20 | 26-Apr-20 | 3-May-20 | 10-May-20 | 17-May-20 | 24-May-20 | | |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| Insurance | | 2,135,719 | 2,257,787 | 2,346,366 | 1,917,717 | 1,104,489 | 2,559,855 | 1,166,439 | 1,204,957 | 1,614,743 | 2,211,530 | 1,193,471 | 1,304,021 | 1,684,898 | 22,701,990 | 22,653,789 |
| Employer Services | | 1,428,728 | 790,762 | 313,555 | 868,934 | 1,733,168 | 232,836 | 463,608 | 277,977 | 1,605,696 | 249,709 | 182,527 | 546,834 | 292,298 | 8,986,632 | 7,086,061 |
| Health Plan Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | 1,058 | | | | | | | | | | | | | 1,058 | (19) |
| **Total Operating Receipts** | A | 3,565,504 | 3,048,549 | 2,659,921 | 2,786,652 | 2,837,657 | 2,792,691 | 1,630,047 | 1,482,934 | 3,220,439 | 2,461,239 | 1,375,997 | 1,850,855 | 1,977,196 | 31,689,679 | 29,739,831 |
| | | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Payroll - Admin & Exam | | 1,510,949 | 28,470 | 1,387,253 | - | 1,189,253 | 223,076 | 1,195,270 | 267,691 | 1,190,660 | 220,891 | 1,189,583 | 220,891 | 1,179,462 | 9,803,451 | |
| Payroll Taxes | | 206,245 | 3,886 | 189,360 | - | 162,333 | 30,450 | 163,154 | 36,540 | 162,525 | 30,152 | 162,378 | 30,152 | 160,997 | 1,338,171 | |
| Payroll and Benefits | B | 1,717,193 | 32,356 | 1,576,613 | - | 1,351,586 | 253,526 | 1,358,425 | 304,231 | 1,353,185 | 251,043 | 1,351,962 | 251,043 | 1,340,459 | 11,141,622 | 10,088,441 |
| Medical Insurance Funding | | 81,763 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,682 | 78,821 | 78,821 | 78,821 | 1,004,091 | 1,005,606 |
| 401k | | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 234,449 | 290,880 |
| Healthcare Providers - Pro | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contractor (1099) | | 882,011 | - | 778,318 | - | - | 753,757 | - | 904,509 | - | 920,404 | - | 920,404 | - | 5,159,403 | 5,168,984 |
| Federal, Gas, City Taxes | | - | - | - | - | - | 8,000 | - | - | - | - | - | - | - | 8,000 | 6,470 |
| Sales Taxes | | - | 28,500 | - | - | - | 28,500 | - | - | - | - | - | - | 28,500 | 85,500 | 74,877 |
| Medical Records Fee | | 743,953 | 426,717 | 526,717 | 726,717 | 526,717 | 521,456 | 517,948 | 517,948 | 317,948 | 518,693 | 421,669 | 521,669 | 521,669 | 6,809,824 | 7,277,773 |
| Postage Meters | | 500 | 500 | 26,000 | 500 | 500 | 500 | 500 | 26,000 | 500 | 500 | 500 | 500 | 500 | 57,500 | 73,159 |
| Travel & Expenses Reimbursement | | 27,934 | 27,831 | 27,269 | 27,079 | 26,461 | 26,240 | 26,225 | 26,406 | 27,664 | 26,364 | 27,807 | 30,334 | 29,299 | 356,913 | 379,287 |
| Rent | | 180,114 | - | - | 180,114 | - | - | - | 180,114 | - | - | - | - | - | 540,343 | 656,111 |
| Other Operating Disbursements | | 458,620 | 498,569 | 422,591 | 374,229 | 379,822 | 334,568 | 387,977 | 381,638 | 339,480 | 359,731 | 275,537 | 322,093 | 399,841 | 4,934,698 | 5,207,585 |
| **Total Operating Disbursements** | | 4,092,089 | 1,129,696 | 3,433,656 | 1,423,862 | 2,361,234 | 2,041,770 | 2,367,223 | 2,456,070 | 2,114,926 | 2,192,493 | 2,156,296 | 2,303,939 | 2,399,089 | - | 30,472,343 | 30,229,176 |
| **Net Operating Cash Flow** | | (526,585) | 1,918,853 | (773,735) | 1,362,789 | 476,423 | 750,921 | (737,176) | (973,136) | 1,105,512 | 268,746 | (780,298) | (453,084) | (421,893) | 1,217,336 | (489,344) |
| | | | | | | | | | | | | | | | | |
| **Non-Operating Receipts (Disbursements)** | | | | | | | | | | | | | | | | |
| Term Interest and Principal Payments | | | (25,693) | - | - | | (25,693) | - | - | | (24,837) | - | - | | (76,223) | (174,215) |
| Revolver Interest Payments | | | (106,609) | - | - | | (113,167) | - | - | | (109,888) | - | - | | (329,664) | (360,465) |
| Professional Firm Payments | | (16,000) | | - | - | | (16,000) | - | - | | (16,000) | - | - | | (48,000) | (49,946) |
| CapEx | B | | | - | - | | - | - | - | | (50,000) | - | - | | (50,000) | (132,913) |
| Other Non-Operating Disbursement | C | | | - | - | | - | - | - | | 140,000 | - | - | | 148,000 | (75,192) |
| Other Non-Operating Receipt | | | | - | - | | - | - | - | | - | - | - | | - | |
| **Total Non-Operating Receipts (Disbursements)** | | (16,000) | (132,302) | 0 | 0 | 0 | (154,861) | 0 | 0 | 0 | (200,725) | 0 | 0 | 0 | (503,888) | (792,732) |
| **Net Cash Flow** | | (542,585) | 1,786,551 | (773,735) | 1,362,789 | 476,423 | 596,060 | (737,176) | (973,136) | 1,105,512 | 68,021 | (780,298) | (453,084) | (421,893) | 713,449 | (1,282,076) |
| | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | D | (506,645) | | | | | | | | | | | | | (506,645) | 66,709 |
| Adjusted Net Cash Flow | | (542,585) | 1,786,551 | (773,735) | 1,362,789 | 476,423 | 596,060 | (737,176) | (973,136) | 1,105,512 | 68,021 | (780,298) | (453,084) | (421,893) | 713,449 | (1,282,076) |
| Revolver Draw/(Payment) | E | 1,049,230 | (1,786,551) | 773,735 | (1,362,789) | (476,423) | (596,060) | 737,176 | 973,136 | (1,105,512) | (68,021) | 780,298 | 453,084 | 421,893 | (206,804) | 686,915 |
| Sponsor Funding Draw | | | | | | | | | | | | | | | - | |
| **Ending Cash Balance** | | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | (528,453) |
| | | | | | | | | | | | | | | | | |
| **Ending Revolver Balance** | E | 18,623,477 | 16,836,926 | 17,610,661 | 16,247,872 | 15,771,449 | 15,175,389 | 15,912,566 | 16,885,702 | 15,780,189 | 15,712,168 | 16,492,466 | 16,945,550 | 17,367,443 | | |
| Ending Sponsor Funding Balance | F | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **Total Ending Availability** | | 132,092 | 1,200,342 | 34,022 | 657,217 | 589,978 | 675,311 | 408,604 | 30,983 | 313,359 | 147,773 | 184,150 | 30,910 | 235,862 | - | |

Notes:
A   The timing of receipts are based on historical customer payment days and divisional DSO. Manual adjustments are made for known one-time payments or credits.
B   The CapEx total amounts shown under the Non-Operating Receipts (Disbursements) section relate only to capital expenditures paid to external vendors CDW. Capitalized software development costs are captured as part of the payroll and benefits total.
C   Other Non-Operating disbursements include estimates for severance payments.
D   The beginning book balance shown is a roll forward based on the actual book balance as at the most recently reconciled month-end. As such, month-end cash adjustments, such as reversing entries for voided checks, are not captured in the roll forward.
E   The model assumes cash dominion by Wells Fargo and sufficient borrowing availability during the periods shown based on revised availability limits under the Amendment to the Credit Agreement.
E   The Sponsor Funding Balance no longer includes the proceeds from the sale of the Waco location.