# EXHIBIT G

## FORBEARANCE AGREEMENT

## FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT

This **FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND SECURITY AGREEMENT** (this "Agreement") dated as of February 26, 2020, is made by and among **EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation, **EMSI HOLDING COMPANY**, a Delaware corporation, **EMSI ACQUISITION, INC.**, a Delaware corporation, (collectively, the "Borrowers", and each, individually, a "Borrower"), **BEECKEN PETTY O'KEEFE FUND IV, L.P.**, a Delaware limited partnership ("Fund IV"), and **BEECKEN PETTY O'KEEFE FUND IV-A, L.P.**, a Delaware limited partnership ("Fund IV-A" and together with Fund IV, individually and collectively, "Guarantor"),and **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust, individually as a Lender, and as Agent.

## R E C I T A L S:

**WHEREAS**, Agent and Borrowers have entered into certain financing arrangements pursuant to that certain Credit and Security Agreement, dated as of April 26, 2019, among Agent, Borrowers, Lenders and the other Credit Parties from time to time party thereto (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Credit Agreement");

**WHEREAS**, pursuant to that certain letter agreement entered into as of August 19, 2019, by and among Agent, the Lenders, and the Borrowers (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Overadvance Letter") Agent and the Lenders agreed to provide an Overadvance (as defined in the Overadvance Letter) in the maximum principal amount of $2,000,000, to the Borrowers for a limited period of time, all as described more fully in the Overadvance Letter.

**WHEREAS**, the Overadvance is guaranteed by Guarantors pursuant to that certain Guaranty of Collection (Overadvance), dated as of August 19, 2019 (as amended and restated on the date hereof, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Forbearance Guaranty");

**WHEREAS**, Events of Default under the Credit Agreement have occurred and are continuing;

**WHEREAS**, Borrowers have requested that, subject to the terms and conditions of this Agreement, Agent and Lenders (i) increase the Overadvance amount and extend the time in which it will be available, and (ii) forbear from exercising their rights as a result of such Events of Default, which are continuing, notwithstanding such Events of Default; and

**WHEREAS**, Agent and Lenders are willing to agree to such changes to the Overadvance, document such modified Overadvance as an amendment to the Credit Agreement and forbear from exercising certain of their rights and remedies solely for the period and on the terms and conditions specified herein.

**NOW, THEREFORE**, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1

## DEFINITIONS

1.1.    **Interpretation**.  All capitalized terms used herein (including the recitals hereto) will have the respective meanings ascribed thereto in the Credit Agreement unless otherwise defined herein.  The foregoing recitals, together with all exhibits attached hereto, are incorporated by this reference and made a part of this Agreement.  Unless otherwise provided herein, all section and exhibit references herein are to the corresponding sections and exhibits of this Agreement.

1.2.    **Additional Definitions**.  As used herein, the following terms will have the respective meanings given to them below:

(a)    "Budget" means the 13-week cash flow forecast attached as Exhibit B hereto, as amended from time to time as set forth herein.

(b)    "Existing Defaults" means, collectively, the Events of Default identified on Exhibit A hereto.

(c)    "Forbearance Period" means the period commencing on the date hereof and ending on the date which is the earliest of (i) May 31, 2020, as may be extended pursuant to the last sentence of this definition; (ii) at Agent's election, the occurrence or existence of any Event of Default (including, without limitation, the failure of Borrower to comply with any of the requirements set forth in this Agreement (including without limitation Section 5.2(b) relating to the Budget)), other than the Existing Defaults; or (iii) the occurrence of any Termination Event. The May 31, 2020, date in clause (i) of this definition shall be extended to July 31, 2020 automatically and without any need for amendment so long as, on or before May 31, 2020, Agent has acknowledged in writing to Borrowers that the following terms have been satisfied: (1) Borrowers have delivered to Agent an executed copy (or copies) of the purchase agreement (or purchase agreements) related to a Strategic Transaction which purchase agreement(s) shall be in form and substance acceptable to Agent in its good faith credit judgment (including, without limitation, that such purchase agreement(s) shall include so-called "Sungard provisions" limiting the purchaser's opportunities to not proceed to closing of the Strategic Transaction), and such purchase agreement(s) shall provide for Sufficient Net Cash Proceeds to be paid to Borrowers at the closing of such Strategic Transaction, and (2) Borrowers have delivered to Agent an updated then-current Budget, in form acceptable to Agent in its good faith credit judgment, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement and showing sufficient anticipated cash receipts to cover expenses for the duration of time until the closing of the Strategic Transaction.

(d)    "KPO Sale" means the sale of all, or substantially all, of the assets of or equity in entities composing Borrower's knowledge process outsourcing operations, consummated

2

in accordance with the terms and provisions of the Financing Documents and this Agreement, cash proceeds of which are used to repay the Obligations in full at the closing thereof.

(e)    "MPS Sale" means the sale of all, or substantially all, of the assets of or equity in entities composing Borrower's mobile phlebotomy services operations, consummated in accordance with the terms and provisions of the Financing Documents and this Agreement, cash proceeds of which are used to repay the Obligations at the closing thereof.

(f)    "Strategic Transaction" means any of (i) a KPO Sale, (ii) a MPS Sale or (iii) both a KPO Sale and MPS Sale.

(g)    "Sufficient Net Cash Proceeds" means, (i) in the case of a KPO Sale, sufficient net cash proceeds to repay the Obligations in full and (ii) in the case of a MPS Sale, sufficient net cash proceeds to repay the Term Loan and related Obligations in full (and, for the avoidance of doubt, the changes to the Credit Agreement provided for herein, including the Temporary Overadvance and Forbearance Guaranty, would remain in effect under the terms of this Agreement).

(h)    "Termination Event" means (i) the initiation of any action by any Borrower, any other Credit Party or any Releasing Party (as defined herein) to invalidate or limit the enforceability of any of the acknowledgments set forth in Section 2, the release set forth in Section 8.6 or the covenant not to sue set forth in Section 8.7 or (ii) the occurrence of an Event of Default under Sections 10.1(e) or (f) of the Credit Agreement.

(i)    "Variance Report Date" means March 3, 2020, and each Tuesday thereafter.

## SECTION 2

## ACKNOWLEDGMENTS

2.1.    **Acknowledgment of Obligations**.  Each Borrower hereby acknowledges, confirms and agrees that as of the close of business on February 25, 2020, (a) Borrowers are indebted to Lenders in respect of the Revolving Loans, including the Overadvance, in the principal amount of approximately $17,800,000, and (b) Borrowers are indebted to Lenders in respect of the Term Loans in the aggregate principal amount of $3,500,000.  Each Borrower hereby acknowledges, confirms and agrees that all such Loans and Letter of Credit Liabilities, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by any Borrower to Lenders, are unconditionally owing by Borrowers to Lenders, without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2.    **Acknowledgment of Security Interests**.  Each Credit Party hereby acknowledges, confirms and agrees that Agent has, and will continue to have, valid, enforceable and perfected first-priority continuing liens upon and security interests in the Collateral heretofore granted to Agent, for the benefit of Agent and Lenders, pursuant to the Credit Agreement and the Financing Documents or otherwise granted to or held by Agent, for the benefit of Agent and Lenders.

2.3.    **Binding Effect of Documents**.  Each Credit Party hereby acknowledges, confirms and agrees that:  (a) this Agreement constitutes a Financing Document, (b) each of the Credit

Agreement and the other Financing Documents to which it is a party has been duly executed and delivered to Agent by such Credit Party, and each is and will remain in full force and effect as of the date hereof except as modified pursuant hereto, (c) the agreements and obligations of such Credit Party contained in such documents and in this Agreement constitute the legal, valid and binding Obligations of such Credit Party, enforceable against it in accordance with their respective terms (except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles), and such Credit Party has no valid defense to the enforcement of such Obligations, and (d) Agent and Lenders are and will be entitled to the rights, remedies and benefits provided for under the Credit Agreement and the other Financing Documents and applicable law (except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles).

## SECTION 3

## FORBEARANCE IN RESPECT OF EXISTING DEFAULTS

3.1.     **Acknowledgment of Defaults**.  Each Credit Party hereby acknowledges and agrees that the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles Agent and Lenders to exercise their rights and remedies under the Credit Agreement, the other Financing Documents, applicable law and otherwise.  Each Credit Party represents and warrants that as of the date hereof, no Events of Default exist other than the Existing Defaults.  Each Credit Party hereby acknowledges and agrees that, subject only to the terms of this Agreement, Agent and Lenders have the right to declare the Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Financing Documents.

3.2.     **Forbearance**.

(a)      In reliance upon the representations, warranties and covenants of the Credit Party contained in this Agreement, and subject to the terms and conditions of this Agreement and any documents or instruments executed in connection herewith, Agent and Lenders agree to forbear during the Forbearance Period from exercising their rights and remedies under the Credit Agreement, the other Financing Documents and applicable law in respect of the Existing Defaults.

(b)      Upon the expiration or termination of the Forbearance Period, the agreement of Agent and Lenders to forbear will automatically and without further action terminate and be of no force and effect, it being expressly agreed that the effect of such termination will be to permit Agent and Lenders to exercise immediately all rights and remedies under the Credit Agreement the other Financing Documents and applicable law, including, but not limited to, (i) ceasing to make any further Loans, including, without limitation, any Overadvances, and (ii) accelerating all of the Obligations under the Credit Agreement and the other Financing Documents, in all events, without any further notice to any Credit Party, passage of time or forbearance of any kind.

3.3. **No Waivers; Reservation of Rights**.

(a) Agent and Lenders have not waived, are not by this Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and Agent and Lenders have not agreed to forbear with respect to any of their rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Existing Defaults to the extent expressly set forth herein) occurring at any time.

(b) Subject to Section 3.2 above (solely with respect to the Existing Defaults), Agent and Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Financing Documents as a result of any other Events of Default occurring at any time. Agent and Lenders have not waived any of such rights or remedies, and nothing in this Agreement, and no delay on their part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

3.4. **Additional Events of Default**. The parties hereto acknowledge, confirm and agree that any misrepresentation by any Credit Party, or any failure of any Credit Party to comply with the covenants, conditions and agreements contained in this Agreement, the Credit Agreement or any other Financing Document or in any other agreement, document, or instrument at any time executed or delivered by any Credit Party with, to or in favor of Agent or any Lenders will constitute an immediate Event of Default under this Agreement, the Credit Agreement, and the other Financing Documents. In the event that any Person, other than Agent or Lenders, at any time exercises for any reason (including, without limitation, by reason of any Existing Defaults, any other present or future Event of Default, or otherwise) any of its rights or remedies against any Borrower or any obligor providing credit support for any Borrower's obligations to such other Person, or against any Borrower's or such obligor's properties or assets, such event will constitute an immediate Event of Default hereunder and an Event of Default under the Credit Agreement and the other Financing Documents (without any notice or grace or cure period).

## SECTION 4

## AMENDMENTS TO FINANCING DOCUMENTS

4.1. Agent, Lenders and Borrowers hereby agree that the Credit Agreement is amended as follows: to add the following new definitions in appropriate alphabetical order:

"Third Amendment" means that certain Forbearance Agreement and Third Amendment to Credit and Security Agreement dated as of February 26, 2020 (as amended or otherwise modified), by and among the Borrowers and Agent.

"Temporary Overadvance" means (a) during the period from August 19, 2019 up to but not including the date of the Third Amendment, $2,000,000, and (b) from and after the date of the Third Amendment, $4,000,000; provided that upon the expiration or termination of the Forbearance Period, the Temporary Overadvance shall be automatically reduced to $0.

5

4.2.    The definition of "Borrowing Base" set forth in Section 1.1 of the Credit Agreement is hereby is hereby deleted in its entirety and replaced with the following:

"**Borrowing Base**" means:

(a)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *plus*

(b)    the Temporary Overadvance; *minus*

(c)    the amount of any reserves and/or adjustments provided for in this Agreement.

4.3.    Section 7.2(c) of the Credit Agreement is hereby amended by inserting the following phrase immediate after the reference to "Event of Default" therein: "(other than the "Existing Defaults" during the "Forbearance Period" (as such terms are defined in the Third Amendment))".

4.4.    Notwithstanding anything to the contrary in the Credit Agreement, Borrowers agree that no Letters of Credit may be requested and issued under the Credit Agreement.

4.5.    Notwithstanding anything to the contrary in the Credit Agreement, any regularly scheduled principal payments that are due in respect of the Term Loans during the Forbearance Period shall not be payable until the expiration or termination of the Forbearance Period.

4.6.    Upon the effectiveness of this Forbearance Agreement, the Overadvance shall be deemed terminated and no longer available under the Overadvance Letter and all amounts advanced pursuant thereto or outstanding thereunder (whether prior to, on or after the date of the Third Amendment) shall be deemed advanced and outstanding pursuant to the Temporary Overadvance component of the Borrowing Base under the Credit Agreement.

## SECTION 5

## OTHER COVENANTS

5.1.    **Financial Covenants Compliance**.  Notwithstanding anything to the contrary in the Credit Agreement, the Credit Parties shall not be required to comply with the financial covenants set forth in Article 6 of the Credit Agreement during the Forbearance Period.

5.2.    **Budget**.  During the Forbearance Period, Borrowers shall continue to cause all Collateral proceeds to be remitted directly to Borrowers' Lockbox Account in accordance with Section 2.11 of the Credit Agreement, for application to the Obligations,. Borrowers shall only use proceeds of Revolving Loan advances to pay such expenses set forth in the Budget, as and when such expenses are due and payable in accordance with the Budget.

(a)    On each Variance Report Date, Borrowers shall deliver to Agent (i) an updated Budget which shall be in form reasonably acceptable to Agent, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement, prepared by

Borrowers' management, adding an additional week to the end of the then existing Budget that is in form reasonably acceptable to Agent, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement, (ii) a reconciliation that compares Borrowers budgeted to actual performance (a) for the prior week ending Saturday and (b) for the cumulative period commencing on the date hereof and ending the Saturday prior to such Variance Report Date, (iii) such other data and information as requested by Agent.

(b)     (i) Borrowers' actual sales for the period commencing on the date hereof and ending as of the Friday prior to each such Variance Report Date shall not be less than the amount of sales in the Budget for such cumulative period by more than ten percent (10%), and (ii) Borrowers' actual disbursements for the period commencing on the date hereof and ending as of the Friday prior to each such Variance Report Date shall not exceed the amount of disbursements in the Budget for such cumulative period by more than five percent (5%).

5.3.   **Sale Milestones**.

(a)     Borrowers have advised Agent that they have engaged Lincoln International as an investment banker under and pursuant to that certain Letter Agreement dated as of February 6, 2020. Borrowers shall continue to retain and engage Lincoln International or another investment banker on terms and conditions, and such investment banker to be, reasonably acceptable to Agent (the "Investment Banker"). All fees, costs and expenses of the Investment Banker shall be solely the responsibility of Borrowers, and in no event will Agent or any Lender have any liability or responsibility of any kind with respect to the Investment Banker (including, without limitation, as to the payment of any of the Investment Banker's fees, costs or expenses), and Agent and Lenders will not have any obligation or liability of any kind or nature to Borrowers, the Investment Banker, or any other Person by reason of any acts or omissions of the Investment Banker.

(b)     Borrowers shall cause the Investment Banker to provide Agent and Lenders (on not less than a weekly basis) with such information, drafts, and reports, and to make the Investment Banker available for weekly discussions by phone with Agent and Lenders, regarding the status and prospects of a Strategic Transaction. Borrowers may participate in such discussions at the times agreed to by the Investment Banker, Agent and Lenders pursuant to the immediately preceding sentence, provided that any Borrower's failure to elect to do so will not prevent Agent or any Lender from proceeding with such discussions. Borrowers shall cause the Investment Banker to maintain an appropriate data room to which Agent, Lenders, their respective counsel, and any other consultant or financial advisor engaged by Agent, or by Agent's counsel, will have unlimited access and review rights at all times.

(c)     On or before March 13, 2020, Borrowers shall have received at least one bona fide indication of interest for a Strategic Transaction from one or more prospective purchasers or investors, which indications of interest and prospective purchasers are all reasonably acceptable to Agent.

(d)     On or before April 30, 2020, Borrowers shall have received at least one letter of intent for a Strategic Transaction from bona fide prospective purchaser and Borrowers shall have authorized Borrowers' management and professionals to work expeditiously to document and close such Strategic Transaction(s).

VP/#22827544.8

(e)  On or before May 31, 2020, (i) Borrowers shall have delivered to Agent an executed copy (or copies) of the purchase agreement (or purchase agreements) related to a Strategic Transaction which purchase agreement(s) shall be in form and substance acceptable to Agent in its good faith credit judgment (including, without limitation, that such purchase agreement(s) shall include so-called "Sungard provisions" limiting the purchaser's opportunities to not proceed to closing of the Strategic Transaction), and such purchase agreement(s) shall provide for Sufficient Net Cash Proceeds to be paid to Borrowers at the closing of such Strategic Transaction, and (ii) Borrowers have delivered to Agent an updated then-current Budget, in form acceptable to Agent in its good faith credit judgment, containing line items of sufficient detail and in substantially the form attached as Exhibit B to this Agreement and showing sufficient anticipated cash receipts to cover expenses for the duration of time until the closing of the Strategic Transaction

5.4.  **Compliance with Information Requests**.  Borrowers shall provide weekly updates to and shall participate in weekly discussions with Agent and Lenders, and shall promptly comply with Agent's and Lenders' reasonable requests for information, concerning the Strategic Transaction, the Credit Parties' financial status, management, operations and Collateral in accordance with the Credit Agreement.

5.5.  **Lender-Side Consultant**.  Borrowers acknowledge and agree that Agent (or its counsel) and Lenders have the right to retain a financial advisor or a consultant (the "Lender-Side Consultant") to provide certain advisory services in connection with, among other things, the Strategic Transaction, the Credit Parties' financial status, management, operations and Collateral and that Borrowers are required to reimburse Agent for all reasonable and documented out-of-pocket costs and expenses Agent or its counsel may incur in connection with such engagement in accordance with Section 12.14(a) of the Credit Agreement.  In the event that Agent, Lenders or Agent's counsel engage a Lender-Side Consultant, (i) the Credit Parties shall provide such Lender-Side Consultant with access to all places of business, officers, consultants and employees of the Credit Parties during normal business hours, upon reasonable prior notice by Agent or the Lender-Side Consultant, and (ii) the Credit Parties shall promptly provide to such Lender-Side Consultant, at the Credit Parties' premises (or electronically, if regularly maintained in such format), such books, records, financial information concerning the Credit Parties' financial condition, businesses, assets, and liabilities as such Lender-Side Consultant may reasonably request from time to time.

5.6.  **Forbearance and Amendment Fee**.  In consideration of Agent's and Lenders' agreements set forth in this Agreement, Borrowers hereby agree to pay to Agent, for the ratable benefit of the Lenders, a fee in the amount of $200,000 (the "Forbearance and Amendment Fee"), which Forbearance and Amendment Fee shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

5.7.  **Deferred Revolving Loan Origination Fee**. In further consideration of Agent's and Lenders' agreements set forth in this Agreement, Borrowers hereby agree that in lieu of any fee otherwise due under Section 2.2(e) of the Credit Agreement, if any, there shall be a fee as compensation for the costs of Lenders being prepared to make funds available to Borrowers under the Agreement, equal to an amount determined by *multiplying* the highest Revolving Loan

8

Commitment in effect from and after the Closing Date *by* two percent (2.00%), which fee shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

5.8. **Overadvance Amendment Fee**. Agent and Lenders agree that the Overadvance Amendment Fee, as defined in and required to be paid under that certain Amendment No. 1 to Overadvance Letter between Borrowers, Agent and Lender dated as of October 22, 2019, in the amount of $50,000, shall be fully earned, due, and payable upon the earlier to occur of (i) the end of the Forbearance Period or (ii) the payment in full in cash of the other Obligations.

## SECTION 6

## REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants as of the date hereof that it has the full power and authority to execute, deliver and perform this Agreement and to incur the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate, limited liability company or limited partnership, as applicable, action. Each Credit Party hereby further represents and warrants as of the date hereof that (a) the representations and warranties made respectively by such Credit Party in the Financing Documents are true and correct in all material respects (except with respect to the Existing Defaults and to the extent that such representation or warranty relates to a specific date, in which case such representation and warranty shall be true as of such earlier date); and (b) the execution and delivery by such Credit Party of this Agreement and the performance by such Credit Part of its obligations hereunder: (i) do not and will not violate any law or regulation applicable to such Credit Party; (ii) do not and will not violate any material agreement, order, decree or judgment by which such Credit Party is bound; and (3) do not and will not violate or conflict with, result in a breach of or constitute (with notice, lapse of time, or otherwise) a default under any material agreement, mortgage, indenture or other contractual obligation to which such Credit Party is a party, or by which such Credit Party's properties are bound. Each Credit Party represents and warrants that as of the date of this Agreement, upon the effectiveness of this Agreement, except the Existing Defaults, no Default or Event of Default has occurred and is continuing.

## SECTION 7

## CONDITIONS TO EFFECTIVENESS OF CERTAIN
## PROVISIONS OF THIS AGREEMENT

The terms and provisions of this Agreement will be effective immediately upon satisfaction of the following conditions precedent:

(a) Agent's receipt of this Agreement, duly authorized, executed and delivered by each Credit Party (including, without limitation, written evidence of appropriate corporate consents and resolutions);

(b) Agent's receipt of the Forbearance Guaranty;

VP/#22827544.8

(c)      Agent's receipt of a copy of (i) the form of non-disclosure agreement ("NDA") to be executed by prospective purchasers, investors, or other Persons in connection with the Strategic Transaction, in form and substance acceptable to Agent, (ii) a detailed list of the Persons whom have executed and delivered a NDA, and (iii) a detailed list of the Persons to whom the Investment Banker has sent or intends to send the NDA;

(d)      Agent's receipt of (i) a confidential information memorandum ("CIM") relating to the Strategic Transaction, in form and substance acceptable to Agent, (ii) a detailed list of the Persons whom have received the CIM; and

(e)      Agent's receipt of all fees and other amounts payable on or prior to the closing date of this Agreement, including all attorneys', consultants' and other professionals' fees and expenses incurred by Agent or Lenders, if requested Agent.

## SECTION 8

## MISCELLANEOUS

8.1.    **Continuing Effect of Credit Agreement**.  Except as modified pursuant hereto, no other changes or modifications to the Credit Agreement or any other Financing Document are intended or implied by this Agreement and in all other respects the Credit Agreement and the other Financing Documents hereby are ratified and reaffirmed by all parties hereto as of the date hereof. To the extent of any conflict between the terms of this Agreement, the Credit Agreement and the other Financing Documents, the terms of this Agreement will govern and control.  The Credit Agreement and this Agreement will be read and construed as one agreement.

8.2.    **Costs and Expenses**.  In addition to, and without in any way limiting, the obligations of Borrowers set forth in Section 12.14 of the Credit Agreement, each Borrower absolutely and unconditionally agrees to pay to Agent, on demand by Agent at any time, whether or not all or any of the transactions contemplated by this Agreement are consummated:  all fees, costs and expenses incurred by Agent and any of its directors, officers, employees or agents (including, without limitation, fees, costs and expenses incurred of any counsel to Agent), regardless of whether Agent or any such other Person is a prevailing party, in connection with (a) the preparation, negotiation, execution, delivery or enforcement of this Agreement, the Credit Agreement, any Guarantee, the other Financing Documents and any agreements, documents or instruments contemplated hereby and thereby, and (b) any investigation, litigation or proceeding related to this Agreement, the Credit Agreement, any Guarantee or any other Financing Document or any act, omission, event or circumstance in any matter related to any of the foregoing.

8.3.    **Further Assurances**.  At Borrowers' expense, the parties hereto will execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

8.4.    **Successors and Assigns; No Third-Party Beneficiaries**.  This Agreement will be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.  No Person other than the parties hereto and, in the case of Sections 8.6 and 8.7 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-

party beneficiary rights (other than the rights of the Releasees under Sections 8.6 and 8.7 hereof) are hereby expressly disclaimed.

8.5.   **Survival of Representations, Warranties and Covenants**.  All representations, warranties, covenants and releases of each Borrower made in this Agreement or any other document furnished in connection with this Agreement will survive the execution and delivery of this Agreement, and no investigation by Agent or any Lender, or any closing, will affect the representations and warranties or the right of Agent and Lenders to rely upon them.

8.6.   **RELEASE**.

(a)   IN CONSIDERATION OF THE AGREEMENTS OF AGENT AND LENDERS CONTAINED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, EACH CREDIT PARTY, ON BEHALF OF ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER SUBSIDIARIES, DIVISIONS AND PREDECESSORS (EACH CREDIT PARTY AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "RELEASING PARTIES" AND INDIVIDUALLY AS A "RELEASING PARTY"), HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY RELEASES, REMISES AND FOREVER DISCHARGES AGENT, EACH LENDER, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR RESPECTIVE PRESENT AND FORMER SUBSIDIARIES, DIVISIONS, PREDECESSORS, OFFICERS, DIRECTORS, EMPLOYEES, TRUSTEES, AGENTS, INVESTMENT ADVISORS AND INVESTMENT MANAGERS, COLLATERAL MANAGERS, SERVICERS, AND COUNSEL (AGENT, LENDERS AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "RELEASEES" AND INDIVIDUALLY AS A "RELEASEE"), OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, DAMAGES AND ANY AND ALL OTHER CLAIMS, COUNTERCLAIMS, DEFENSES, RIGHTS OF SET-OFF, DEMANDS AND LIABILITIES WHATSOEVER (INDIVIDUALLY, A "CLAIM" AND COLLECTIVELY, "CLAIMS") OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, AT LAW OR IN EQUITY, WHICH ANY RELEASING PARTY OR ANY OF ITS SUCCESSORS, ASSIGNS, OR OTHER LEGAL REPRESENTATIVES MAY NOW OR HEREAFTER OWN, HOLD, HAVE OR CLAIM TO HAVE AGAINST THE RELEASEES OR ANY OF THEM FOR, UPON, OR BY REASON OF ANY CIRCUMSTANCE, ACTION, CAUSE OR THING WHATSOEVER WHICH ARISES AT ANY TIME ON OR PRIOR TO THE DATE OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, FOR OR ON ACCOUNT OF, OR IN RELATION TO, OR IN ANY WAY IN CONNECTION WITH THIS AGREEMENT, THE CREDIT AGREEMENT, ANY OF THE OTHER FINANCING DOCUMENTS OR ANY OF THE TRANSACTIONS HEREUNDER OR THEREUNDER. RELEASING PARTIES HEREBY REPRESENT TO THE RELEASEES THAT THEY HAVE NOT ASSIGNED OR TRANSFERRED ANY INTEREST IN ANY CLAIMS AGAINST ANY RELEASEE PRIOR TO THE DATE HEREOF.

(b)   EACH CREDIT PARTY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE RELEASE SET FORTH ABOVE MAY BE PLEADED AS A FULL AND COMPLETE DEFENSE TO ANY CLAIM AND MAY BE USED AS A BASIS FOR AN

11

INJUNCTION AGAINST ANY ACTION, SUIT OR OTHER PROCEEDING WHICH MAY BE INSTITUTED, PROSECUTED OR ATTEMPTED IN BREACH OF THE PROVISIONS OF SUCH RELEASE.

(c)     EACH CREDIT PARTY AGREES THAT NO FACT, EVENT, CIRCUMSTANCE, EVIDENCE OR TRANSACTION WHICH COULD NOW BE ASSERTED OR WHICH MAY HEREAFTER BE DISCOVERED WILL AFFECT IN ANY MANNER THE FINAL, ABSOLUTE AND UNCONDITIONAL NATURE OF THE RELEASE SET FORTH ABOVE.

8.7.    **COVENANT NOT TO SUE**.    EACH RELEASING PARTY HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY COVENANTS AND AGREES WITH AND IN FAVOR OF EACH RELEASEE THAT IT WILL NOT SUE (AT LAW, IN EQUITY, IN ANY REGULATORY PROCEEDING OR OTHERWISE) ANY RELEASEE ON THE BASIS OF ANY CLAIM RELEASED, REMISED AND DISCHARGED BY ANY RELEASING PARTY PURSUANT TO SECTION 8.6 ABOVE.  IF ANY RELEASING PARTY VIOLATES THE FOREGOING COVENANT, EACH CREDIT PARTY, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER MEMBERS, MANAGERS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, DIVISIONS, PREDECESSORS, DIRECTORS, OFFICERS, ATTORNEYS, EMPLOYEES, AGENTS, LEGAL REPRESENTATIVES AND OTHER REPRESENTATIVES, AGREES TO PAY, IN ADDITION TO SUCH OTHER DAMAGES AS ANY RELEASEE MAY SUSTAIN AS A RESULT OF SUCH VIOLATION, ALL ATTORNEYS' FEES AND COSTS INCURRED BY ANY RELEASEE AS A RESULT OF SUCH VIOLATION.

8.8.    **Severability**.    Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable will not impair or invalidate the remainder of this Agreement.

8.9.    **Reviewed by Attorneys**.    Each Credit Party represents and warrants to Agent and Lenders that it (a) understands fully the terms of this Agreement and the consequences of the execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement with, and have this Agreement reviewed by, such attorneys and other persons as such Credit Party may wish, and (c) has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto will be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

8.10.    **Disgorgement**.    If Agent or any Lender is, for any reason, compelled by a court or other tribunal of competent jurisdiction to surrender or disgorge any payment, interest or other consideration described hereunder to any person because the same is determined to be void or voidable as a preference, fraudulent conveyance, impermissible set-off or for any other reason, such indebtedness or part thereof intended to be satisfied by virtue of such payment, interest or other consideration will be revived and continue as if such payment, interest or other consideration

had not been received by Agent or such Lender, and Borrowers will be liable to, and will indemnify, defend and hold Agent or such Lender harmless for, the amount of such payment or interest surrendered or disgorged. The provisions of this Section will survive repayment of the Obligations or any termination of the Credit Agreement or any other Financing Document.

8.11. **Tolling of Statute of Limitations**. Each and every statute of limitations or other applicable law, rule or regulation governing the time by which Agent must commence legal proceedings or otherwise take any action against any Credit Party with respect to any breach or default that exists on or prior to the expiration or termination of the Forbearance Period and arises under or in respect of the Credit Agreement or any other Financing Document shall be tolled during the Forbearance Period. Each Credit Party agrees, to the fullest extent permitted by law, not to include such period of time as a defense (whether equitable or legal) to any legal proceeding or other action by Agent in the exercise of its rights or remedies referred to in the immediately preceding sentence.

8.12. **Relationship**. Each Credit Party agrees that the relationship between Agent and such Credit Party and between each Lender and Credit Party is that of creditor and debtor and not that of partners or joint venturers. This Agreement does not constitute a partnership agreement, or any other association between Agent and any Credit Party or between any Lender and any Credit Party. Each Credit Party acknowledges that Agent and each Lender has acted at all times only as a creditor to such Credit Party within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Agent or any Lender attempted to exercise any control over such Credit Party or its business or affairs. Each Borrower further acknowledges that Agent and each Lender has not taken or failed to take any action under or in connection with its respective rights under the Credit Agreement or any of the other Financing Documents that in any way or to any extent has interfered with or adversely affected such Borrower's ownership of Collateral.

8.13. **No Effect on Rights Under Subordination Agreements**. Agent's agreement pursuant to Section 3.2 of this Agreement shall not extend to any of Agent's rights or remedies under any Subordination Agreement in favor of Agent governing the Subordinated Debt which may arise as a result of the Existing Defaults, it being understood that the Existing Defaults shall at all times constitute Events of Default for purposes of any applicable Subordination Agreement in favor of Agent, and Agent shall at all times be permitted to enforce all rights and remedies in respect thereof (including, without limitation, blocking payments to any holders of Subordinated Debt in accordance with the Subordination Agreement).

8.14. **Governing Law; Submission to Jurisdiction**. THIS AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING GOVERNING LAW AND SUBMISSION TO JURISDICTION SET FORTH IN SECTION 12.8 OF THE CREDIT AGREEMENT, AND SUCH PROVISIONS ARE HEREBY INCORPORATED HEREIN BY THIS REFERENCE, MUTATIS MUTANDIS.

8.15. **Waivers**.

(a) **Mutual Waiver of Jury Trial**. THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE

13

BETWEEN AGENT OR ANY LENDER AND ANY BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR THE CREDIT AGREEMENT OR THE OTHER FINANCING DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

(b)     **Waivers by Borrowers**.  Borrowers hereby waive any rights any Borrower may have upon payment in full of the Obligations to require Agent to terminate its security interest in the Collateral, other collateral or in any other property of any Borrower until termination of the Credit Agreement in accordance with its terms and the execution by each Borrower of an agreement indemnifying Agent from any loss or damage Agent may incur as the result of dishonored checks or other items of payment received by Agent from any Borrower or any account debtor and applied to the obligations and releasing and indemnifying, in the same manner as described in Section 8.6 of this Agreement, the Releasees from all claims arising on or before the date of such termination.  Borrowers acknowledge that the foregoing waiver is a material inducement to Agent in entering into this Agreement and that Agent is relying upon the foregoing waiver in its future dealings with Borrowers.

8.16.   **Counterparts**.  This Agreement may be executed and delivered via facsimile or email (in .pdf format) transmission with the same force and effect as if an original were executed and may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

[*signatures on following page*]

14

IN WITNESS WHEREOF, this Agreement is executed and delivered as of the day and year first above written.

**BORROWERS:**

**EXAMINATION MANAGEMENT SERVICES, INC.**, a Nevada corporation

By: _____
William Keys
Chief Financial Officer

**EMSI HOLDING COMPANY**, a Delaware corporation

By: _____
William Keys
Chief Financial Officer

**EMSI ACQUISITION, INC.**, a Delaware corporation

By: _____
William Keys
Chief Financial Officer

**GUARANTORS:**

**BEECKEN PETTY O'KEEFE FUND IV, L.P.**, a Delaware limited partnership

By: _____
Troy Phillips
Partner

**BEECKEN PETTY O'KEEFE FUND IV-A, L.P.**, a Delaware limited partnership

By: _____
Troy Phillips
Partner

[Signatures continue on following page.]

**AGENT AND LENDER:**

**MIDCAP FUNDING IV TRUST**, a Delaware
statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

    By:  Apollo Capital Management GP, LLC
    Its:   General Partner


    By: _____
        Maurice Amsellem
        Authorized Signatory

**EXHIBIT A**
TO
**FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND
SECURITY AGREEMENT**

**Existing Events of Default**

1. An Event of Default under Section 10.1(a)(iii) of the Credit Agreement as a result of Borrowers failure to satisfy the financial covenant set forth in Section 6.3 of the Credit Agreement in that they failed to not permit the Senior Net Leverage Ratio for the Defined Period ending November 30, 2019, to be greater than 5.00 to 1.00.

2. An Event of Default under Section 10.1(b) of the Credit Agreement as a result of Borrowers failure to give notice of the above described default in accordance with Section 4.9 (Notice of Litigation and Defaults) of the Credit Agreement.

3. An Event of Default under Section 10.1(a)(iii) of the Credit Agreement as a result of Borrowers failure to satisfy the financial covenants set forth in Section 6.2 of the Credit Agreement in that they failed to not permit the Fixed Charge Coverage Ratio Ratio for the Defined Period ending December 31, 2019, to be less than 1.10 to 1.00 and Section 6.3 of the Credit Agreement in that they failed to not permit the Senior Net Leverage Ratio for the Defined Period ending December 31, 2019, to be greater than 5.00 to 1.00.

2. An Event of Default under Section 10.1(b) of the Credit Agreement as a result of Borrowers failure to give notice of the above described defaults in accordance with Section 4.9 (Notice of Litigation and Defaults) of the Credit Agreement.

**<u>EXHIBIT B</u>**
**TO**
**FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO CREDIT AND
SECURITY AGREEMENT**

**<u>Budget</u>**

[See Attached]

**EMSI Consolidated**
**Thirteen Week Cash Flow**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total for the 13 week period | Total For Prior 13 week period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | | | | | | | | | | | | | | | |
| Week Beginning Date | | 24-Feb-20 | 2-Mar-20 | 9-Mar-20 | 16-Mar-20 | 23-Mar-20 | 30-Mar-20 | 6-Apr-20 | 13-Apr-20 | 20-Apr-20 | 27-Apr-20 | 4-May-20 | 11-May-20 | 18-May-20 | | |
| Week Ending Date | | 1-Mar-20 | 8-Mar-20 | 15-Mar-20 | 22-Mar-20 | 29-Mar-20 | 5-Apr-20 | 12-Apr-20 | 19-Apr-20 | 26-Apr-20 | 3-May-20 | 10-May-20 | 17-May-20 | 24-May-20 | | |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| Insurance | | 2,135,719 | 2,257,787 | 2,346,366 | 1,917,717 | 1,104,489 | 2,559,855 | 1,166,439 | 1,204,957 | 1,614,743 | 2,211,530 | 1,193,471 | 1,304,021 | 1,684,898 | 22,701,990 | 22,653,789 |
| Employer Services | | 1,428,728 | 790,762 | 313,555 | 868,934 | 1,733,168 | 232,836 | 463,608 | 277,977 | 1,605,696 | 249,709 | 182,527 | 546,834 | 292,298 | 8,986,632 | 7,086,061 |
| Health Plan Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | 1,058 | - | - | - | - | - | - | - | - | - | - | - | - | 1,058 | (19) |
| Total Operating Receipts | A | 3,565,504 | 3,048,549 | 2,659,921 | 2,786,652 | 2,837,657 | 2,792,691 | 1,630,047 | 1,482,934 | 3,220,439 | 2,461,239 | 1,375,997 | 1,850,855 | 1,977,196 | 31,689,679 | 29,739,831 |
| | | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Payroll - Admin & Exam | | 1,510,949 | 28,470 | 1,387,253 | - | 1,189,253 | 223,076 | 1,195,270 | 267,691 | 1,190,660 | 220,891 | 1,189,583 | 220,891 | 1,179,462 | 9,803,451 | |
| Payroll Taxes | | 206,245 | 3,886 | 189,360 | - | 162,333 | 30,450 | 163,154 | 36,540 | 162,525 | 30,152 | 162,378 | 30,152 | 160,997 | 1,338,171 | |
| Payroll and Benefits | B | 1,717,193 | 32,356 | 1,576,613 | - | 1,351,586 | 253,526 | 1,358,425 | 304,231 | 1,353,185 | 251,043 | 1,351,962 | 251,043 | 1,340,459 | 11,141,622 | 10,088,441 |
| Medical Insurance Funding | | 81,763 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,148 | 76,682 | 78,821 | 78,821 | 78,821 | 1,004,091 | 1,005,606 |
| 401k | | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 39,075 | - | 234,449 | 290,880 |
| Healthcare Providers - Pro | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contractor (1099) | | 882,011 | - | 778,318 | - | 753,757 | - | 904,509 | - | 920,404 | - | 920,404 | - | - | 5,159,403 | 5,168,984 |
| Federal, State, City Taxes | | - | - | - | - | 8,000 | - | - | - | - | - | 140,000 | - | - | 148,000 | 6,470 |
| Sales Taxes | | - | 28,500 | - | - | 28,500 | - | - | - | - | - | - | - | - | 85,500 | 74,877 |
| Medical Records Fee | | 743,953 | 426,717 | 526,717 | 726,717 | 526,717 | 521,456 | 517,948 | 517,948 | 317,948 | 518,693 | 421,669 | 521,669 | 521,669 | 6,809,824 | 7,277,773 |
| Postage Meters | | 500 | 500 | 26,000 | 500 | 500 | 500 | 500 | 26,000 | 500 | 500 | 500 | 500 | 500 | 57,500 | 73,159 |
| Travel & Expenses Reimbursement | | 27,934 | 27,831 | 27,269 | 27,079 | 26,461 | 26,240 | 26,225 | 26,406 | 27,664 | 26,364 | 27,807 | 30,334 | 29,299 | 356,913 | 379,287 |
| Rent | | 180,114 | - | - | 180,114 | - | - | - | 180,114 | - | - | - | - | - | 540,343 | 656,111 |
| Other Operating Disbursements | | 458,620 | 498,569 | 422,591 | 374,229 | 379,822 | 334,568 | 387,077 | 381,638 | 339,480 | 359,731 | 275,537 | 322,093 | 399,841 | 4,934,698 | 5,207,585 |
| Total Operating Disbursements | | 4,092,089 | 1,129,696 | 3,433,656 | 1,423,862 | 2,361,234 | 2,041,770 | 2,367,223 | 2,456,070 | 2,114,926 | 2,192,493 | 2,156,296 | 2,303,939 | 2,399,089 | - | 30,472,343 | 30,229,176 |
| Net Operating Cash Flow | | (526,585) | 1,918,853 | (773,735) | 1,362,789 | 476,423 | 750,921 | (737,176) | (973,136) | 1,105,512 | 268,746 | (780,298) | (453,084) | (421,893) | 1,217,336 | (489,344) |
| | | | | | | | | | | | | | | | | |
| **Non-Operating Receipts (Disbursements)** | | | | | | | | | | | | | | | | |
| Term Interest and Principal Payments | | | (25,693) | - | - | - | (25,693) | - | - | - | (24,837) | - | - | - | (76,223) | (174,215) |
| Revolver Interest Payments | | | (106,609) | - | - | - | (113,167) | - | - | - | (109,888) | - | - | - | (329,664) | (360,465) |
| Professional Firm Payments | | (16,000) | - | - | - | (16,000) | - | - | - | (16,000) | - | - | - | (48,000) | (49,946) |
| CapEx | B | | - | - | - | - | - | - | - | - | (50,000) | - | - | - | (50,000) | (132,913) |
| Other Non-Operating Disbursement | C | | - | - | - | - | - | - | - | - | - | - | - | - | - | (75,192) |
| Other Non-Operating Receipt | | | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Total Non-Operating Receipts (Disbursements) | | (16,000) | (132,302) | 0 | 0 | 0 | (154,861) | 0 | 0 | 0 | (200,725) | 0 | 0 | 0 | (503,888) | (792,732) |
| Net Cash Flow | | (542,585) | 1,786,551 | (773,735) | 1,362,789 | 476,423 | 596,060 | (737,176) | (973,136) | 1,105,512 | 68,021 | (780,298) | (453,084) | (421,893) | 713,449 | (1,282,076) |
| | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | D | (506,645) | | | | | | | | | | | | | (506,645) | 66,709 |
| Adjusted Net Cash Flow | | (542,585) | 1,786,551 | (773,735) | 1,362,789 | 476,423 | 596,060 | (737,176) | (973,136) | 1,105,512 | 68,021 | (780,298) | (453,084) | (421,893) | 713,449 | (1,282,076) |
| Revolver Draw/(Payment) | E | 1,049,230 | (1,786,551) | 773,735 | (1,362,789) | (476,423) | (596,060) | 737,176 | 973,136 | (1,105,512) | (68,021) | 780,298 | 453,084 | 421,893 | (206,804) | 686,915 |
| Sponsor Funding Draw | | | | | | | | | | | | | | | | |
| Ending Cash Balance | | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | (528,453) |
| | | | | | | | | | | | | | | | | |
| Ending Revolver Balance | E | 18,623,477 | 16,836,926 | 17,610,661 | 16,247,872 | 15,771,449 | 15,175,389 | 15,912,566 | 16,885,702 | 15,780,189 | 15,712,168 | 16,492,466 | 16,945,550 | 17,367,443 | | |
| Ending Sponsor Funding Balance | F | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Total Ending Availability | | 132,092 | 1,200,342 | 34,022 | 657,217 | 589,978 | 675,311 | 408,604 | 30,983 | 313,359 | 147,773 | 184,150 | 30,910 | 235,862 | - | |

Notes:
A   The timing of receipts are based on historical customer payment days and divisional DSO. Manual adjustments are made for known one-time payments or credits.
B   The CapEx total amounts shown under the Non-Operating Receipts (Disbursements) section relate only to capital expenditures paid to external vendors CDW. Capitalized software development costs are captured as part of the payroll and benefits total.
C   Other Non-Operating disbursements include estimates for severance payments.
D   The beginning cash balance shown is a roll forward based on the actual book balance as at the most recently reconciled month-end. As such, month-end cash adjustments, such as reversing entries for voided checks, are not captured in the roll forward.
E   The model assumes cash dominion by Wells Fargo and sufficient borrowing availability during the periods shown based on revised availability limits under the Amendment to the Credit Agreement.
E   The Sponsor Funding Balance no longer includes the proceeds from the sale of the Waco location.